## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL GOODWIN,** | : | **CIVIL ACTION** |
| | : | |
| | : | **NO: _____** |
| **PLAINTIFF** | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, CAPTAIN** | : | **FORMERLY** |
| **JAMES CLARK, DETECTIVE JAMES** | : | **COURT OF COMMON PLEAS** |
| **PITTS, DETECTIVE THOMAS GAUL,** | : | **TRIAL DIVISION—CIVIL** |
| **DETECTIVE GEORGE PIRRONE &** | : | |
| **DETECTIVE JOHN VERRECCHIO** | : | **OCTOBER TERM, 2023** |
| | : | **NO. 2233** |
| **DEFENDANTS.** | : | |
| | : | **JURY TRIAL DEMANDED** |

### NOTICE OF REMOVAL

**To the Honorable Judges of the United States District Court for the Eastern District of Pennsylvania.**

Pursuant to 28 U.S.C. § 1441, Defendant, the City of Philadelphia (the "City" or "Petitioner"), through its undersigned counsel, respectfully petitions for the removal of this action to the United States District Court for the Eastern District of Pennsylvania.  In support thereof, Petitioner states the following:

1.      On October 22, 2023, Plaintiff Chrsitopher Goodwin ("Plaintiff"), initiated this action by complaint in the Court of Common Pleas in Philadelphia, October Term, 2023; No. 2233. (A true and correct copy of the Complaint is attached hereto at Exhibit "A.")

2.      The Complaint names as defendants the City, Captain James Clark, Detective Pitts, Detective Thomas Gaul, Detective George Pirrone, and Detective John Verrecchio.

3.      The City learned of the Complaint when it received a courtesy copy of the Motion

for Alternative Service filed by Plaintiff, which was sent on November 21, 2023 and received by the City on November 27, 2023; the City has not been served with the Complaint. (A true and correct copy of the Motion for Alternative Service and mailing label is attached hereto at Exhibit "B.")

4.      The City has determined based on additional investigation that no defendant has been served with a copy of the Complaint as of this filing.[1]

5.      At Count VII of the Complaint, Plaintiff seeks relief against the City pursuant to 42 U.S.C. § 1983 for alleged deprivations of Decedent's rights protected by the Constitution of the United States.[2] (*See* Exhibit A.)

6.      28 U.S.C. § 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

7.      The United States District Court for the Eastern District of Pennsylvania has original jurisdiction over the claim alleged by Plaintiff pursuant to 28 U.S.C. § 1331.

8.      True and correct copies of this Notice of Removal with accompanying exhibits and separate Notice to State Court of Filing of Notice of Removal, a copy of which is attached hereto at Exhibit "C," will be served upon the Plaintiff and filed with the Office of Judicial Records of the Court of Common Pleas of Philadelphia County, Pennsylvania, in accordance with the provisions of 28 U.S.C. § 1446(d).

9.      In filing this Notice of Removal, Petitioner does not waive any available defenses in this action.

---

[1] The below signed counsel reviewed the docket and confirmed that no affidavits of service have been filed. Additionally, the below signed counsel conferred with Plaintiff's counsel on the afternoon of November 29, 2023 just prior to this filing regarding the status of service, and was informed that service had not yet been effectuated on any defendant (including pursuant to the Philadelphia Court of Common Pleas' order on Plaintiff's Motion for Alternative Service dated November 22, 2023).
[2] Counts I, II, IV, V and VI also assert claims pursuant to 42 U.S.C. § 1983.

**WHEREFORE,** Petitioner, City of Philadelphia, respectfully requests that the captioned

Complaint be removed to the United States District Court for the Eastern District of Pennsylvania.

Respectfully submitted,

BY:     /s/ Bailey E. Axe
Bailey E. Axe
Deputy City Solicitor
PA Attorney I.D. 309686
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5443
(215) 683-5397 (fax)
bailey.axe@phila.gov

Date:  November 29, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| MICHAEL GOODWIN, | : | CIVIL ACTION |
| | : | |
| | : | NO: _____ |
| **PLAINTIFF** | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, CAPTAIN | : | **FORMERLY** |
| JAMES CLARK, DETECTIVE JAMES | : | **COURT OF COMMON PLEAS** |
| PITTS, DETECTIVE THOMAS GAUL, | : | **TRIAL DIVISION—CIVIL** |
| DETECTIVE GEORGE PIRRONE & | : | |
| DETECTIVE JOHN VERRECCHIO | : | **OCTOBER TERM, 2023** |
| | : | **NO. 2233** |
| **DEFENDANTS.** | : | |
| | : | **JURY TRIAL DEMANDED** |

---

## NOTICE OF FILING OF REMOVAL

TO:   Alan Tauber, Esq.
        Jon Cioschi, Esq.
        Wiseman & Schwartz, LLP
        718 Arch Street, Suite 702N
        Philadelphia, PA 19106

**PLEASE TAKE NOTICE THAT** on November 29, 2023, Defendant City of Philadelphia filed, in the office of the Clerk of the United States District Court for the Eastern District of Pennsylvania, a verified Notice of Removal.

A copy of this Notice of Removal is attached hereto and is also being filed with the Clerk of the Court of Common Pleas of Philadelphia County, pursuant to Title 28, United States Code, Section 1446(e).

                                         */s/ Bailey Axe*
                                         Bailey Axe
                                         Deputy City Solicitor
                                         City of Philadelphia Law Department
                                         1515 Arch Street, 14th Floor

Philadelphia, PA 19102
(215) 683-5443
(215) 683-5397 (fax)
bailey.axe@phila.gov

*Attorney for Defendant City of Philadelphia*

# EXHIBIT A

**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**COURT OF COMMON PLEAS OF PHILADELPHIA**

*Filed and Attested by the
Office of Judicial Records
22 OCT 2023 10:13 pm
C. SMITH*

CHRISTOPHER GOODWIN,

    Plaintiff,

    v.

CITY OF PHILADELPHIA,
CAPTAIN JAMES CLARK,
DETECTIVE JAMES PITT,
DETECTIVE THOMAS GAUL,
DETECTIVE GEORGE PIRRONE, &
DETECTIVE JOHN VERRECHIO,

    Defendants.

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

Philadelphia Bar Association
Lawyer Referral
and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

### AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

10-284

Alan Tauber (Pa Bar No. 57353)
Jon Cioschi (Pa Bar No. 318793)
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702N
Philadelphia, Pa. 19106
(215) 360-3988
atauber@atauberlaw.com
cioschi@wisemanschwartz.com

Counsel for Plaintiff
Christopher Goodwin

_____

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | |
| | : | |
| Plaintiff, | : | COURT OF COMMON PLEAS |
| | : | CIVIL TRIAL DIVISION |
| v. | : | |
| | : | October Term, 2023 |
| City of Philadelphia, Captain James | : | |
| Clark, Detective James Pitts, | : | No. _____ |
| Detective Thomas Gaul, Detective | : | |
| George Pirrone, & Detective John | : | JURY TRIAL DEMANDED |
| Verrecchio, | : | |
| | : | **COMPLAINT** |
| Defendants. | : | |
| | : | |

_____

### Introduction

Plaintiff Christopher Goodwin lost eleven years, six months, and fifteen days of his life to incarceration because he was wrongfully convicted for the murder of Dwayne Isaacs.

Mr. Goodwin was innocent, and spent his twenty-first through his thirty-second birthdays behind bars because Philadelphia Police Detectives John Verrecchio, Thomas Gaul, George Pirrone, and James Pitts illegally detained two purported witnesses for over twelve hours and, through various coercive means ranging from choking one witness to threatening to charge both with Mr. Isaac's murder, forced them to falsely identify Mr. Goodwin as Mr. Isaac's killer.

These detectives proceeded to conceal their violent, abusive tactics and fabrications, leading to the wrongful prosecution and conviction of Mr. Goodwin, who was exonerated and released from prison on February 16, 2023 after prosecutors admitted that evidence of Detective

1

Case ID: 231002233

Pitts' lengthy history of serious misconduct was concealed from Mr. Goodwin, and after prosecutors concluded that no reliable evidence connected Mr. Goodwin to Mr. Isaac's killing. Neither physical evidence nor any non-coerced, non-fabricated witness statements of Mr. Goodwin's guilt was presented at his trial.  Nor does any exist.

Those egregious and costly violations of Mr. Goodwin's constitutional rights were not simply a product of a few bad officers gone rogue.  They were the result of the City of Philadelphia's longstanding policy, practice, or custom of coercing fabricated witness statements and confessions, and concealing the truth about these statements and how they were obtained—a tool that Philadelphia homicide detectives used for decades to secure scores of wrongful arrests and convictions.

Mr. Goodwin brings this suit to obtain a measure of justice from the City of Philadelphia, former Homicide Unit Captain Clark, Detectives Gaul, Pirrone, and Verrecchio, and former Detective Pitts for the irreversible wrongs they perpetrated against him.

### Parties

1.     Plaintiff Christopher Goodwin is, and at all times relevant to this Complaint was, a resident of Philadelphia, Pennsylvania.

2.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania.  It owns, operates, manages, directs, and controls the Philadelphia Police Department (PPD), which, at all times relevant to this complaint, employed defendants James Clark, James Pitts, Thomas Gaul, John Verrecchio, and George Pirrone.

3.     Defendant James Pitts was at all relevant times employed as a detective with the PPD.[1]  He is sued in his individual capacity.

---

[1] Defendant Pitts was fired from the PPD and is now awaiting trial in the Philadelphia County Court of Common Pleas on two counts of perjury (18 Pa.C.S. § 4902) and three counts of obstructing the administrative of law or other governmental function (18 Pa.C.S. § 5101) for

Case ID: 231002233

4.      Defendant Thomas Gaul was at all relevant times employed as a detective with the PPD.  He is sued in his individual capacity.

5.      Defendant John Verrecchio was at all relevant times employed as a sergeant with the PPD.  He is sued in his individual capacity.

6.      Defendant George Pirrone was at all relevant times employed as a sergeant with the PPD.  He is sued in his individual capacity.

7.      Defendant James Clark was at all relevant times employed as a captain with the PPD.  He is sued in his individual capacity.

8.      At all times relevant to this Complaint, all defendants acted in concert and conspiracy.

9.      All defendants are jointly and severally liable for the injuries and damages suffered by Plaintiff as set forth in this Complaint.

## Statement of Facts

**The June 25, 2011 Shooting of Lekirr Brown,
and the Retaliatory Murder of Dwayne Isaacs on June 26, 2011**

10.     On June 24, 2011, Lekirr Brown was shot in the face in his home in South Philadelphia in the Wilson Park Homes.

11.     Mr. Brown was rushed to the hospital and suffered serious injuries.

12.     Rumors in the community implicated Rahsul Isaacs in Mr. Brown's shooting.

13.     Rahsul Isaacs was Dwayne Isaacs' nephew.

14.     In the hours following the shooting, Dwayne Isaacs asked Lekirr Brown's father, Leroy Brown, how Lekirr was faring.

---

violently interrogating Obina Onyiah to secure Onyiah's false confession to a robbery and homicide and subsequently lying about that interrogation at Onyiah's pretrial motions hearing and jury trial.  *See generally Com. v. James Pitts*, CP-51-CR-0004729-2022 (Phila. Ct. Com. Pl.). Onyiah was exonerated in May 2021.

3

Case ID: 231002233

15.     Outraged that the father of the man who was rumored to have shot his son would ask him such a question, Leroy Brown cursed Dwayne Isaacs out, threatened to "fuck" him up for saying that, and told him he "better watch his back."

16.     Then, just after midnight on June 26, 2011, Dwayne Isaacs was tragically shot to death near a circle of benches in a park in the Wilson Park Homes.

17.     Within hours, the word among Wilson Park residents was that Leroy Brown had shot Dwayne Isaacs.

**Despite His Innocence, Plaintiff Christopher Goodwin
Is Falsely Implicated as Dwayne Isaacs' Killer
Through the Abusive and Deceitful Tactics of Philadelphia Homicide Detectives**

18.     In the hours leading up to Dwayne Isaacs' killing, Mr. Goodwin was spending time with his community at a child's birthday party in a park nearby Wilson Park.

19.     At about 10:00 PM, after the birthday party ended and the park was cleaned, Mr. Goodwin and other partygoers went to the steps outside of Rayetta Hawkins' house at 2620 Jackson Street.

20.     There, Mr. Goodwin and his friends drank and shared laughs and stories, until they heard shots ring out nearby after midnight, prompting them to seek shelter.

21.     They later learned that the shots were the sounds of Dwayne Isaacs being killed.

22.     Moments after Dwayne Isaacs was killed, the PPD's Homicide Unit was deployed to investigate, with Defendant Verrecchio as the lead, or assigned, detective.

23.     Throughout the course of this investigation, Defendant Verrecchio worked closely with other PPD Homicide Unit detectives, including Defendants Gaul, Pirrone, and Pitts.[2]

---

[2] Below, Plaintiff uses the term "cohort" to refer to Defendants Gaul, Pirrone, Pitts, and Verrecchio.

Case ID: 231002233

24.     Together, they agreed to employ, and did in fact employ, illicit tactics to close the case.

25.     To compel Andre Cunningham and Aaron Respes, two purported eyewitnesses, to sign and adopt fabricated statements falsely implicating Mr. Goodwin as Dwayne Isaacs' killer, these detectives: illegally detained them for hours on end; agreed to deprive them of necessities like sleep, food, and water; threatened to criminally prosecute them for Dwayne Isaacs' murder; and, as to Mr. Cunningham, even deployed physical abuse.

26.     To safeguard their bogus case against Mr. Goodwin, Defendants Verrecchio, Gaul, Pitts, and Pirrone concealed the truth about their methods from the prosecution, and the judiciary, as well as Mr. Goodwin and his trial attorney.

27.     Andre Cunningham was their first target.

28.     On June 20, 2011, at the behest of Defendants Verrecchio, Gaul, Pirrone, and Pitts, police illegally detained and handcuffed Andre Cunningham without lawful authority and transported him to the PPD's Homicide Unit, where he arrived at 6:00 PM.

29.     On the orders of Defendants Verrecchio, Gaul, Pirrone, and Pitts, Mr. Cunningham, who was clearly intoxicated, was locked in a small, windowless, brightly lit room, adorned only with a steel chair and table.

30.     Soon, Defendant Pitts entered the room and asked Mr. Cunningham if he knew why he was at the Homicide Unit.

31.     Mr. Cunningham replied that he did not know and that he was high.

32.     Defendant Pitts asked him where he was when Dwayne Isaacs was killed and what happened leading up to Dwayne Isaacs killing.

5

Case ID: 231002233

33.    Mr. Cunningham truthfully replied that he was on Taney Terrace, a different location, when the shooting occurred, and that he did not witness the shooting.

34.    Defendant Pitts made clear he did not believe Mr. Cunningham and told Mr. Cunningham to "stop acting stupid."

35.    To frighten Mr. Cunningham, Defendant Pitts falsely asserted that people were accusing him of killing Dwayne Isaacs.

36.    When Mr. Cunningham replied that he did not know what Defendant Pitts was talking about, Defendant Pitts pulled Mr. Cunningham's chair close to him and told Mr. Cunningham to stop playing with him.

37.    Defendant Pitts said, "You know you did it. You're going to go down for it."

38.    Mr. Cunningham replied, "You can take me down there and process me, but I can't tell you something I don't know."

39.    Defendant Pitts asked Mr. Cunningham if he thought he was "a bad ass," and Mr. Cunningham said "no, sir."

40.    Defendant Pitts grabbed Mr. Cunningham and threw him around so hard that he tore Mr. Cunningham's shirt.

41.    Defendant Pitts proceeded to choke Mr. Cunningham and said "you're going to give me the information I need to close the case."

42.    Mr. Cunningham insisted he did not witness the shooting.

43.    Defendant Pitts let go of him, and Pitts then left the room.

44.    Over the course of the next several hours, Defendant Pitts came in and out of the room with the intent of compelling Mr. Cunningham to falsely implicate Mr. Goodwin in the murder of Dwayne Isaacs.

6

Case ID: 231002233

45.   To that end, Defendant Pitts told Mr. Cunningham that if he did not start cooperating, he would be charged with Dwayne Isaacs' murder and other crimes.

46.   Likewise, Defendant Pitts made clear to Mr. Cunningham that he would not be released from the Homicide Unit until he started cooperating.

47.   Defendant Pitts also threatened to take Mr. Cunningham "in the basement" if he did not cooperate—ominously suggesting additional physical abuse awaited him if he did not give the detectives what they wanted.

48.   Later, Mr. Cunningham fell asleep on the table.  While Mr. Cunningham was sleeping, Defendant Pitts returned and threw a pile of phone books on the table to awaken and startle Mr. Cunningham.

49.   Defendant Pitts then grabbed Mr. Cunningham and pushed him against the wall.

50.   At around 10:00 PM, after Mr. Cunningham had been unlawfully detained for four hours, Defendant Pitts apprised Defendants Gaul and Verrecchio of his interactions with—and abuse—of Mr. Cunningham thus far.

51.   Equipped with this information, Defendants Gaul and Verrecchio entered the room.

52.   Defendant Gaul placed individual photos of Aaron Respes, Raheem Zachary, and Mr. Goodwin on the table.

53.   Defendant Gaul pointed to Raheem Zachary's photo and asked if Mr. Cunningham knew him.  Mr. Cunningham said he did not.

54.   Then, Defendant Gaul pointed to Mr. Goodwin's picture and asserted that he and Defendant Verrecchio were certain he knew Mr. Goodwin, and that they knew Mr. Goodwin killed Dwayne Isaacs.

7

Case ID: 231002233

55.     Defendant Gaul told Mr. Cunningham that the detectives needed him to help them out and identify Mr. Goodwin as Dwayne Isaacs' killer.

56.     Mr. Cunningham replied that he could not, because he did not see the shooting, and he did not know who did it.

57.     Mr. Cunningham said that Mr. Goodwin could not have done it, because he saw Mr. Goodwin sitting on a nearby stoop at the time of the shooting.

58.     Defendant Gaul said he could not help Mr. Cunningham, that he would be stuck at the Homicide Unit unless he did what they wanted him to do, and then left the room,  slamming the door on his way out.

59.     For hours on end, Defendants Gaul and Verrecchio continued returning to the room and demanding Mr. Cunningham cooperate—that is, identify Mr. Goodwin as the murderer, or remain detained at the Homicide Unit.

60.     Like Defendant Pitts, they also threatened him with criminal charges—including prosecution for Dwayne Isaacs' murder—if he did not give them what they wanted.

61.     At one point, they offered him food, and he accepted their offer, but they intentionally never gave him anything to eat.

62.     They also never offered him anything to drink.

63.     Then, around 1:30 PM on July 21st, after Mr. Cunningham had been illegally detained at the Homicide Unit for over nineteen hours and subjected to a litany of coercive tactics, his will was finally broken.

64.     Defendant Gaul again told Mr. Cunningham that they knew Mr. Goodwin killed Dwayne Isaacs and that Defendants needed his help.

Case ID: 231002233

65.     Out of fear of what they would do to him if he did not, as they said, cooperate with them, Mr. Cunningham felt compelled to go along with the false story that Defendants had crafted, one that misidentified Mr. Goodwin as Dwayne Isaacs' killer, and one that created the misimpression that Defendants had treated him well during the course of his brutal interrogation.

66.     Accordingly, Mr. Cunningham involuntarily assented to a false statement implicating Mr. Goodwin in the murder and stating or otherwise implying that Defendants Gaul, Verrecchio, Pirrone, and Pitts had not employed abusive and coercive tactics against him.

67.     For instance, the statement falsely indicated:

  a. that Mr. Cunningham had been at the Homicide Unit for nearly one day "due to unrelated murder investigations," when the truth was that Defendants held him there for that duration as a coercive tactic;

  b. that Mr. Cunningham had the opportunity to eat, drink, and rest and felt well physically; and

  c. that no one from PPD or the Homicide Unit "threatened" him or "promised" him anything "to give this interview," and that Mr. Cunningham had cooperated with Defendants voluntarily.

68.     After typing the false statement, Defendant Gaul mockingly asked Mr. Cunningham if he was hungry.

69.     Mr. Cunningham said he was.

70.     Defendant Gaul printed out the statement and told Mr. Cunningham they needed him to sign and initial it.

71.     Recalling Defendants' threats, abuse, and unlawful detention of him, Mr. Cunningham believed the only way they would stop was if he did as Defendant Gaul demanded.

9

Case ID: 231002233

72.    So, Mr. Cunningham signed and initialed the statement and falsely identified Mr. Goodwin as the shooter both in a typed statement and in handwriting on a photo of Mr. Goodwin.

73.    Then, at approximately 3:00 PM on July 21st, Defendant Gaul handed him $15 and released him from the Homicide Unit, following a nineteen-and-a-half-hour unlawful and torturous detention and interrogation.

74.    It was not long before Defendants Gaul, Verrecchio, Pirrone, and Pitts again deployed their abusive and dishonest tactics.

75.    Approximately three hours after Mr. Cunningham's release, and at the behest of Defendants Verrecchio, Gaul, Pirrone, and Pitts, police detained and handcuffed Aaron Respes without lawful authority and transported him to the PPD's Homicide Unit.

76.    There, on the orders of Defendants Verrecchio, Gaul, Pirrone, and Pitts, he was locked in a small, windowless room, much like the room to which Mr. Cunningham was confined.

77.    Defendants Gaul, Pirrone, and Pitts took the lead in interrogating Mr. Respes.

78.    Soon after Mr. Respes arrived at the Homicide Unit, Defendants Gaul and Pirrone entered the room where he was detained.

79.    Defendant Gaul told Mr. Respes that he had already spoken with Mr. Cunningham, and Cunningham said Mr. Respes was present when Isaacs was killed.

80.    Defendant Gaul indicated that he already knew what happened to Dwayne Isaacs and that Mr. Respes needed to help the detectives with the investigation into Isaacs' killing.

81.    Defendant Gaul told Mr. Respes that if he did not comply, he would be in serious trouble.

Case ID: 231002233

82.     Mr. Respes truthfully told Defendants Gaul and Pirrone that he did not know what happened, that he did not know who shot and killed Dwayne Isaacs, and that all he could say was the shooter had a beard and dark skin, based on the extremely quick glance he got of the shooting.

83.     Defendants Gaul and Pirrone left the room.

84.     To foster the impression that Mr. Respes would be detained indefinitely and be in legal trouble if he did not comply with their demands, Defendants Gaul and Pirrone waited hours until they returned.

85.     In the meantime, Mr. Respes could not, and did not, sleep.

86.     That was the result that Defendants Gaul, Pitts, and Pirrone wanted by intentionally doing nothing to help Mr. Respes feel comfortable enough to sleep, knowing that sleep deprivation would weaken Mr. Respes' will to resist their coercive tactics.

87.     When Defendants Gaul and Pirrone finally did return, this time accompanied by Defendant Pitts,[3] Mr. Respes asked them if he could leave.

88.     They said he could not.

89.     They falsely told him he was going to be charged with conspiracy to murder Dwayne Isaacs.

90.     Then, Defendant Gaul read Mr. Respes his *Miranda*[4] rights, to create the false impression in Mr. Respes' mind that they were serious about charging him.

91.     To that end as well, Defendants Gaul, Pirrone, and Pitts told Mr. Respes that he would be sent to Curran-Fromhold Correctional Facility, a/k/a CFCF, a maximum-security prison in Philadelphia, and that he would never see his mother again.

---

[3] Before returning with Defendant Pitts, Defendants Gaul and Pirrone apprised him of their interactions with and abuse of Mr. Respes.
[4] 384 U.S. 486 (1966).

11

Case ID: 231002233

92.     But they made clear that if Mr. Respes cooperated with them, he might not face that fate.

93.     Mr. Respes felt compelled to do as they demanded.

94.     Defendant Gaul displayed to Mr. Respes a number of photos, including a photo of Mr. Goodwin.

95.     That photo was the same one on which Mr. Cunningham had identified Mr. Goodwin as Dwayne Isaacs' killer, and Defendants told Mr. Respes as much—but intentionally concealed the falsity of the identification and the coercive tactics they used to secure it.

96.     Defendants Gaul, Pirrone, and Pitts then told Mr. Respes that Mr. Goodwin had killed Dwayne Isaacs, and that they needed him to identify Mr. Goodwin as Dwayne Isaacs' killer.

97.     Mr. Respes told them he could not identify Mr. Goodwin as the shooter, because all he saw was the shooter's beard and dark complexion.

98.     Defendants Gaul, Pirrone, and Pitts then left the room, stoking fear in Mr. Respes that they would make good on their threats.

99.     Defendants Gaul, Pirrone, and Pitts later returned to the room and repeated their threats, making clear that Mr. Respes' would either identify Mr. Goodwin as the shooter, or be charged with conspiracy to murder Dwayne Isaacs.

100.    So coerced, Mr. Respes agreed to falsely identify Mr. Goodwin.

101.    Accordingly, Mr. Respes involuntarily assented to a false statement implicating Mr. Goodwin in the murder and stating or otherwise implying that Defendants Gaul, Pirrone, and Pitts had not employed abusive and coercive tactics against him.

102.    For instance, the statement falsely indicated:

Case ID: 231002233

    a. that Mr. Respes had been at the Homicide Unit for more than twelve hours "due to unrelated murder investigations," when the truth was that Defendants held him there for that duration as a coercive tactic;

    b. that Mr. Respes "felt good" physically; and

    c. that no one from PPD or the Homicide Unit "threatened" him or "promised" him anything "to give this interview," and that Mr. Respes had cooperated with Defendants voluntarily.

103.    Then, at approximately 7:30 AM on July 22nd, following nearly thirteen hours of illegal detention and coercive, unlawful interrogation tactics, Defendants released Mr. Respes.

104.    To help ensure that their unlawful tactics were concealed, Defendants Verrecchio, Gaul, Pirrone, and Pitts did not document them, whether in the coerced statements of Mr. Cunningham and Mr. Respes or elsewhere.

105.    Nor did they document any evidence of the falsity of the identifications they coerced.

106.    On or about August 2, 2011, Defendant Verrecchio swore out an affidavit of probable cause (AOPC) to secure a warrant for Mr. Goodwin's arrest in connection with the killing of Dwayne Isaacs.

107.    The only assertions in the AOPC supporting a finding of probable cause were descriptions of the purported identifications of Mr. Goodwin by Mr. Cunningham and Mr. Respes.

108.    But Defendant Verrecchio intentionally omitted from the AOPC the illegal and coercive tactics he and his cohort employed to secure those identifications and the bevy of additional facts indicating those identifications were false and unreliable.

13

Case ID: 231002233

109.   Defendant Verrecchio transmitted the AOPC to the prosecution, but he intentionally concealed from the prosecution the truth about the interrogations of Mr. Cunningham and Mr. Respes.

110.   No other police officer supplied the prosecution with the truth.

111.   None the wiser, the prosecution approved the AOPC, paving the way for Mr. Goodwin's wrongful arrest.

112.   Defendant Verrecchio then presented the AOPC to a magistrate judge on August 2, 2011, but he concealed the truth about the interrogations of Mr. Cunningham and Mr. Respes from the judge as well.

113.   No other police officer supplied the judge with the truth.

114.   The judge approved the warrant for Mr. Goodwin's arrest.

115.   Hours later, Mr. Goodwin was arrested without incident in the park where Dwayne Isaacs was killed.

116.   Soon thereafter, Mr. Goodwin was arraigned on murder and related charges and held without bail in CFCF, the same jail where Defendants Gaul, Pirrone, and Pitts threatened to send Mr. Respes if he did not falsely implicate Mr. Goodwin.

117.   On October 25, 2011, Mr. Goodwin appeared before the Philadelphia Municipal Court for his preliminary hearing.

118.   His preliminary hearing had previously been continued because Mr. Respes did not come to court.

119.   Mr. Respes did not come to court because the police had forced him to falsely identify Mr. Goodwin, and he did not want to continue to be complicit in framing an innocent man for murder.

14

Case ID: 231002233

120.    This time, however, Defendants Gaul and Verrecchio secured a bench warrant for Mr. Respes.

121.    They executed the warrant by kicking down the door of his mother's house, handcuffing Mr. Respes, and placing him under arrest.

122.    They then brought Mr. Respes to the Homicide Unit and later to the Criminal Justice Center, where the Philadelphia Municipal Court was located.

123.    They told Mr. Respes that he had a choice: either testify consistently with his police statement, or stay in jail.

124.    Coerced once again, Mr. Respes falsely testified that Mr. Goodwin shot Dwayne Isaacs and that the detectives treated him decently.

125.    However, Mr. Respes did truthfully testify that he could only see the shooter's beard, that detectives told him that Mr. Goodwin killed Dwayne Isaacs, and told him they needed him to help them by identifying Mr. Goodwin.

126.    Defendant Gaul testified as well, falsely telling the judge that detectives did not identify Mr. Goodwin as the shooter before Mr. Respes did, that Mr. Respes was not forced to identify Mr. Goodwin or told to pick Mr. Goodwin, and that Mr. Respes never expressed doubt about Mr. Goodwin's identity as the shooter.

127.    Again, the prosecution and Mr. Goodwin were none the wiser.  Not only did Defendants continue to hide the truth about Mr. Respes' interrogation from them, but they also concealed their threat to jail Mr. Respes if he did not testify consistently with his false statement.

128.    As a result of Mr. Respes' coerced, false identification testimony and Defendant Gaul's perjury, Mr. Goodwin was bound over for trial for Dwayne Isaacs' murder.

**Mr. Goodwin Is Tried and Convicted for Dwayne Isaacs' Murder**
**Based on False Evidence and Sentenced to Die in Prison for a Crime He Did Not Commit**

Case ID: 231002233

129.   Mr. Goodwin remained incarcerated without bail at CFCF while he awaited trial, which took place from May 20th through May 28th of 2013, nearly two years after his arrest.

130.   No physical or forensic evidence connected Mr. Goodwin to Dwayne Isaacs' killing.

131.   Accordingly, the prosecution's case against Mr. Goodwin rested on the coerced, fabricated police statements of Mr. Cunningham and Mr. Respes and the lies that Defendants Gaul and Verrecchio told the jury to conceal the truth about their cohort's interrogations of Mr. Cunningham and Mr. Respes.

132.   Mr. Cunningham truthfully testified that he did not witness the shooting of Dwayne Isaacs, so he could not actually identify anyone as the shooter, and that he told the Homicide Unit detectives as much.

133.    Mr. Cunningham further truthfully testified that, through coercive methods including prolonged detention, threats of criminal prosecution, and physical abuse, he was forced to falsely implicate Mr. Goodwin and sign a statement that included numerous falsehoods, from identifying Mr. Goodwin as Dwayne Isaacs' shooter, to stating that no one from the PPD or the Homicide Unit threatened him into implicating Mr. Goodwin.

134.   Mr. Respes truthfully testified that, although he saw the immediate aftermath of the shooting for a split second, he could not identify the shooter, and that he told the Homicide Unit detectives as much.

135.   Mr. Respes also truthfully testified that, through coercive methods including prolonged detention and threats of criminal prosecution, he was forced to falsely implicate Mr. Goodwin and sign a statement that included numerous falsehoods, from identifying Mr. Goodwin

16

Case ID: 231002233

as Dwayne Isaacs' shooter, to stating that no one from the PPD or the Homicide Unit threatened him into implicating Mr. Goodwin.

136.    Because Pennsylvania Rules of Evidence permit the introduction of prior inconsistent statements as substantive evidence, the coerced, false police statements of Mr. Cunningham and Mr. Respes were admitted against Mr. Goodwin.

137.    So, too, was the false testimony of Defendants Gaul and Verrecchio.

138.    Defendant Gaul admitted that he was involved in taking the statements of Mr. Cunningham and Mr. Respes, and that Defendant Pitts "definitely had contact with Mr. Cunningham."

139.    But he offered little other truthful testimony concerning the interrogations of Mr. Cunningham and Mr. Respes or Homicide Unit interrogation practice more generally.

140.    Instead, he lied repeatedly to the jury to create the false impression that Mr. Cunningham and Mr. Respes voluntarily, and that they truthfully identified Mr. Goodwin as Dwayne Isaacs' shooter.

141.    Those lies included:

   a.   That he and his cohort took every precaution to ensure that Mr. Cunningham and Mr. Respes were kept comfortable and given anything they wanted;

   b.   That he and his cohort were simply attempting to build a positive rapport with Mr. Cunningham and Mr. Respes;

   c.   That he and his cohort did not threaten, physically abuse, or otherwise deploy coercive tactics against Mr. Cunningham and Mr. Respes;

   d.   That Defendant Pitts would not deploy physical abuse towards a witness or suspect, and therefore did not choke Mr. Cunningham;

Case ID: 231002233

e. That Mr. Cunningham and Mr. Respes never expressed doubt about their ability to identify or an inability to identify Dwayne Isaacs' shooter; and

f. That the answers in Mr. Cunningham's and Mr. Respes' statements were their own words, not his, Defendant Verrecchio's, Defendant Pirrone's, or Defendant Pitts'.

142. Defendant Verrecchio spun similar falsehoods, telling the jury that neither he nor any detective in his presence threatened Mr. Cunningham, that he had no information anyone choked Mr. Cunningham, and that he had made unfruitful attempts to investigate Leroy Brown as a suspect in Dwayne Isaacs' killing.

143. As before trial, Defendants Gaul, Verrecchio, Pirrone, and Pitts concealed the truth about their abusive, deceitful tactics from the prosecution and defense as well.

144. They also concealed evidence from the prosecution and the defense that would have undermined Defendant Gaul's and Verrecchio's testimony that their cohort treated Mr. Cunningham and Mr. Respes respectfully and humanely, including Defendant Pitts' sustained PPD Internal Affairs (IA) complaints, Richard Carpenter's lawsuit against Defendant Gaul, and Recco Ford's lawsuit against Defendant Verrecchio. *See* ¶¶ 148–51, 168, & 169 , *infra*.

145. Through the testimony of Anara Brown, Mr. Goodwin presented the above-described evidence of his innocence.[5]

146. But it was not enough to overcome the lies that Defendants Verrecchio, Gaul, Pirrone, and Pitts had spun.

147. As a result of their coercive, deceitful police work and their concealment of the same from the prosecution, the judiciary, the jury, and the defense, Mr. Goodwin was wrongfully

---

[5] *See* ¶¶ 18–21.

Case ID: 231002233

convicted of Dwayne Isaacs' murder on May 28, 2013 and sentenced to life without parole the same day.

### Mr. Goodwin Receives Federal Habeas Relief Based on the Concealment of Defendant Pitts' History of Misconduct and Is Later Exonerated

148.   In December 2021, over one decade into Mr. Goodwin's wrongful incarceration for Dwayne Isaacs' murder, the Philadelphia District Attorney's Office (DAO) disclosed Defendant Pitts' internal affairs ("IA") history to Mr. Goodwin.

149.   That IA history contains witness statements and conclusions of the PPD finding that Defendant Pitts had abused his authority.

150.   The prosecution concluded that these sustained findings of misconduct were, until December 2021, concealed from Mr. Goodwin.

151.   Those findings were:

a.   That, on January 18, 2002, Defendant Pitts assaulted his then-wife, PPD Officer Michelle Dotson, and that Defendant Pitts' version of the events to IA, in which he accused Dotson of, among other things, striking him, was not credible;

b.   That, in 2012, Defendant Pitts unjustifiably arrested and detained for over six hours Leroy Cook, an 84-year-old man whose grandson, Naim Cook, was a material witness in a homicide prosecution, that Defendant Pitts "utilized the detention [of the 84-year-old] as a tool to illicit [sic] cooperation from [the material witness]," and that, in so doing, Defendant Pitts abused his authority and unjustifiably damaged private property; and

c.   That, beginning on June 1, 2013, Defendant Pitts unlawfully detained Zshani al-Rasul, who was sought in connection with a murder investigation,

Case ID: 231002233

at the Homicide Unit for approximately 47 hours without legal justification, failed to offer her a meal every eight hours, and abused his authority, and that Defendant Pitts' version of the events was not credible.[6]

152.    The prosecution also explained that, had this favorable evidence been disclosed to Mr. Goodwin, he could have discovered additional damning evidence of Defendant Pitts' abusive behavior in other homicide prosecutions, including Unique Drayton's and Amin Speakes'.[7]

153.    Equipped with this exculpatory and impeaching evidence, Mr. Goodwin, the prosecution explained, could have severely undermined the case against him and, thus, his due process rights were violated, entitling him to habeas corpus relief.

154.    Concluding that the suppression of this favorable evidence violated Mr. Goodwin's right to a fair trial, United States Magistrate Judge Lynne A. Sitarski recommended granting Mr. Goodwin habeas corpus relief, a recommendation United States District Court Judge Timothy J. Savage accepted less than one month later.

155.    Following additional investigation, the prosecution concluded that Mr. Goodwin was likely innocent and moved to withdraw all charges against Mr. Goodwin on February 16, 2013.

156.    That day, Philadelphia County Common Pleas Court Judge Barbara A. McDermott granted the prosecution's motion, finally vindicating Mr. Goodwin's claim of innocence.

---

[6] Disgraced former Detective Ronald Dove—who was sentenced to prison and probation for helping his girlfriend evade arret for the slaying of her ex-lover—was also involved in al-Rasul's mistreatment.    Joseph A. Slobodzian, *Ex-Philly homicide detective pleads guilty to helping girlfriend flee murder charge*, THE PHILADELPHIA INQUIRER (Apr. 26, 2017), available at https://www.inquirer.com/philly/news/crime/Ex-Philly-homicide-detective-pleads-guilty-to-helping-girlfriend-flee-murder-charge.html.

[7] Defendant Pitts' shocking misconduct in Ms. Drayton's and Mr. Speakes' cases is detailed below at ¶¶ 171 & 173.

Case ID: 231002233

157.    Soon, for the first time in over eleven years, Mr. Goodwin was a free man.

**The PPD's Pattern and Practice**
**of Unconstitutional Misconduct in Homicide Investigations, and**
**Defendant Clark's Specific Endorsement and Encouragement of the Same**

158.    For decades before the investigation of Dwayne Isaacs' murder and for years following it, the City of Philadelphia had in force and effect a policy, practice, and custom of unconstitutional misconduct in homicide investigations.

159.    That policy, practice, or custom involved: using coercive techniques in interviews and interrogations to obtain confessions; fabricating inculpatory evidence; withholding exculpatory evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees by, for example, feeding details about the crime that police knew (or believed to be true) to those witnesses, suspects, and arrestees.

160.    This policy, practice, or custom involved withholding and hiding evidence from the prosecution and defense lawyers for the accused leading up to and at trial and continuing with post-conviction counsel for decades, including, without limitation: interview reports, photographs, forensic analyses, circumstances of confessions, facts on how confessions were coerced,  and  what promises were made to obtain confessions or incentivize witnesses.

161.    This policy, practice, or custom involved the use of various techniques to coerce inculpatory statements, including, but not limited to: isolation; separating vulnerable suspects or witnesses from their friends and family; intentionally interrogating those in custody without first advising them of their *Miranda* rights; threatening witnesses and suspects with criminal prosecution; intentionally advising witnesses of their *Miranda* rights to create the impression that they would be charged with a crime if they did not comply with investigators' demands; subjecting individuals to needlessly and deliberately prolonged interrogations; unlawful

Case ID: 231002233

detention; denial of legal counsel; making false promises, including the promise that a suspect or witness will be allowed to go home if they make an inculpatory statement; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence; and providing false assurances, to vulnerable people and others, that they would benefit from making an inculpatory statement minimizing their own involvement.

162. This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: fabricating detailed statements based on alleged facts previously known to police; providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation; selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation, and rehearsal; and misrepresenting that a suspect's or witness's formal statement was a verbatim statement in the their own words.

163. At the time of the investigation into Dwayne Isaacs' murder, these practices had long been well known to the City of Philadelphia and its policymakers due to newspaper investigations (including Pulitzer Prize-winning reporting in the *Philadelphia Inquirer* in 1977 and 1978), governmental investigations, complaints from lawyers and civilians, and internal police investigations.

164. The misconduct described in this Complaint was committed with the knowledge of and in full view of Homicide Unit and PPD supervisors, because of their deliberate indifference to it, or through affirmative encouragement and instruction.

Case ID: 231002233

165.    Even though he was responsible for ensuring that those detectives and their colleagues adhered to legal restrictions on their investigative methods, Defendant Clark made clear to Homicide Unit detectives—like Defendants Verrecchio, Gaul, Pitts, and Pirrone—that he supported and expected them to deploy the unconstitutional tactics described above to close homicide investigations.  And, as explained, they met these expectations in their investigation of Dwayne Isaacs' murder.

166.    Defendant Clark effectively fostered a culture of impunity among Homicide Unit personnel.  He either intentionally ignored or consciously disregarded constitutional and other legal restrictions on his and his subordinates' conduct, at least in part because he believed that those legal restrictions improperly interfered with their ability to close homicide investigations.  And he commended his subordinates for closing cases while knowing or recklessly disregarding the fact that they were closed through the deployment of unlawful tactics and falsely implicated innocent persons.

167.    Various cases demonstrate that the above-described misconduct was pervasive within the PPD at the time of the investigation into Dwayne Isaacs' murder.

168.    **Richard Carpenter** (No. 07-cv-0012-MMB (E.D. Pa.)).  In 2007, prosecutors admitted they made a mistake when they sought a murder conviction against Kevin Felder.  The case against Mr. Felder was based on four inculpatory witness statements, though all four witnesses recanted their statements and testified that the statements were the results of threats and intimidation by homicide detectives.  One of those witnesses was Richard Carpenter.  In 2006, **Defendant Gaul** physically abused Mr. Carpenter, threatened his family, and coerced him to falsely implicate Mr. Felder.  Without objection from the City of Philadelphia, Mr. Carpenter obtained an injunction against Defendant Gaul, prohibiting Defendant Gaul from contacting him

23

Case ID: 231002233

without his written consent or his counsel's presence.  The City settled Carpenter's suit for $30,000.

169.    **Recco Ford** (No. 12-cv-02150-JP (E.D. Pa.)).   In 2007, Recco Ford was arrested and charged with murder for the shooting death of Leon Blackwell.  He was ultimately acquitted in 2010 after serving three years in prison.  **Defendant Verrecchio** was one of the two detectives assigned to lead the investigation.  Mr. Ford's arrest was predicated on an arrest warrant secured by Defendant Verrecchio, who knew, or had reason to know, that the information in the affidavit in support of the arrest warrant was false and based on statements that two juvenile witnesses were coerced into signing.  Defendant Verrecchio did not disclose to prosecutors: (a) the fact that the juveniles were coerced into identifying Ford as the shooter; (b) that the juveniles written statements were fabricated; (c) that a recording of exculpatory police dispatch broadcasts was in police files; and (d) that two suspects in the shooting had been taken into custody on the day of the shooting, but were released shortly thereafter.  The City settled the lawsuit for $600,000.

170.    **Dwayne Thorpe** (CP-51-CR-0011433-2008; 2:19-cv-05094-GEKP).  On July 4, 2008, Hamin Span was shot and killed by a teenager in Kensington, while Mr. Thorpe, then 25 years old, was at a block party in a different Philadelphia neighborhood miles away.  But **Defendant Pitts**, **Detective Timothy Scally**, and others would soon pin Mr. Span's murder on Mr. Thorpe with the aid of unconstitutional investigative tactics.  Defendant Pitts and Detective Scally first coerced Senetra Stones to falsely implicate Mr. Thorpe in Mr. Span's killing, by deploying tactics including threatening to take her children away and threatening criminal prosecution for alleged contraband found in her apartment during an illegal search.  Pitts then turned to Allen Chamberlain, against whom he deployed physical violence, threats of a murder prosecution, and threats to take Mr. Chamberlain's children away to coerce him to falsely

24

Case ID: 231002233

implicate Mr. Thorpe in Mr. Span's killing.  Finally, Defendant Pitts and Detective Scally unlawfully induced Nyfeese Robinson, Mr. Span's 15-year-old brother, to falsely identify Mr. Thorpe as Span's killer.  Pitts, Scally, and their cohort concealed their tactics from the prosecution and the defense, as well as the jury that convicted Mr. Thorpe on the basis of Mr. Chamberlain's false implication of Mr. Thorpe to the police and Mr. Robinson's improper in-court identification.    In November 2017, the Honorable M. Theresa Sarmina of the Philadelphia Court of Common Pleas granted Mr. Thorpe a new trial, concluding that Pitts used "habitually coercive conduct towards witnesses in custodial interrogations" based on the testimony of numerous witnesses who had suffered such abuse at Pitts' hands.  After concluding that Mr. Robinson's identification was the product of suggestion and Mr. Chamberlain's purported statement to Pitts was unreliable, the prosecution dismissed all charges against Mr. Thorpe in March 2019, liberating him following almost 11 years of wrongful incarceration.  In early 2023, the City of Philadelphia, Defendant Pitts, Detective Scally, and other Homicide Unit Detectives implicated in Mr. Thorpe's wrongful prosecution and incarceration settled Mr. Thorpe's civil rights lawsuit for an undisclosed sum.

**171.  Unique Drayton** (CP-51-CR-0013794-2009).  Beginning on August 24, 2009, Unique Drayton was detained at the Homicide Unit by **Defendant Pitts**.  In a windowless interrogation room, where she was held for forty hours, Defendant Pitts threw her into and handcuffed her to a bolted chair.  When she tried to sleep, Pitts cursed at her.  She was not read her *Miranda* rights before Pitts began questioning her, and Pitts ignored her requests to call her attorney.  While interrogating her, Pitts repeatedly threatened her and cursed at her.  Ultimately, he fabricated a statement that she, under duress, agreed to sign.  Only after Ms. Drayton so agreed did Pitts issue her *Miranda* warnings.  A judge of the Philadelphia County Court of

25

Case ID: 231002233

Common Pleas concluded that Drayton's alleged confession was the product of "psychological coercion" and that Pitts' contrary testimony was "incredible." Following this ruling, the prosecution withdrew all charges against Drayton in 2011.

172. **Jamaal Simmons** (CP-51-CR-0007218-2010; No. 5:19-cv-01648-GJP (E.D. Pa.)). Jamaal Simmons was convicted of third-degree murder and related charges based on false inculpatory statements of two alleged witnesses, Richard Taylor and Kareem Jenkins. On August 23 and 24, 2009, now-disgraced **Detective Philip Nordo[8]** and **Detective Norma Serrano** detained Mr. Taylor in a locked interrogation room at the Homicide Unit. On August 26, 2009, Nordo and Serrano did the same to Mr. Jenkins. The detectives fed Mr. Taylor and Mr. Jenkins details concerning the crime, and they failed to record statements both made that exculpated Mr. Simmons. Instead, Nordo and Serrano fabricated statements inculpating Mr. Simmons, and they used threats, physical force, and deception to coerce Mr. Taylor and Mr. Jenkins to sign these statements as if they had made them. For instance, they told Mr. Taylor and Mr. Jenkins that the fabricated statements were simply forms that needed to be signed to secure their own release from custody. Nordo also constantly confronted Mr. Taylor when he was not in police custody and told him that if he did not inculpate Mr. Simmons, Nordo would ensure his life was "fucked up." Nordo and Serrano also attempted to force, coerce, and intimidate Mr. Simmons into falsely confessing to the murder. Neither Nordo nor Serrano disclosed their methods to the prosecution. Years later, Simmons' conviction was vacated, and the DAO withdrew all charges against him.

---

[8] Former Detective Nordo is now serving a 24.5-to-49-year prison term for sexually assaulting witnesses and informants in murder cases. Chris Palmer, *Up to 49 years in prison for an ex-Philly homicide detective who sexually abused witnesses and informants*, THE PHILADELPHIA INQUIRER (Dec. 16, 2022), available at https://www.inquirer.com/news/philip-nordo-philadelphia-sex-assault-prison-20221216.html.

Case ID: 231002233

173.    **Amin Speakes** (No Docket Available).  Soon after the October 7, 2009 slaying of Timothy Ross, Shaquille Rainey, a 16-year-old child with a learning disability, was detained and transported to the Homicide Unit.   **Defendant Pitts** and **Detective Ohmar Jenkins** held Mr. Rainey there for more than six hours and interrogated him without a parent present, despite his repeated requests to call his aunt.  During the interrogation, Pitts pushed Mr. Rainey around the interview room, threatened to kick his ass, and repeatedly told him he would be charged with Ross' murder and spend the rest of his life in jail unless he implicated Mr. Speakes.  So coerced, Mr. Rainey signed a statement that falsely implicated Mr. Speakes in Ross' murder.  Fortunately, Mr. Speakes' innocence—and the falsity of Mr. Rainey's statement—was proven by video footage that placed both of them miles away from the scene of the crime when Mr. Ross was killed.   Following two years of pretrial detention, Mr. Speakes was acquitted at trial. Commenting to the Philadelphia Inquirer about the case, with full knowledge of what the trial had revealed, **Defendant James Clark** did not express contrition, regret, or concern about the appalling misconduct of his detectives, but instead said he was "very sorry to hear it was a not-guilty verdict."

174.    **Marvin Hill** (CP-51-CR-0005356-2011; No. 2:23-cv-01002-GJP).  On January 7, 2010, Stacey Linwood Sharpe, Jr., was shot and killed in the 1300 block of Cumberland Street in North Philadelphia, while, as evidenced by surveillance video obtained by the PPD the next day and the police dispatch report, Mr. Hill stood in the front of a corner store approximately one block away, completely uninvolved in the shooting.  Nonetheless, beginning on January 15, 2010, Mr. Hill was detained and brutally interrogated at the Homicide Unit by **Detective Nordo** and **Detective Kevin Judge** about his involvement in Mr. Sharpe's killing, beginning with Detective Judge rejecting Mr. Hill's repeated assertions that he did not know anyone by the name

Case ID: 231002233

Stacey Sharpe or recognize Mr. Sharpe's photo, and, with Detective Judge's knowledge, proceeded with Defendant Nordo engaging in a litany of coercive behavior over the ensuing days, ranging from threats to make Mr. Hill's "life a living hell" if he did not do as Nordo demanded, to a highly disturbing series of sexual advances, to the use of physical force against Mr. Hill.  When Mr. Hill rejected Nordo's sexual advances, Nordo promised Mr. Hill he would "make sure [he] never [sees] daylight again" and left him in the interrogation room for another full day, before he was released.  Defendant Nordo made good on his promise, coercing two purported witnesses to falsely implicate Mr. Hill, and fabricating a statement implicating Mr. Hill from a third witness.  Following twelve years of wrongful incarceration, Mr. Hill was exonerated on February 21, 2023.

175.  **Obina Onyiah** (CP-51-CR-0001632-2011; No. 2:22-cv-01556-JP (E.D. Pa.)). Based on the tip of Donnell Cheek, an opportunistic jailhouse informant seeking a reduction in his lengthy federal sentence, **Defendant Pitts**, **Detective Jenkins**, and **Detective Thorston Lucke** detained Mr. Onyiah for questioning on November 8, 2010 in connection with the October 21, 2010 murder of William Glatz, committed by two perpetrators—one who died at the scene and one who got away.  The detectives agreed that Defendant Pitts, as was his practice, would employ coercive tactics, including physical force to threats, to convince Mr. Onyiah to confess the murder, and Defendant Pitts deployed these tools, at times, in the presence of Detectives Jenkins and Lucke.  In response to Mr. Onyiah's proclamations of innocence, Defendant Pitts deployed violence and intimidating tactics against Mr. Onyiah, including punching him with a closed fist on his chest, hitting his shoulder, jabbing his shoulder with a pointed finger, and yelling and spitting no more than two inches from his face.  After the interrogation, Defendant Pitts sat next to a computer to conduct a photo identification procedure,

Case ID: 231002233

during which Pitts grabbed the back of Mr. Onyiah's neck and forced it between Mr. Onyiah's

own legs, demanding that he "stop lying and pick the right one."  Years later, through analyzing

video footage of Mr. Glatz's murder, experts in photogrammetry[9] determined that Mr. Onyiah

*could not* have been the second perpetrator.  Following eleven years of wrongful incarceration,

Mr. Onyiah was exonerated in May 2021.  Less than one year later, Defendant Pitts was arrested

and charged with two counts of perjury for denying he touched or hit Mr. Onyiah or grabbed Mr.

Onyiah's head and put it between Mr. Onyiah's legs, and one count of Obstructing the

Administration of Law or Other Governmental Function for assaulting Mr. Onyiah without

lawful justification on November 8, 2010.[10]  Pitts' jury trial is scheduled to begin October 30,

2023.

      a.   The grand jury that recommended charging Pitts heard evidence from one of
           Pitts' fellow Homicide Unit detectives, identified only as Detective #4 in the
           jury's presentment, who described Pitts' interrogation technique as
           "aggressive with yelling and kind of easing his way into the personal space
           of that person trying to get their attention."  Detective #4 said Pitts would
           get "as close as [a] foot to a person" being interrogated, curse at them and
           call them names, and "threaten witnesses with jail time saying 'if you don't
           tell us the truth you might get locked up and you might not be able to see
           your kids again.'"

---

[9] Photogrammetry is the science and technology of obtaining reliable information about physical objects and the environment through the process of recording, measuring, and interpreting photographic images and patterns of electromagnetic radiant imagery and other phenomena.

[10] *Com. v. James Pitts*, CP-51-CR-0004729-2022, MC-51-CR-0003501-2022 (Phila. Ct. Com. Pl.).

Case ID: 231002233

b. Detective #4 not only verified that Pitts regularly used such threats, but implied that it was a widespread practice, one that Detective #4 and the Homicide Unit widely employed, stating "you try to say things that get their heart going and say, hey, what's more important to you here, your family and your freedom," or not cooperating with the Homicide Unit.

c. As to Pitts, the grand jury concluded "that while acting in his official capacity Detective Pitts habitually used coercive interrogation techniques when interviewing suspects and witnesses in the Homicide Unit of the Philadelphia Police Department, and lied under oath to conceal his criminal acts."

176.  **Cordero Smith** (CP-51-CR-0001649-2012).  Cordero Smith was convicted of first-degree murder and related charges based, in significant part, on a false inculpatory statement falsely attributed to Brandon Coley, which was obtained by the collective efforts of **Detectives Jenkins**, **Nordo**, **Gregory Singleton**, and **Frank Glenn**.  On August 3, 2011, Nordo and two other detectives detained and cuffed Mr. Coley, then a juvenile, while Coley was in Philadelphia Family Court, and brought him without his parents to the Homicide Unit.  Nordo and Singleton locked Mr. Coley in a small, windowless interrogation room for eight to nine hours.  Toward the end of that time, Singleton and Glenn supplied Mr. Coley with a false inculpatory narrative, and they threatened to charge him with the murder if he did not agree to it.  After Mr. Coley signed the statement under duress, he was released.  The detectives also supplied a false inculpatory narrative to the other key witness in the case, Aleisha Pope.

177.  **Keisha Jones**  (CP-51-CR-0001050-2012).  On November 27, 2011, Keisha Jones was charged with murder after allegedly hitting her husband with a car and killing him.

30

Case ID: 231002233

That charge followed a lengthy, unconstitutional interrogation by **Defendant Pitts** and **Detective John Bamberski**. Jones was taken by police to the Homicide Unit shortly after her husband died, where Bamberski and Pitts locked her without her shoes in a windowless, frigid interrogation room for many hours. She complained of being cold and needing the bathroom, but her complaints were ignored. Pitts told Jones that if she did not implicate her brother in another homicide, they would charge her with killing her husband, that she would go to prison for life, and that her children would be placed in foster care. Pitts repeatedly called her a "bitch." Ultimately, Bamberski and Pitts fabricated a statement creating the false impression that Jones admitted to chasing the victim with the car, forcefully stepping on the gas, and hitting him with the car. Ms. Jones actually told them that she hit the gas pedal while looking for her husband in a vacant lot, did everything she could to stop the car, and did not even know her husband was hit because she did not see him walk in front of the car. Neither Bamberski nor Pitts recorded this version in their fabricated statement. Nor did they disclose the truth about Ms. Jones's statement to the prosecution. Ultimately, they coerced her – with threats and physical force – to sign the false confession. Instead of disclosing their interrogation tactics and Ms. Jones's protestations of innocence, Bamberski and Pitts concealed their misconduct. The fabricated inculpatory statement was integral to the Commonwealth's case, leading to a first-degree murder conviction and life without parole sentence. Ms. Jones's convictions and sentences were reversed on appeal due, in significant part, to the discrepancy between her exculpatory testimony at trial and the false inculpatory statement fabricated by the detectives.

178.   **Reuben White** (CP-51-CR-0003382-2013; No. 180202076). White was falsely charged with first-degree murder and related charges in connection with a drive-by shooting,

31

Case ID: 231002233

following the deployment of unconstitutional investigative tactics by **Detective Nate Williams**[11] and fellow Homicide **Detectives Micah Spotwood**, **Edward Tolliver**, and **James Griffin**.

179.    They first targeted **Ernest Davis**, whom they knew, based on video footage, could not have identified those responsible for the shooting.  Beginning in the evening of May 31, 2012, they held Mr. Davis against his will for approximately twenty hours in a Homicide Unit interrogation room.  During that time, Mr. Davis repeatedly and truthfully insisted he could not identify those responsible for the shooting, but the detectives told him they believed he could. They insisted he knew Mr. White was involved, and they told him he would be charged with the murder if he did not identify White as the driver of the car from which the shots were fired that killed the decedent.  Spotwood and Griffin typed up a statement for Mr. Davis, falsely asserting Davis implicated White, and told Davis he would not be allowed to leave until he signed it. Following twenty hours of confinement, Mr. Davis relented and signed the statement.  Neither Spotwood nor Griffin disclosed the truth or their tactics to the prosecution.

180.    Then, on July 22, 2012, Williams and Tolliver targeted **William Truxton**, the owner of the car used in the drive-by.  Even though they had no evidence Mr. Truxton to the shooting or any crime, Williams and Tolliver detained him at the Homicide Unit for thirty hours, questioning him repeatedly and insisting that they knew he had rented his car to Mr. White.  Mr. Truxton denied these accusations, insisting he had rented it to someone else.   Williams and Tolliver rejected his denials, and they told Mr. Truxton he would be charged with the murder if he did not identify Mr. White as the person to whom he rented the car.  At approximately 8:00

---

[11] On November 21, 2019, Detective Williams was fired from the PPD and charged with Tampering with Public Records or Information with the Intent to Defraud or Injure Another, Tampering with or Fabricating Physical Evidence, Unsworn Falsification to Authorities (four counts), and Obstructing Governmental Administration.  The erroneous dismissal of those charges for lack of evidence is now pending before the *en banc* Superior Court.  *Com. v. Nathaniel Williams*, No. 980 EDA 2021.

Case ID: 231002233

PM on July 23, 2012, **Williams** typed up a statement purporting to show that Mr. Truxton identified Mr. White as the person to whom he rented the car before the shooting. Having been detained for more than thirty hours, Mr. Truxton reluctantly signed the statement. Neither Williams nor Tolliver disclosed to the prosecution that they knew Mr. Truxton had not identified Mr. White as the renter. Nor did they disclose that he only signed the statement because he was held against his will for over a day and was threatened with criminal charges.

181.    On August 14, 2012, Spotwood and Tolliver prepared a false, typewritten statement for a third witness, **Ikim Graham**. As with Mr. Davis, the detectives knew, from video evidence, that Mr. Graham could not credibly identify those responsible for the shooting. Nonetheless, Spotwood and Tolliver detained Mr. Graham at the Homicide Unit and insisted he knew that White was the driver of the car from which the shots were fired. Mr. Graham repeatedly and truthfully insisted he did not know who was driving the car. Spotwood and Tolliver typed up a statement reflecting their false version of the events and made clear to Mr. Graham that, if he did not sign it, he would be charged with the murder and/or face federal firearms charges. Neither Spotwood nor Tolliver disclosed their tactics or the truth to the prosecution.

182.    Finally, on October 12, 2012, Mr. White was taken into custody and held for three days at the Homicide Unit, where Spotwood and Tolliver repeatedly questioned him to pressure and coerce him into making and signing a confession. White truthfully told them he was not involved in the murder.

183.    Aware of the tactics his subordinates deployed, **Lieutenant Melvin Williams** requested the prosecution charge Mr. White. However, he did not disclose his subordinates' misconduct to the prosecution, because this misconduct was consistent with Homicide Unit's

33

Case ID: 231002233

operations and policy, and because disclosure would prevent Mr. White from being charged. The charges were approved.

184.    Mr. Davis, Mr. Truxton, and Mr. Graham testified truthfully at Mr. White's jury trial and advised the jury that they had been coerced into signing the false inculpatory statements. On February 25, 2016, the jury acquitted White of all charges.

185.    **James Frazier** (CP-51-CR-0010069-2012, CP-51-CR-0010070-2012; No. 19-cv-1692 (E.D. Pa.)). James Frazier was convicted of two counts of third-degree murder and related charges based entirely on a false inculpatory confession falsely attributed to him. That false confession was fabricated by **Defendant Nordo**, with the assistance of allegations previously known to homicide investigators. Nordo twice detained and interrogated Mr. Frazier at the Homicide Unit in June 2012. The first detention began on June 2, 2012 and lasted at least three-and-a-half – if not five-and-a-half – days. Mr. Frazier was permitted to defecate once, but Nordo would not permit him to wipe, so feces remained on his body for days. Nordo also made sexual advances towards Mr. Frazier, which Frazier rejected. Nordo threatened and intimidated Mr. Frazier until he falsely confessed, despite his repeated protestations of innocence. And falsely confess he did, so that he would be permitted to leave, shower, and change his clothes. Nordo did not memorialize this false confession, understanding it would be deemed unconstitutionally obtained. Instead, Nordo detained and interrogated Mr. Frazier again on or about June 19, 2012, lied to **Detective John Verrecchio** that Frazier had confessed, and recruited Verrecchio to memorialize the false confession.[12]  Nordo never *Mirandized* Mr. Frazier. Nor did he disclose any of his unconstitutional tactics to the prosecution. The prosecution only learned of Nordo's misdeeds following Mr. Frazier's conviction on both murders and years of imprisonment. On April 4, 2019, following the prosecution's discovery of Nordo's misconduct

_____
[12] This process was not captured on audio or video.

34

Case ID: 231002233

in Mr. Frazier's case, the Honorable Scott O'Keefe of the Philadelphia County Court of Common Pleas permitted the withdrawal of all charges against Frazier.

186.   **Zshani al-Rasul**.  In June of 2013, **Detectives Pitts** and **Ronald Dove** detained al-Rasul, an alleged witness to a homicide, for three days in a locked Homicide Unit interrogation room, where she was forced to sleep on a metal, bench-like chair.  They denied her request for a phone call.  Dove put a note on the door of the room to ensure she was not fed. Over the entire weekend, she was only permitted to have one pretzel and one Pepsi.  While Ms. al-Rasul was detained, Dove and Pitts repeatedly insisted she had information about the homicide, and she insisted she did not.  Pitts grabbed her arm and told her to remove her jewelry and shoelaces, and he threatened that she would go to prison and have her thirteen-year-old son taken away.  Despite the detectives' efforts, Ms. al-Rasul did not sign a statement.  In November 2013, al-Rasul filed a complaint with PPD's Internal Affairs Division (IAD), which concluded that Pitts abused his authority, improperly detained her, and failed to offer her a meal every eight hours.  In August 2014, the City of Philadelphia paid $110,000 to settle Ms. al-Rasul's lawsuit concerning her brutal mistreatment.

187.   **Sherman McCoy** (CP-51-CR-0002501-2014; No. 21-cv-1458 (E.D. Pa.)).  On September 18, 2013, Shaheed Jackson was shot and killed in North Philadelphia by Lester Lanier and Rashawn Mack, as an eyewitness told **Detective Nordo** soon thereafter.  Through various coercive tactics—including physical abuse (choking) and threats of the same, as well as threats of prosecution for Mr. Jackson's murder, prolonged detention, and deprivation of food, the bathroom, and sleep—**Detectives Nordo** and **Williams**, together with **Sergeant Robert Wilkins**, forced Lester Lanier to falsely implicate Mr. McCoy in Mr. Jackson's shooting death. Then, they turned their sights to Mr. McCoy, whom they knew was intellectually disabled.

Case ID: 231002233

Again through a litany of coercive tactics—including denying him water, food, and sleep; screaming at and spitting on him; authoritatively asserting his guilt; threatening indefinite detention if he did not cooperate; and promising him he could leave if he signed a statement implicating himself—**Nordo**, with the blessing of Williams and Wilkins, forced Mr. McCoy to falsely implicate himself in Mr. Jackson's murder.  Before Mr. McCoy's trial, at which the sole evidence against him was his false confession, Lester Lanier was granted immunity for the purposes of testifying against Mr. McCoy.  But Nordo deceived the jury, telling them that Mr. Lanier was not granted immunity.  His and his fellow detectives' deception did not end there; indeed, they also concealed the truth about their mistreatment of Mr. McCoy and the fact that an eyewitness exculpated Mr. McCoy.  Nearly six years after Mr. McCoy's arrest, he was granted a new trial based on Nordo's perjury concerning the immunity agreement and exonerated on the same day.

188.  **Ruben Mora**.  In 2014, Mora was arrested in connection with the drug-related murder of  Miguel Gonzalez and spent thirteen months in jail, before prosecutors withdrew all charges against him.  **Defendant Gaul** and **Detective Carl Watkins** coerced the sole alleged witness to identify Mora, by threatening to prosecute her criminally and take away her child if she did not identify Mora.  Mr. Mora filed a civil suit alleging the same, which the City of Philadelphia settled for $45,000.

189.  **Quintin Jones** (CP-51-CR-0006928-2015).  Quintin Jones was charged with first-degree murder and related charges.  A key piece of evidence was an inculpatory statement that **Detectives Nordo** and **Nate Williams** fabricated and falsely attributed to Mr. Jones, an intellectually disabled man, during a seventeen-hour detention and interrogation that took place on May 19 and 20, 2015.  Nordo, in conspiracy and concert with Williams, interrogated Mr.

36

Case ID: 231002233

Jones for over five hours without providing *Miranda* warnings, and failed to record Jones's declarations of innocence. After a pretrial hearing in which Nordo invoked his privilege against self-incrimination and refused to testify, the Honorable Diana Anhalt of the Philadelphia County Court of Common Pleas found that Nordo fabricated Jones's inculpatory statement and falsely attributed it to Jones. At the time of Mr. Jones's interrogation, he had the following drugs in his system: Adderall, Theraquil, Abilify, Xanax, and PCP.

190.     At the time of the investigation and prosecution of Mr. Goodwin, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses in criminal investigations, without legal cause and with the intent of coercing statements from these persons, under threat of punishment, detention, physical harm and/or other sanctions or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and / or their attorney sought the right to consult. Exculpatory evidence obtained during these detentions and interrogations was concealed by the PPD from the prosecution, as were the forcible and coercive tactics the PPD employed in these investigations.

191.     This policy, practice, or custom – exemplified by the investigation in Mr. Goodwin's case and those detailed in paragraphs 168 through 189, *supra* – continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.

192.     This deliberate indifference is not simply evidenced by this case and the those detailed in paragraphs 168 through 189, *supra*, and others that are expected to be revealed through discovery, but also by the fact that, prior to January 1, 2014, the PPD did not have clear

37

Case ID: 231002233

internal guidance and / or rules in place concerning the constitutional rights of suspects and witnesses in the context of questioning and interrogation.

193.    For instance, there was no clear guidance or rules on how long a suspect or witness could lawfully be in custody *or* how to interview a suspect or witness consistent with constitutional mandates (e.g., that *Miranda* warnings must precede custodial interrogation).

194.    Additionally, prior to January 1, 2014, there was no directive or policy in place prohibiting the use of force, including low-level force,[13] in interrogations and interviews.

195.    Likewise, prior to January 1, 2014, the PPD did not mandate the recording of interrogations, even though they had access to audio and video recording equipment.  The absence of mandatory recording precluded *bona fide* supervisory review of interrogators' conduct and helped enable the deployment of unconstitutional tactics.

196.    Finally, as of the date of this filing, the PPD still does not have in place a policy or clear guidance on disclosing exculpatory or impeachment evidence of any sort to the prosecution, including, but not limited to, exculpatory evidence uncovered while questioning or interrogating a suspect or witness.[14]

197.    On January 1, 2014, after further proof of the unconstitutional policy, practice, and custom described above was provided to the PPD, the DAO, and the City of Philadelphia, the PPD began requiring the video recording of all Homicide Unit interrogations, and issued

---

[13] Low-level force encompasses police language (vocabulary, tone, or volume), physical positioning, or touching  employed to threaten, coerce, or intimidate an individual to say or do something that individual would not say or do otherwise.  Examples of improper low-level force include threatening the imposition of criminal punishment or some other form of sanction, including taking one's children away.

[14] The PPD's current directive on the Rules of Discovery, Directive 5.21, includes obsolete citations to rules of criminal procedure, both local (Mun. Ct. R. Crim. P. 558) and statewide (Pa. R. Crim. P. 305), that no longer govern discovery.  It does not include any instructions on recording exculpatory or impeachment material or disclosing such material to the prosecution, notwithstanding clear legal precedent and authority from at least 1996.

Case ID: 231002233

Directive 5.23, which provided guidance for the detention and interrogation of witnesses and suspects.

198. Among other things, Directive 5.23 established that:

a. "Police personnel shall not use force of any kind, threats, of force, threats of deportation, threats of administrative action, improperly withhold property or conduct any other form of abusive coercion directed toward a victim complainant, witness or any family member thereof to make the victim, complainant or witness provide information";

b. "Under no circumstances are police personnel permitted to use force or any physically inhumane or abusive coercion against a suspect to make them provide incriminating information.  The use of physical force during an interrogation is expressly prohibited";

c. "All custodial interrogations shall be preceded by the issuance of the *Miranda* warning. ... If at any stage of the custodial questioning the suspect indicates by word or action that they want to stop talking or to consult with an attorney before continuing, the questioning shall stop";

d. Investigators must clearly notify witnesses, complainants, and victims being questioned in police facilities "that the questioning is non-custodial and that the person being questioned is free to discontinue and leave at any[]time"; and

e. Suspects[15] may not be detained indefinitely and must be released after thirty-six hours of detention without being charged; and

---

[15] Directive 5.23 does not define "suspect."

Case ID: 231002233

       f.   Police detaining a suspect must follow a set of detailed procedures once an uncharged suspect is in custody for twelve, twenty-four, and thirty-six hours.

199.    The response to the enactment of Directive 5.23 shows just how integral the above-described unconstitutional policies, practices, and customs were to the operations of the PPD Homicide Unit.

200.    The clearance rate – the rate of cases cleared by arrest or other means – for homicide cases dropped precipitously after Directive 5.23 went into effect.

201.    Detectives in the Homicide Unit publicly spoke out against the Directive. **Defendant Clark**, commander of the Homicide Unit from 2007 through July of 2017, stated publicly that the Directive's policies "have really handcuffed, and made it very, very difficult, for my detectives to do their jobs."[16] According to these detectives and Defendant Clark, Directive 5.23 "made it difficult to **compel** anyone to provide information to the police."[17] (emphasis added).

202.    In other words, the PPD's Homicide Unit relied on the ability to violate the constitutional rights of suspects and witnesses to investigate and clear cases. Absent that freedom, the Homicide Unit lost among the most effective tools at its disposal, and its clearance rate dropped from over 70% between 2008 and 2013 to 58.1% in 2014, 51% in 2015, 45.4% in 2016, and 37.4% in 2017.[18] And, of course, the higher "clearance" rate included a significant number of false convictions—like Mr. Goodwin's—that would not have existed but for the

---

[16] Chris Palmer, *Head of Philly Police Homicide Unit Transferred*, THE PHILADELPHIA INQUIRER (July 31, 2017, 11:08 AM), https://www.inquirer.com/philly/news/crime/head-of-philly-police-homicide-unit-transferred-20170713.html.

[17] *Id.*

[18] Given this reliance on violating constitutional rights as an indispensable investigative tool, it is no surprise that the Homicide Unit's five-year 70% clearance rate was nearly 10 points higher than the national average.

Case ID: 231002233

unconstitutional conduct of Homicide Unit detectives, including Defendants Clark, Verrecchio, Pirrone, Gaul, and Pitts.

203.    This policy, practice, or custom was not recently developed and implemented in the Homicide Unit.  Instead, it had been a central feature of the Homicide Unit's investigative practices for decades, as highlighted in the cases of Anthony Wright (2:16-cv-05020-GEKP), Walter Ogrod (2:21-cv-02499-JP), and Jimmy Dennis (2:18-cv-02689-JS), filed in the Federal District Court for the Eastern District of Pennsylvania, as well as many others.[19]

204.    In sum, at the time of the investigation and prosecution of Mr. Goodwin, the PPD had a practice, policy, or custom of:

       a. Engaging in unlawful interrogation of suspects, witness detentions and interrogations, fabrication of witness and suspect statements, and failing to record and disclose exculpatory and impeachment evidence;

       b. Failing to appropriately discipline or take corrective action against police officers who engaged in illegal or unconstitutional conduct;

       c. Failing to properly train and supervise officers on the constitutional limitations on their investigative, detention, and arrest powers;

       d. Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights during police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, arrests, coercion of witnesses, falsifying and fabrication of evidence, and suppression of exculpatory evidence; and

---

[19] Mr. Goodwin incorporates by reference the complaints filed the cases of Anthony Wright, Walter Ogrod, and Jimmy Dennis.

Case ID: 231002233

e. Failing to properly sanction or discipline PPD officers, who are aware of and conceal and / or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police officers, including the defendant officers in this case, to violate the rights of citizens such as Mr. Goodwin.

205.   At the time of the investigation and prosecution of Mr. Goodwin, and for many years before and thereafter, the PPD and the City of Philadelphia have been deliberately indifferent to the need to train, supervise, and discipline police officers.  The PPD's IAD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions.  Instead, its disciplinary system is marred by the following deficiencies:

a. An arbitrary and inconsistent process that does not meet accepted standards;

b. Excessive and chronic delays in resolving disciplinary complaints;

c. A lack of consistent, rational, and meaningful disciplinary and remedial actions;

d. Persistent failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

e. An incident-based, rather than progressive, approach to discipline, such that repeat violators are not penalized in proportion to the number of violations;

f. Insufficient training and supervision of IAD personnel in the proper conduct of IAD investigations, reflected by the poor quality of investigations conducted – including routinely failing to interview eyewitnesses and conducting interviews below accepted standards, by, e.g., failing to address key issues – and by the invalidity of investigative findings and conclusions;

42

Case ID: 231002233

g.  A pattern of administrative conduct where the benefit of the doubt is given to the officer, as reflected in a global analysis of IAD's investigatory procedures;

h.  The absence of an effective early warning system to identify, track, and monitor "problem" officers; and

i.  Persistent failures to acknowledge the disproportionate use of force against civilians and duly classify the police officers' misconduct as impermissible uses of force.[20]

---

[20] On March 24, 2015, the Department of Justice issued a report critical of PPD policies and practices, finding that "[t]he department's disciplinary mechanism is inconsistent, subject to chronic delays, failed to impose meaningful disciplinary or remedial sanctions, and marred by inadequate investigations."

Case ID: 231002233

**Damages**

206.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Goodwin to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve nearly twelve years in prison for a crime he did not commit.

207.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin sustained injuries and damages, including loss of freedom and youth for nearly twelve years between the ages of twenty-one and thirty-two, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

208.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin was deprived of his familial relationships, romantic relationships, and friendships.

209.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin sustained economic injuries and damages, including loss of income and loss of career opportunities.

210.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

Case ID: 231002233

## CAUSES OF ACTION

### COUNT I

**42 U.S.C. § 1983: Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments** (against all individual defendants excluding Defendant Clark)

211.    Plaintiff incorporates the preceding paragraphs by reference.

212.    The individual defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Goodwin for Dwayne Isaacs' murder, intentionally caused Mr. Goodwin to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Goodwin's clearly established Fourth and Fourteenth Amendment rights to be free from prosecution without probable cause.

213.    The individual defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

214.    The individual defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Goodwin's clearly established constitutional rights.  No reasonable officer in 2011 would have believed this conduct was lawful.

215.    The prosecution finally terminated in Mr. Goodwin's favor on February 16, 2023, when the Philadelphia County Court of Common Pleas permitted the Commonwealth of Pennsylvania to withdraw all charges against Mr. Goodwin.

216.    The individual defendants' acts and omissions described in the preceding paragraphs were the direct and proximate cause of Mr. Goodwin's injuries, because they knew, or should have known, that their conduct would result in the wrongful arrest, charging, prosecution, conviction, and incarceration of Mr. Goodwin.

45

Case ID: 231002233

**COUNT II**

**42 U.S.C. § 1983: Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation** (against all individual defendants excluding Defendant Clark)

217.    Plaintiff incorporates the preceding paragraphs by reference.

218.    The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Goodwin of his clearly established right to due process of law and a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including, without limitation, the false statements of Andre Cunningham and Aaron Respes.

219.    The individual defendants deprived Mr. Goodwin of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense, including, without limitation, information regarding the true circumstances of the interrogations of Mr. Cunningham and Mr. Respes.

220.    The individual defendants deprived Mr. Goodwin of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to duly investigate Leroy Brown as the real killer.

221.    The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Goodwin's clearly established constitutional rights.  No reasonable officer in 2011 would have believed this conduct was lawful.

222.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries.  Defendants knew, or should have

46

Case ID: 231002233

known, that their conduct would result in Mr. Goodwin's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV
### 42 U.S.C. § 1983: Civil Rights Conspiracy (against all individual defendants)

223.    Plaintiff incorporates the preceding paragraphs by reference.

224.    The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Goodwin of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

225.    In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

      a.  Suggesting, coercing, and / or fabricating inculpatory evidence in the form of witness statements;

      b.  Intentionally or with deliberate indifference failing to comply with their duty to disclose exculpatory and impeachment material during the pendency of this case;

      c.  Wrongfully prosecuting Mr. Goodwin while knowing that they lacked probable cause; and

      d.  Committing perjury during hearings and trials.

226.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries. Defendants knew, or should have

Case ID: 231002233

known, that their conduct would result in Mr. Goodwin's wrongful arrest, charging, prosecution, conviction, and incarceration.

## COUNT V
**42 U.S.C. § 1983: Failure to Intervene** (against all individual defendants)

227.   Plaintiff incorporates all the preceding paragraphs by reference.

228.   By their conduct and under color of state law, the individual  Defendants, acting within the scope of their employment with the PPD, had opportunities to intervene on behalf of Mr. Goodwin to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law.  Yet, with deliberate indifference, they declined to do so.

229.   These Defendants' failures to intervene violated Mr. Goodwin's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 2011 would have believed that failing to intervene to prevent these Defendants from any of the following actions was lawful: coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, conducting custodial interrogations without giving *Miranda* warnings, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, or causing Mr. Goodwin to be arrested, prosecuted, convicted, and sentenced without probable cause.

230.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries. Defendants knew, or should have

Case ID: 231002233

known, that their conduct would result in Mr. Goodwin's wrongful arrest, charging, prosecution, conviction, and incarceration.

## COUNT VI
### 42 U.S.C. § 1983: Supervisory Liability (against Defendant Clark)

231.    Plaintiff incorporates the preceding paragraphs by reference.

232.    Defendants Verrecchio, Gaul, Pirrone, and Pitts acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Clark, both in this case and as a matter of practice and custom.

233.    Defendant Clark acted recklessly and with deliberate indifference to Mr. Goodwin's constitutional rights by failing to adequately train, supervise, and discipline the PPD Homicide detectives assigned to investigate Dwayne Isaacs' murder, thereby allowing and causing these detectives to deprive Mr. Goodwin of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

234.    Defendant Clark, as the Captain of the Homicide Unit, developed, implemented, and affirmatively encouraged the use of unconstitutional investigative tactics by, for example, instructing his subordinates, to employ such tactics, commending his subordinates for "solving" cases through use of such tactics, and refusing to discipline his subordinates for employing such tactics.

235.    The reckless and deliberately indifferent conduct of Defendant Clark violated their clearly established duty in 2011 to supervise Defendants Verrecchio, Gaul, Pirrone, and Pitts, and no reasonable police supervisor in 2011 would have believed that reckless and

Case ID: 231002233

deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

236.    The acts and omissions of Defendant Clark, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries.  Defendant Clark knew, or should have known, that his conduct would result in Mr. Goodwin's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT VII**
**42 U.S.C. § 1983: Municipal Liability** (against Defendant City of Philadelphia)

237.    Plaintiff incorporates the preceding paragraphs by reference.

238.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Goodwin's  wrongful  arrest and conviction, and for many years preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular: the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; and the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory and impeachment evidence.

239.    The City of Philadelphia's final policymakers had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; and fabricating inculpatory evidence (e.g., fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime).  Despite being on notice

50

Case ID: 231002233

of these unconstitutional practices, policies, or customs, the City of Philadelphia  failed to take appropriate remedial and / or disciplinary actions to curb this pattern of misconduct.

240.     Such unconstitutional municipal customs, practices, and / or policies were the moving force behind Mr. Goodwin's false arrest, charging, prosecution, and more than 11.5 years of incarceration, as well as the other injuries and damages set forth above.

### COUNT VIII
**Malicious Prosecution under Pennsylvania Law** (against all individual defendants excluding Defendant Clark)

241.     Plaintiff incorporates the preceding paragraphs by reference.

242.     The defendants, acting alone, jointly, and/or in concert and conspiracy knowingly, intentionally, negligently, maliciously and/or recklessly caused, initiated, or continued proceedings against Mr. Goodwin's without probable cause, and the proceedings ultimately terminated in Mr. Goodwin's favor on February 16, 2023, when the prosecution withdrew all charges against him.

243.     As a result of this malicious prosecution, Mr. Goodwin sustained the injuries and damages set forth above.

### COUNT IX
**Outrageous Conduct Causing Severe Emotional Distress under Pennsylvania Law** (against all individual defendants excluding Defendant Clark)

244.     Plaintiff incorporates the preceding paragraphs by reference.

245.     Defendants, acting alone, jointly, and/or in concert and conspiracy, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Mr. Goodwin.

Case ID: 231002233

246.    The acts or omissions of the defendants as alleged in the preceding paragraphs constitute the tort of Outrageous Conduct Causing Severe Emotional Distress, all to Mr. Goodwin's great detriment and loss.

247.    As a result of the defendants' conduct, Mr. Goodwin suffered and continues to suffer damages as described above.

**COUNT X**

**Civil Conspiracy under Pennsylvania Law** (against all individual defendants)

248.    Plaintiff incorporates the preceding paragraphs by reference.

249.    Defendants acting alone, jointly, and/or in concert and conspiracy committed tortious and other unlawful acts against Mr. Goodwin, including malicious prosecution and outrageous conduct causing severe emotional distress.

250.    As a result of the defendants' conduct, Mr. Goodwin suffered and continues to suffer damages as described above.

**<u>RELIEF DEMANDED</u>**

WHEREFORE, Christopher Goodwin respectfully requests that the Court grant the following relief:

A.    A declaratory judgment that Defendants violated Mr. Goodwin's rights under the Fourth and Fourteenth Amendments and Pennsylvania law;

B.    An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

C.    An award of nominal damages against all Defendants in an amount to be determined by the finder of fact;

52

D.     An award of punitive damages against Defendants Clark, Verrecchio, Gaul, Pirrone, and Pitts in an amount to be determined by the finder of fact;

E.     Reasonable attorney's fees and costs; and,

F.     Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

/s/ Jon Cioschi
/s/ Alan Tauber
WISEMAN & SCHWARTZ, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 360-3988
cioschi@wisemanschwartz.com
atauber@atauberlaw.com

53

Case ID: 231002233

DocuSign Envelope ID: 682CEF44-A7C1-410F-A2B0-3385EDFCFEA9

## VERIFICATION

I, _____Christopher Goodwin_____, verify that the statements

contained in the foregoing Complaint are true and correct to the best of my

knowledge or information and belief. I understand that any false statement in the

Complaint is made subject to the penalties of 28 U.S.C. § 1746 and 18 Pa. Cons.

Stat. Ann. § 4904, relating to unsworn falsification to authorities.

Dated: _10/22/2023_

# EXHIBIT B

FCM LG ENV
PHILADELPHIA, PA 19105
NOV 21, 2023
$3.75
R2305K142593-4

19102

RDC 99

NOV 2 2 REC'D

Anne Taylor
Chief Deputy City Solicitor
Civil Rights Unit
City of Philadelphia
1515 Arch St, 14th Floor
Philadelphia, PA 19102

WISEMAN & SCHWARTZ
By: Alan J. Tauber, Esquire
Attorney ID: 57353
Jon Cioschi, Esquire
Attorney ID: 318793
718 Arch Street, Suite 702N
Philadelphia, PA 19103
(215) 313-7188; Fax: (215) 703-1675                Attorneys for Plaintiff

---

IN THE COURT OF COMMON PLEAS,
PHILADELPHIA COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN | : | |
| | : | |
| Plaintiff | : | |
| v. | : | No. 231002233 |
| | : | |
| JAMES PITTS, *et al.*, | : | |
| | : | |
| Defendants | : | |

---

PLAINTIFF CHRISTOPHER GOODWIN'S MOTION FOR ALTERNATIVE SERVICE OF
PROCESS ON DEFENDANT JAMES PITTS PURSUANT TO
PENNSYLVANIA RULE OF CIVIL PROCEDURE 430

Plaintiff Christopher Goodwin by and through his attorneys Alan J. Tauber. Esquire and

Jon Cioschi, Esquire hereby moves this Court for alternative service pursuant to Pa. R. Civ. P. 430

to enter an Order in the form attached. In support, Plaintiff makes the following representations.

1.      On October 22, 2023, Plaintiff instituted a civil action for damages sustained as a

result of being wrongfully prosecuted for a homicide and incarcerated for eleven years by

Defendants. Plaintiff's complaint is attached as Exhibit A.

2.      One of those defendants is former Philadelphia Police Department Detective James

Pitts.

1

Case ID: 231002233

3.      Defendant Pitts is also the subject of a criminal case in this court[1] and a civil action for damages from a wrongful homicide prosecution.  In that civil action, Pitts has evaded service of process.

4.      On or about August 4, 2023, Plaintiff's undersigned counsel contacted Diane Cowan, a private investigator, to research and identify the residence of Defendant Pitts so that Plaintiff's complaint could be personally served on him.

5.      As reflected in her report ("Cowan Affidavit," attached as Exhibit B),[2] Investigator Cowan completed exhaustive research and investigation to identify Defendant Pitts' current residence.

6.      This research included the following:

    a.      Search of investigative database sources containing residence information;

    b.      Requesting information from the Philadelphia Board of Elections Voter Registration Division;

    c.      Making inquiries with the Pennsylvania Department of Transportation;

    d.      Conducting searches of Philadelphia County and United States District Court records;

    e.      Making contact with various addresses associated with Pitts; and

    f.      Communicating with neighbors at the address Pitts has provided to this Court in connection with his criminal case.

---

[1] *See Com. v. James Pitts*, CP-51-CR-0004729-2022 (charging Pitts with two counts of perjury under 18 Pa.C.S. § 4902 and three counts of obstructing governmental administration under 18 Pa.C.S. § 5101 for Pitts' allegedly dishonest conduct that led to the wrongful incarceration of Obina Onyiah for a murder Onyiah did not commit); *see also* Ex. A, n.1 & ¶ 175.

[2] Some sensitive identification information, including Defendant Pitts' social security number, is contained in this exhibit.  Plaintiff's counsel has made a good faith effort to redact any such information.  Plaintiff's counsel is responsible for each redaction in this document.

2

*See* Ex. B, at 1–2.

7.       Investigator Cowan's report details her attempts at service of process. *See id.*

8.       Investigator Cowan's investigation revealed four potential residences. *Id.* at 2.

9.       The investigation pointed to one of those addresses – 5745 Hazel Avenue in Philadelphia – as the most likely current address for Defendant Pitts. *Id.* at 1–2, 4–13.

10.      Service was nonetheless attempted on each of the three other potential residences on four separate occasions without success. *Id.* at 1–2.

11.      The Cowan Affidavit carefully explains why the Hazel Avenue address should be considered Defendant Pitts' last known address. *Id.*

12.      One of these reasons is that Defendant Pitts, in March of 2022, gave the Hazel Avenue address to Clerk of Courts, the District Attorney, and the Office of Judicial Records Bail Acceptance Unit. *Id.* at 1, 6–7.

13.      On or about March 3, 2022, Defendant Pitts was arrested by Philadelphia Police Department and charged with various criminal offenses. *Id.* at 21–33, 41; *see* n.1, *supra*. Following that arrest, Defendant Pitts provided the address to 5745 Hazel Avenue Philadelphia PA 19143 as his residence to the Pretrial Services Division of this Court. Ex. B, at 7. He also used that address in a certification of bail and discharge on March 3, 2022. *Id.* at 6.

14.      In a separate case filed in the United States District Court in the Eastern District of Pennsylvania (*Obina Onyiah v. James Pitts,* et al., No. 2:22-cv-1556), in which Defendant Pitts is a defendant, counsel for Plaintiff Onyiah attempted personal service by first asking the City Law Department ("City") to accept service for Defendant Pitts, believing that the city of Philadelphia would assume his defense, as the conduct in question in the suit was done in Defendant Pitts' capacity as a city employee. Ex. B, at 10–11.

3

Case ID: 231002233

15.    The City advised counsel for Plaintiff Onyiah that the city would not be representing Defendant Pitts and therefore could not accept service for him.  *Id.*

16.    As part of their attempts to effect personal service on Defendant Pitts in the federal lawsuit, counsel for Plaintiff Onyiah received confirmation from the City that, to its knowledge, Pitts' last known address was 5745 Hazel Avenue.  *Id.* at 19; *see also id.* at 11.

17.    Counsel for Plaintiff Onyiah made numerous attempts to serve Defendant Pitts personally and by mail at the 5745 Hazel Avenue address.  *Id.* at 1, 11–12, 20–25.  Those attempts proved unsuccessful.  *Id.*

18.    Next, counsel for Plaintiff Onyiah intended to serve Defendant Pitts at in this Court at his scheduled trial, but it was continued.  *Id.* at 11–12.

19.    Counsel for Plaintiff Onyiah next attempted to complete personal service on Defendant Pitts by asking a private civil attorney who had represented Pitts in other matters to obtain authority to accept service for Pitts.  *Id.* at 12, 34–37.

20.    Defendant Pitts' civil attorney advised counsel for Plaintiff Onyiah that he had no authority to accept service for Pitts.  *Id.* at 34.  Pitts' civil attorney also made clear he could not provide any information whatsoever concerning Pitts' whereabouts.  *Id.* at 35–37.

21.    With respect to ongoing efforts at service in the present case, Plaintiff has made numerous attempts to serve Defendant Pitts at his last known address, 5745 Hazel Avenue.

22.    Prior to engaging Investigator Cowan, Plaintiff's counsel engaged a separate process server, who made three additional attempts at service there at the following dates and times:

- October 24th at 12:27 PM;

- November 2 at 12:47 PM; and

4

Case ID: 231002233

- November 9 at 11:21 AM.

*See* Exhibit C (Affidavit of Shawn Schaffer).  Those attempts were unsuccessful. *Id.*

    23.    Investigator Cowan's exhaustive attempts at service there have also been unsuccessful. Ex. B, at 2.

    24.    Since receiving the complaint on October 24, 2023, Investigator Cowan has unsuccessfully attempted to serve it on six separate occasions:

    a.    Once on October 27th at 7:00 PM ("There was no response at the residence and there were no lights inside the residence.");

    b.    Once on October 29th at 3:30 PM ("[T]here was no response at the residence.");

    c.    Once on November 1st at 4:00 PM ("There was no response at the residence.");

    d.    Once on November 3rd at 6:30 PM ("There was no response at the residence.");

    e.    Once on November 4th at 2:00 PM ("There was no response to knocks at the door."); and

    f.    Once on November 9th at 6:30 PM ("[A]gain the house was dark and there was no response to knocks at the door.").

*Id.*

    25.    As Investigator Cowan noted, therefore, "[o]n each occasions . . . I have found no answer at the door," and "[t]he property has been dark in the evening hours." *Id.*

Case ID: 231002233

26.     Numerous attempts during daylight contacts "to speak to neighbors residing directly adjacent and across the street" from 5745 Hazel did not yield "any information to confirm whether [Defendant] Pitts is a current resident." *Id.*

27.     Thus, it is clear that Defendant Pitts is either intentionally evading service at this address, misrepresented this address as his residence to this Court in his criminal matter, or has moved from this address since he provided it to this Court as his own in March 2022.

28.     If he misrepresented this address as his residence, or if he has since changed addresses, Defendant Pitts is in plain violation of the express conditions of his bail bond *and* the Pennsylvania Rules of Criminal Procedure.

29.     As an express condition of Defendant Pitts' bail bond, "the DEFENDANT and SURETY must give written notice to the issuing authority, Clerk of Courts, SCCJ, 1301 Filbert Street, 3rd Fl; the District Attorney[;] and the Office of Judicial Records Bail Acceptance Unit, SCCJ 1301 Filbert Street, Basement 215-683-7726/7727 of any change in his address within 48 hours of the date of his address change." Ex. B, at 6.

30.     This condition is codified in the Pennsylvania Rules of Criminal Procedure. *See* Pa. R. Crim. P. 526(A)(3) (Conditions of Bail Bond) ("In every case in which a defendant is released on bail, the conditions of the bail bond shall be that the defendant will . . . . give written notice to the bail authority, the clerk of courts, the district attorney, and the court bail agency or other designated court bail officer, of any change of address within 48 hours of the date of the change.").[3]

---

[3] Given Defendant Pitts' long tenure as a Philadelphia police officer, there can be no question that he was and remains aware of these obligations, even had they not been an express condition of his bail.

6

31.     There is no record that Defendant Pitts has done anything to notify the Clerk of Courts, District Attorney, or the Office of Judicial Records Bail Acceptance Unit of any change in his address since his bail bond was issued.

32.     Additionally, Plaintiff's counsel here endeavored to obtain Defendant Pitts' criminal attorney's assistance in serving Pitts, despite being skeptical of its likelihood of success given Pitts' civil attorney's refusal to provide comparable assistance. *See* Exhibit D (Affidavit of Jon Cioschi, Esq.); *see also* ¶¶ 19–20, *supra*.

33.     Undersigned counsel learned that Defendant Pitts' criminal attorney is William McLaughlin, Esq. Ex. D, at 1 ¶ 2.

34.     Undersigned counsel then contacted Mr. McLaughlin first by phone, leaving a voicemail, and then by email. *See id.* at ¶¶ 4–7. With the email, counsel forwarded a copy of the complaint and requested that McLaughlin accept or secure authority to accept service on behalf of Defendant Pitts. *Id.* at ¶ 7.

35.     Mr. McLaughlin promptly responded to counsel's email and stated that he did not have authority to accept service for this or any other documents that might be proffered. *Id.* at 2 ¶ 8 ("I am not and will not be authorized to accept service of this or any other documents. Thank you.").

36.     It is now abundantly clear that Defendant Pitts is not only refusing to accept service of process, but is actively evading service and attempting to frustrate the orderly operation of the judicial process. This is evidenced by his evasive conduct in the *Onyiah* case, his own criminal case, and in the present case.

7

Case ID: 231002233

37.     Plaintiff submits that he has done more than is necessary to attempt in good faith to effectuate service on Defendant Pitts and has further demonstrated Pitts' obstruction of the judicial process.

38.     Pennsylvania Rule of Civil Procedure 430 states that "[i]f service cannot be made under the applicable rule, the plaintiff may move the Court for special order directing the method of service."

39.     Plaintiff has attempted service on Defendant Pitts as required under Pennsylvania Rule of Civil Procedure 402 (Manner of Service. Acceptance of Service).

40.     Pennsylvania courts have affirmed that an order for alternative service is appropriate where affidavits accompanying a Rule 430 motion demonstrate that a plaintiff has exhibited due diligence and good faith in attempting to locate the defendant.  Plaintiff has satisfied these criteria. *See Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 31 (Pa. Super. 2015) ("One illustration of a good faith effort involves '(1) inquiries of postal authorities including inquiries pursuant to the Freedom of Information Act [...], (2) inquiries of relatives, neighbors, friends, and employers of the defendant, and (3) examinations of local telephone directories, voter registration records, local tax records, and motor vehicle records.' Note, Pa. R. Civ. P. 430(a). While this illustration '[is] by no means exhaustive, [it] is at least indicative of the types of procedures [intended under] Rule 430. In essence, it provides that more than a mere paper search is required before resort can be had to the publication provisions of Rule 430(b).' *Deer Park [Lumber, Inc., v. Major]*, 559 A.2d [941,] 946 [(Pa. Super. 1989).]"); *City of Phila. Water Revenue Bureau v. Tawanda Props. Inc.*, 976 A.2d 1244, 1248–49 (Pa. Cwlth. 2009) (affirming the grant of alternative service where the service investigation involved "an examination of Property Owner's corporate filing with the Commonwealth, an examination of information on file with the

8

City of Philadelphia Board of Revision of Taxes, and internet research including internet telephone directories"); *cf. Rosenberg v. Reading Park Hotel Inc.* 258 A.3d 521, 2021 WL 2418667, at *1, 7–8 (Pa. Super. 2021) (Table) (validating the trial court's grant of alternative service on a business, where the grant was based on a number of good faith efforts by the Plaintiff, including: attempts by the sheriff to serve the defendant at its business premises, where it was discovered "the business had been sold and the new owners had no address for the former owners"; forwarding a copy of the complaint to the insurer for the business; and submitting an inquiry to USPS "but receiv[ing] only the same addresses where service could not be achieved").

41.    For these reasons, Plaintiff respectfully requests that this Court enter an order authorizing service to be accomplished by regular and certified mail and posting on the premises of Defendant Pitts last known address of 5745 Hazel Avenue Philadelphia PA 19143.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order authorizing service to be accomplished by regular and certified mail and posting on the premises of Defendant Pitts last known address of 5745 Hazel Avenue Philadelphia PA 19143.

                                         **WISEMAN & SCHWARTZ**

Date: November 21, 2023              By:    /s/ Alan J. Tauber
                                            /s/ Jon Cioschi

                                     Alan J. Tauber, Esquire
                                     Jon Cioschi, Esquire
                                     Attorneys for Plaintiff Christopher Goodwin

Case ID: 231002233

FILED
21 NOV 2023 04:08 pm
Civil Administration
J. BOYD

WISEMAN & SCHWARTZ
By: Alan J. Tauber, Esquire
Attorney ID: 57353
Jon Cioschi, Esquire
Attorney ID: 318793
718 Arch Street, Suite 702N
Philadelphia, PA 19103
(215) 313-7188; Fax: (215) 703-1675                    Attorney for Plaintiff

---

IN THE COURT OF COMMON PLEAS,
PHILADELPHIA COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN | : | |
| | : | |
| Plaintiff | : | |
| v. | : | No. 231002233 |
| | : | |
| JAMES PITTS, *et al.*, | : | |
| | : | |
| Defendants | : | |

---

PLAINTIFF CHRISTOPHER GOODWIN'S
MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR
ALTERNATIVE SERVICE OF PROCESS ON DEFENDANT JAMES
PITTS PURSUANT TO PENNSYLVANIA RULE OF CIVIL PROCEDURE 430

Plaintiff Christopher Goodwin, through his counsel, respectfully submits this memorandum of law in support of Plaintiff's Motion to Stay Proceeding.

**I.    MATTER BEFORE THE COURT**

Plaintiff's Motion for an Order Designating the Use of Alternative Service of Original Process.

**II.    QUESTION PRESENTED**

Should this Court order alternative service of original process of the filed complaint against Defendant James Pitts where Plaintiff has made good faith efforts to serve Defendant Pitts, as evidenced by the three affidavits attached to Plaintiff's Motion, and Defendant Pitts has

1

demonstrated a manifest intent to evade service of process?

**Suggested Answer: Yes.**

### III. FACTUAL BACKGROUND

On October 22, 2023, Plaintiff instituted a civil action for damages sustained as a result of being wrongfully prosecuted for a homicide and incarcerated for eleven years by Defendants. Plaintiff's complaint is attached as Exhibit A. One of those defendants is Defendant James Pitts.

Defendant Pitts is also the subject of a criminal case in this court[1] and a civil action for damages from a wrongful homicide prosecution. In that civil action, Pitts has evaded service of process.

On or about August 4, 2023, Plaintiff's undersigned counsel contacted Diane Cowan, a private investigator, to research and identify the residence of Defendant Pitts so that complaint could be personally served on him.

As reflected in her report ("Cowan Affidavit," attached as Exhibit B),[2] Investigator Cowan completed exhaustive research and investigation to identify Defendant Pitts' current residence.

This research included the following:

- Search of investigative database sources containing residence information;

- Requesting information from the Philadelphia Board of Elections Voter Registration Division;

- Making inquiries with the Pennsylvania Department of Transportation;

---

[1] *See Com. v. James Pitts*, CP-51-CR-0004729-2022 (charging Pitts with two counts of perjury under 18 Pa.C.S. § 4902 and three counts of obstructing governmental administration under 18 Pa.C.S. § 5101 for Pitts' allegedly dishonest conduct that led to the wrongful incarceration of Obina Onyiah for a murder Onyiah did not commit); *see also* Ex. A, n.1 & ¶ 175.

[2] Some sensitive identification information, including Defendant Pitts' social security number, is contained in this exhibit. Plaintiff's counsel has made a good faith effort to redact any such information. Plaintiff's counsel is responsible for each redaction in this document.

2

- Conducting searches of Philadelphia County and United States District Court records;

- Making contact with various addresses associated with Pitts; and

- Communicating with neighbors at the address Pitts has provided to this Court in connection with his criminal case.

*See* Ex. B, at 1–2.

Investigator Cowan's report details her attempts at service of process. *See id.* Investigator Cowan's investigation revealed four potential residences. *Id.* at 2. The investigation pointed to one of those addresses – 5745 Hazel Avenue in Philadelphia – as the most likely current address for Defendant Pitts. *Id.* at 1–2, 4–13. Service was nonetheless attempted on each of the three other potential residences on four separate occasions without success. *Id.* at 1–2.

The Cowan Affidavit carefully explains why the Hazel Avenue address should be considered Defendant Pitts' last known address. *Id.* One of these reasons is that Defendant Pitts, in March of 2022, gave the Hazel Avenue address to Clerk of Courts, the District Attorney, and the Office of Judicial Records Bail Acceptance Unit. *Id.* at 1, 6–7.

On or about March 3, 2022, Defendant Pitts was arrested by Philadelphia Police Department and charged with various criminal offenses. *Id.* at 21–33, 41; *see* n.1, *supra.* Following that arrest, Defendant Pitts provided the address to 5745 Hazel Avenue Philadelphia PA 19143 as his residence to the Pretrial Services Division of this Court. Ex. B, at 7. He also used that address in a certification of bail and discharge on March 3, 2022. *Id.* at 6.

In a separate case filed in the United States District Court in the Eastern District of Pennsylvania (*Obina Onyiah v. James Pitts,* et al., No. 2:22-cv-1556), in which Defendant Pitts is a defendant, counsel for Plaintiff Onyiah attempted personal service by first asking the City Law Department ("City") to accept service for Defendant Pitts, believing that the city of Philadelphia would assume his defense, as the conduct in question in the suit was done in Defendant Pitts'

3

capacity as a city employee. Ex. B, at 10–11. The City advised counsel for Plaintiff Onyiah that

the city would not be representing Defendant Pitts and therefore could not accept service for him.

*Id.*

As part of their attempts to effect personal service on Defendant Pitts in the federal lawsuit,

counsel for Plaintiff Onyiah received confirmation from the City that, to its knowledge, 5745 Hazel

Avenue was Pitts' last known address. *Id.* at 19; *see also id.* at 11.

Counsel for Plaintiff Onyiah made numerous attempts to serve Defendant Pitts personally

and by mail at the 5745 Hazel Avenue address. *Id.* at 1, 11–12, 20–25. Those attempts proved

unsuccessful. *Id.*

Next, counsel for Plaintiff Onyiah intended to serve Defendant Pitts at in this Court at his

scheduled trial, but it was continued. *Id.* at 11–12.

Counsel for Plaintiff Onyiah next attempted to complete personal service on Defendant

Pitts by asking a private civil attorney who had represented Mr. Pitts in other matters to obtain

authority to accept service for Pitts. *Id.* at 12, 34–37.

Defendant Pitts' civil attorney advised counsel for Plaintiff Onyiah that he had no authority

to accept service for Pitts. *Id.* at 34. Pitts' civil attorney also made clear he could not provide any

information whatsoever concerning Pitts' whereabouts. *Id.* at 35–37.

With respect to ongoing efforts at service in the present case, Plaintiff has made numerous

attempts to serve Defendant Pitts at his last known address, 5745 Hazel Avenue.

Prior to engaging Investigator Cowan, Plaintiff's counsel engaged a separate process

server, who made three additional attempts at service there at the following dates and times:

- October 24th at 12:27 PM;

- November 2 at 12:47 PM; and

Case ID: 231002233
Control No.: 23114867

- November 9 at 11:21 AM.

*See* Exhibit C (Affidavit of Shawn Schaffer).  Those attempts were unsuccessful.  *Id.*

Investigator Cowan's exhaustive attempts at service there have also been unsuccessful.  Ex. B, at 2.  Since receiving the complaint on October 24, 2023, Investigator Cowan has unsuccessfully attempted to serve it on six separate occasions:

- Once on October 27th at 7:00 PM ("There was no response at the residence and there were no lights inside the residence.");

- Once on October 29th at 3:30 PM ("[T]here was no response at the residence.");

- Once on November 1st at 4:00 PM ("There was no response at the residence.");

- Once on November 3rd at 6:30 PM ("There was no response at the residence.");

- Once on November 4th at 2:00 PM ("There was no response to knocks at the door."); and

- Once on November 9th at 6:30 PM ("[A]gain the house was dark and there was no response to knocks at the door.").

*Id.*  As Investigator Cowan noted, therefore, "[o]n each occasions . . . I have found no answer at the door," and "[t]he property has been dark in the evening hours."  *Id.*  Further, numerous attempts during daylight contacts "to speak to neighbors residing directly adjacent and across the street" from 5745 Hazel did not yield "any information to confirm whether [Defendant] Pitts is a current resident."  *Id.*

Thus, it is clear that Defendant Pitts is either intentionally evading service at this address, misrepresented this address as his residence to this Court in his criminal matter, or has moved from this address since he provided it to this Court as his own in March 2022.  If he misrepresented this

5

address as his residence, or if he has since changed addresses, Defendant Pitts is in plain violation of the express conditions of his bail bond *and* the Pennsylvania Rules of Criminal Procedure.

As an express condition of Defendant Pitts' bail bond, "the DEFENDANT and SURETY must give written notice to the issuing authority, Clerk of Courts, SCCJ, 1301 Filbert Street, 3rd Fl; the District Attorney[;] and the Office of Judicial Records Bail Acceptance Unit, SCCJ 1301 Filbert Street, Basement 215-683-7726/7727 of any change in his address within 48 hours of the date of his address change." Ex. B, at 6.

This condition is codified in the Pennsylvania Rules of Criminal Procedure. *See* Pa. R. Crim. P. 526(A)(3) (Conditions of Bail Bond) ("In every case in which a defendant is released on bail, the conditions of the bail bond shall be that the defendant will . . . . give written notice to the bail authority, the clerk of courts, the district attorney, and the court bail agency or other designated court bail officer, of any change of address within 48 hours of the date of the change.").[3]

There is no record that Defendant Pitts has done anything to notify the Clerk of Courts, District Attorney, or the Office of Judicial Records Bail Acceptance Unit of any change in his address since his bail bond was issued.

Additionally, Plaintiff's counsel here endeavored to obtain Defendant Pitts' criminal attorney's assistance in serving Pitts, despite being skeptical of its likelihood of success given Pitts' civil attorney's refusal to provide comparable assistance. *See* Exhibit D (Affidavit of Jon Cioschi, Esq.); *see also* p.4, *supra*.

Undersigned counsel learned that Defendant Pitts' criminal attorney is William McLaughlin, Esq. Ex. D, at 1 ¶ 2. Undersigned counsel then contacted Mr. McLaughlin first by

---

[3] Given Defendant Pitts' long tenure as a Philadelphia police officer, there can be no question that he was and remains aware of these obligations, even had they not been an express condition of his bail.

Case ID: 231002233
Control No.: 23114867

phone, leaving a voicemail, and then by email. *See id*. at ¶¶ 4–7. With the email, counsel

forwarded a copy of the filed complaint (Ex. A) and requested that McLaughlin accept or secure

authority to accept service on behalf of Defendant Pitts. *Id*. at ¶ 7. Mr. McLaughlin promptly

responded to counsel's email and stated that he did not have authority to accept service for this or

any other documents that might be proffered. *Id*. at 2 ¶ 8 ("I am not and will not be authorized to

accept service of this or any other documents. Thank you.").

### III.    LEGAL ARGUMENT

It is now abundantly clear that Defendant Pitts is not only refusing to accept service of

process, but is actively evading service and attempting to frustrate the orderly operation of the

judicial process. This is evidenced by his evasive conduct in the *Onyiah* case, his own criminal

case, and in the present case.

Plaintiff submits that he has done more than is necessary to attempt in good faith to

effectuate service on Defendant Pitts and has further demonstrated Pitts' obstruction of the judicial

process.

Pennsylvania Rule of Civil Procedure 430 states that "[i]f service cannot be made under

the applicable rule, the plaintiff may move the Court for special order directing the method of

service."

Plaintiff has attempted service on Defendant Pitts as required under Pennsylvania Rule of

Civil Procedure 402 (Manner of Service. Acceptance of Service).

Pennsylvania courts have affirmed that an order for alternative service is appropriate where

affidavits accompanying a Rule 430 motion demonstrate that a plaintiff has exhibited due diligence

and good faith in attempting to locate the defendant. Plaintiff has satisfied these criteria. *See*

*Northern Forests II, Inc. v. Keta Realty Co*., 130 A.3d 19, 31 (Pa. Super. 2015) ("One illustration

7

of a good faith effort involves '(1) inquiries of postal authorities including inquiries pursuant to the Freedom of Information Act [...], (2) inquiries of relatives, neighbors, friends, and employers of the defendant, and (3) examinations of local telephone directories, voter registration records, local tax records, and motor vehicle records.' Note, Pa. R. Civ. P. 430(a). While this illustration '[is] by no means exhaustive, [it] is at least indicative of the types of procedures [intended under] Rule 430. In essence, it provides that more than a mere paper search is required before resort can be had to the publication provisions of Rule 430(b).' *Deer Park [Lumber, Inc., v. Major]*, 559 A.2d [941,] 946 [( Pa. Super. 1989).]"); *City of Phila. Water Revenue Bureau v. Tawanda Props. Inc.*, 976 A.2d 1244, 1248–49 (Pa. Cwlth. 2009) (affirming the grant of alternative service where the service investigation involved "an examination of Property Owner's corporate filing with the Commonwealth, an examination of information on file with the City of Philadelphia Board of Revision of Taxes, and internet research including internet telephone directories"); *cf. Rosenberg v. Reading Park Hotel Inc.* 258 A.3d 521, 2021 WL 2418667, at *1, 7–8 (Pa. Super. 2021) (Table) (validating the trial court's grant of alternative service on a business, where the grant was based on a number of good faith efforts by the Plaintiff, including: attempts by the sheriff to serve the defendant at its business premises, where it was discovered "the business had been sold and the new owners had no address for the former owners"; forwarding a copy of the complaint to the insurer for the business; and submitting an inquiry to USPS "but receiv[ing] only the same addresses where service could not be achieved").

## IV.   CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court enter an order authorizing service to be accomplished by regular and certified mail and posting on the premises of Defendant Pitts last known address of 5745 Hazel Avenue Philadelphia PA 19143.

Case ID: 231002233
Control No.: 23114867

**WISEMAN & SCHWARTZ**

Date: November 21, 2023

By:   /s/ Alan J. Tauber
      /s/ Jon Cioschi

Alan J. Tauber, Esquire
Jon Cioschi, Esquire
Attorneys for Plaintiff Christopher Goodwin

9

FILED
21 NOV 2023 04:08 pm
Civil Administration
J. BOYD

# EXHIBIT A

Case ID: 231002233
Control No.: 23114867

**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**COURT OF COMMON PLEAS OF PHILADELPHIA**

Filed and Attested by the
Office of Judicial Records
29 NOV 2023 ...

CHRISTOPHER GOODWIN,

    Plaintiff,

    v.

CITY OF PHILADELPHIA,
CAPTAIN JAMES CLARK,
DETECTIVE JAMES PITT,
DETECTIVE THOMAS GAUL,
DETECTIVE GEORGE PIRRONE, &
DETECTIVE JOHN VERRECHIO,

    Defendants.

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

**Philadelphia Bar Association**
**Lawyer Referral**
**and Information Service**
**One Reading Center**
**Philadelphia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

### AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado inmediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

**Asociacion De Licenciados**
**De Filadelfia**
**Servicio De Referencia E**
**Informacion Legal**
**One Reading Center**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

10-284

Alan Tauber (Pa Bar No. 57353)
Jon Cioschi (Pa Bar No. 318793)
WISEMAN & SCHWARTZ, LLP
718 Arch Street, Suite 702N
Philadelphia, Pa. 19106
(215) 360-3988
atauber@atauberlaw.com
cioschi@wisemanschwartz.com

Counsel for Plaintiff
Christopher Goodwin

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | COURT OF COMMON PLEAS |
| | : | CIVIL TRIAL DIVISION |
| Plaintiff, | : | |
| | : | October Term, 2023 |
| v. | : | |
| | : | No. _____ |
| City of Philadelphia, Captain James | : | |
| Clark, Detective James Pitts, | : | JURY TRIAL DEMANDED |
| Detective Thomas Gaul, Detective | : | |
| George Pirrone, & Detective John | : | **COMPLAINT** |
| Verrecchio, | : | |
| | : | |
| Defendants. | : | |

## Introduction

Plaintiff Christopher Goodwin lost eleven years, six months, and fifteen days of his life to incarceration because he was wrongfully convicted for the murder of Dwayne Isaacs.

Mr. Goodwin was innocent, and spent his twenty-first through his thirty-second birthdays behind bars because Philadelphia Police Detectives John Verrecchio, Thomas Gaul, George Pirrone, and James Pitts illegally detained two purported witnesses for over twelve hours and, through various coercive means ranging from choking one witness to threatening to charge both with Mr. Isaac's murder, forced them to falsely identify Mr. Goodwin as Mr. Isaac's killer.

These detectives proceeded to conceal their violent, abusive tactics and fabrications, leading to the wrongful prosecution and conviction of Mr. Goodwin, who was exonerated and released from prison on February 16, 2023 after prosecutors admitted that evidence of Detective

1

Pitts' lengthy history of serious misconduct was concealed from Mr. Goodwin, and after prosecutors concluded that no reliable evidence connected Mr. Goodwin to Mr. Isaac's killing. Neither physical evidence nor any non-coerced, non-fabricated witness statements of Mr. Goodwin's guilt was presented at his trial.  Nor does any exist.

Those egregious and costly violations of Mr. Goodwin's constitutional rights were not simply a product of a few bad officers gone rogue.  They were the result of the City of Philadelphia's longstanding policy, practice, or custom of coercing fabricated witness statements and confessions, and concealing the truth about these statements and how they were obtained—a tool that Philadelphia homicide detectives used for decades to secure scores of wrongful arrests and convictions.

Mr. Goodwin brings this suit to obtain a measure of justice from the City of Philadelphia, former Homicide Unit Captain Clark, Detectives Gaul, Pirrone, and Verrecchio, and former Detective Pitts for the irreversible wrongs they perpetrated against him.

### Parties

1.      Plaintiff Christopher Goodwin is, and at all times relevant to this Complaint was, a resident of Philadelphia, Pennsylvania.

2.      Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania.   It owns, operates, manages, directs, and controls the Philadelphia Police Department (PPD), which, at all times relevant to this complaint, employed defendants James Clark, James Pitts, Thomas Gaul, John Verrecchio, and George Pirrone.

3.      Defendant James Pitts was at all relevant times employed as a detective with the PPD.[1]  He is sued in his individual capacity.

---

[1] Defendant Pitts was fired from the PPD and is now awaiting trial in the Philadelphia County Court of Common Pleas on two counts of perjury (18 Pa.C.S. § 4902) and three counts of obstructing the administrative of law or other governmental function (18 Pa.C.S. § 5101) for

Case ID: 231002233
Control No.: 23114867

4.      Defendant Thomas Gaul was at all relevant times employed as a detective with the PPD. He is sued in his individual capacity.

5.      Defendant John Verrecchio was at all relevant times employed as a sergeant with the PPD. He is sued in his individual capacity.

6.      Defendant George Pirrone was at all relevant times employed as a sergeant with the PPD. He is sued in his individual capacity.

7.      Defendant James Clark was at all relevant times employed as a captain with the PPD. He is sued in his individual capacity.

8.      At all times relevant to this Complaint, all defendants acted in concert and conspiracy.

9.      All defendants are jointly and severally liable for the injuries and damages suffered by Plaintiff as set forth in this Complaint.

## Statement of Facts

### The June 25, 2011 Shooting of Lekirr Brown, and the Retaliatory Murder of Dwayne Isaacs on June 26, 2011

10.     On June 24, 2011, Lekirr Brown was shot in the face in his home in South Philadelphia in the Wilson Park Homes.

11.     Mr. Brown was rushed to the hospital and suffered serious injuries.

12.     Rumors in the community implicated Rahsul Isaacs in Mr. Brown's shooting.

13.     Rahsul Isaacs was Dwayne Isaacs' nephew.

14.     In the hours following the shooting, Dwayne Isaacs asked Lekirr Brown's father, Leroy Brown, how Lekirr was faring.

---

violently interrogating Obina Onyiah to secure Onyiah's false confession to a robbery and homicide and subsequently lying about that interrogation at Onyiah's pretrial motions hearing and jury trial. *See generally Com. v. James Pitts*, CP-51-CR-0004729-2022 (Phila. Ct. Com. Pl.). Onyiah was exonerated in May 2021.

15.     Outraged that the father of the man who was rumored to have shot his son would ask him such a question, Leroy Brown cursed Dwayne Isaacs out, threatened to "fuck" him up for saying that, and told him he "better watch his back."

16.     Then, just after midnight on June 26, 2011, Dwayne Isaacs was tragically shot to death near a circle of benches in a park in the Wilson Park Homes.

17.     Within hours, the word among Wilson Park residents was that Leroy Brown had shot Dwayne Isaacs.

**Despite His Innocence, Plaintiff Christopher Goodwin**
**Is Falsely Implicated as Dwayne Isaacs' Killer**
**Through the Abusive and Deceitful Tactics of Philadelphia Homicide Detectives**

18.     In the hours leading up to Dwayne Isaacs' killing, Mr. Goodwin was spending time with his community at a child's birthday party in a park nearby Wilson Park.

19.     At about 10:00 PM, after the birthday party ended and the park was cleaned, Mr. Goodwin and other partygoers went to the steps outside of Rayetta Hawkins' house at 2620 Jackson Street.

20.     There, Mr. Goodwin and his friends drank and shared laughs and stories, until they heard shots ring out nearby after midnight, prompting them to seek shelter.

21.     They later learned that the shots were the sounds of Dwayne Isaacs being killed.

22.     Moments after Dwayne Isaacs was killed, the PPD's Homicide Unit was deployed to investigate, with Defendant Verrecchio as the lead, or assigned, detective.

23.     Throughout the course of this investigation, Defendant Verrecchio worked closely with other PPD Homicide Unit detectives, including Defendants Gaul, Pirrone, and Pitts.[2]

---

[2] Below, Plaintiff uses the term "cohort" to refer to Defendants Gaul, Pirrone, Pitts, and Verrecchio.

4

24.     Together, they agreed to employ, and did in fact employ, illicit tactics to close the case.

25.     To compel Andre Cunningham and Aaron Respes, two purported eyewitnesses, to sign and adopt fabricated statements falsely implicating Mr. Goodwin as Dwayne Isaacs' killer, these detectives: illegally detained them for hours on end; agreed to deprive them of necessities like sleep, food, and water; threatened to criminally prosecute them for Dwayne Isaacs' murder; and, as to Mr. Cunningham, even deployed physical abuse.

26.     To safeguard their bogus case against Mr. Goodwin, Defendants Verrecchio, Gaul, Pitts, and Pirrone concealed the truth about their methods from the prosecution, and the judiciary, as well as Mr. Goodwin and his trial attorney.

27.     Andre Cunningham was their first target.

28.     On June 20, 2011, at the behest of Defendants Verrecchio, Gaul, Pirrone, and Pitts, police illegally detained and handcuffed Andre Cunningham without lawful authority and transported him to the PPD's Homicide Unit, where he arrived at 6:00 PM.

29.     On the orders of Defendants Verrecchio, Gaul, Pirrone, and Pitts, Mr. Cunningham, who was clearly intoxicated, was locked in a small, windowless, brightly lit room, adorned only with a steel chair and table.

30.     Soon, Defendant Pitts entered the room and asked Mr. Cunningham if he knew why he was at the Homicide Unit.

31.     Mr. Cunningham replied that he did not know and that he was high.

32.     Defendant Pitts asked him where he was when Dwayne Isaacs was killed and what happened leading up to Dwayne Isaacs killing.

33.     Mr. Cunningham truthfully replied that he was on Taney Terrace, a different location, when the shooting occurred, and that he did not witness the shooting.

34.     Defendant Pitts made clear he did not believe Mr. Cunningham and told Mr. Cunningham to "stop acting stupid."

35.     To frighten Mr. Cunningham, Defendant Pitts falsely asserted that people were accusing him of killing Dwayne Isaacs.

36.     When Mr. Cunningham replied that he did not know what Defendant Pitts was talking about, Defendant Pitts pulled Mr. Cunningham's chair close to him and told Mr. Cunningham to stop playing with him.

37.     Defendant Pitts said, "You know you did it. You're going to go down for it."

38.     Mr. Cunningham replied, "You can take me down there and process me, but I can't tell you something I don't know."

39.     Defendant Pitts asked Mr. Cunningham if he thought he was "a bad ass," and Mr. Cunningham said "no, sir."

40.     Defendant Pitts grabbed Mr. Cunningham and threw him around so hard that he tore Mr. Cunningham's shirt.

41.     Defendant Pitts proceeded to choke Mr. Cunningham and said "you're going to give me the information I need to close the case."

42.     Mr. Cunningham insisted he did not witness the shooting.

43.     Defendant Pitts let go of him, and Pitts then left the room.

44.     Over the course of the next several hours, Defendant Pitts came in and out of the room with the intent of compelling Mr. Cunningham to falsely implicate Mr. Goodwin in the murder of Dwayne Isaacs.

Case ID: 231002233
Control No.: 23114867

45.     To that end, Defendant Pitts told Mr. Cunningham that if he did not start cooperating, he would be charged with Dwayne Isaacs' murder and other crimes.

46.     Likewise, Defendant Pitts made clear to Mr. Cunningham that he would not be released from the Homicide Unit until he started cooperating.

47.     Defendant Pitts also threatened to take Mr. Cunningham "in the basement" if he did not cooperate—ominously suggesting additional physical abuse awaited him if he did not give the detectives what they wanted.

48.     Later, Mr. Cunningham fell asleep on the table.  While Mr. Cunningham was sleeping, Defendant Pitts returned and threw a pile of phone books on the table to awaken and startle Mr. Cunningham.

49.     Defendant Pitts then grabbed Mr. Cunningham and pushed him against the wall.

50.     At around 10:00 PM, after Mr. Cunningham had been unlawfully detained for four hours, Defendant Pitts apprised Defendants Gaul and Verrecchio of his interactions with—and abuse—of Mr. Cunningham thus far.

51.     Equipped with this information, Defendants Gaul and Verrecchio entered the room.

52.     Defendant Gaul placed individual photos of Aaron Respes, Raheem Zachary, and Mr. Goodwin on the table.

53.     Defendant Gaul pointed to Raheem Zachary's photo and asked if Mr. Cunningham knew him.  Mr. Cunningham said he did not.

54.     Then, Defendant Gaul pointed to Mr. Goodwin's picture and asserted that he and Defendant Verrecchio were certain he knew Mr. Goodwin, and that they knew Mr. Goodwin killed Dwayne Isaacs.

7

55.     Defendant Gaul told Mr. Cunningham that the detectives needed him to help them out and identify Mr. Goodwin as Dwayne Isaacs' killer.

56.     Mr. Cunningham replied that he could not, because he did not see the shooting, and he did not know who did it.

57.     Mr. Cunningham said that Mr. Goodwin could not have done it, because he saw Mr. Goodwin sitting on a nearby stoop at the time of the shooting.

58.     Defendant Gaul said he could not help Mr. Cunningham, that he would be stuck at the Homicide Unit unless he did what they wanted him to do, and then left the room, slamming the door on his way out.

59.     For hours on end, Defendants Gaul and Verrecchio continued returning to the room and demanding Mr. Cunningham cooperate—that is, identify Mr. Goodwin as the murderer, or remain detained at the Homicide Unit.

60.     Like Defendant Pitts, they also threatened him with criminal charges—including prosecution for Dwayne Isaacs' murder—if he did not give them what they wanted.

61.     At one point, they offered him food, and he accepted their offer, but they intentionally never gave him anything to eat.

62.     They also never offered him anything to drink.

63.     Then, around 1:30 PM on July 21st, after Mr. Cunningham had been illegally detained at the Homicide Unit for over nineteen hours and subjected to a litany of coercive tactics, his will was finally broken.

64.     Defendant Gaul again told Mr. Cunningham that they knew Mr. Goodwin killed Dwayne Isaacs and that Defendants needed his help.

8

65.    Out of fear of what they would do to him if he did not, as they said, cooperate with them, Mr. Cunningham felt compelled to go along with the false story that Defendants had crafted, one that misidentified Mr. Goodwin as Dwayne Isaacs' killer, and one that created the misimpression that Defendants had treated him well during the course of his brutal interrogation.

66.    Accordingly, Mr. Cunningham involuntarily assented to a false statement implicating Mr. Goodwin in the murder and stating or otherwise implying that Defendants Gaul, Verrecchio, Pirrone, and Pitts had not employed abusive and coercive tactics against him.

67.    For instance, the statement falsely indicated:

a.    that Mr. Cunningham had been at the Homicide Unit for nearly one day "due to unrelated murder investigations," when the truth was that Defendants held him there for that duration as a coercive tactic;

b.    that Mr. Cunningham had the opportunity to eat, drink, and rest and felt well physically; and

c.    that no one from PPD or the Homicide Unit "threatened" him or "promised" him anything "to give this interview," and that Mr. Cunningham had cooperated with Defendants voluntarily.

68.    After typing the false statement, Defendant Gaul mockingly asked Mr. Cunningham if he was hungry.

69.    Mr. Cunningham said he was.

70.    Defendant Gaul printed out the statement and told Mr. Cunningham they needed him to sign and initial it.

71.    Recalling Defendants' threats, abuse, and unlawful detention of him, Mr. Cunningham believed the only way they would stop was if he did as Defendant Gaul demanded.

9

72.    So, Mr. Cunningham signed and initialed the statement and falsely identified Mr. Goodwin as the shooter both in a typed statement and in handwriting on a photo of Mr. Goodwin.

73.    Then, at approximately 3:00 PM on July 21st, Defendant Gaul handed him $15 and released him from the Homicide Unit, following a nineteen-and-a-half-hour unlawful and torturous detention and interrogation.

74.    It was not long before Defendants Gaul, Verrecchio, Pirrone, and Pitts again deployed their abusive and dishonest tactics.

75.    Approximately three hours after Mr. Cunningham's release, and at the behest of Defendants Verrecchio, Gaul, Pirrone, and Pitts, police detained and handcuffed Aaron Respes without lawful authority and transported him to the PPD's Homicide Unit.

76.    There, on the orders of Defendants Verrecchio, Gaul, Pirrone, and Pitts, he was locked in a small, windowless room, much like the room to which Mr. Cunningham was confined.

77.    Defendants Gaul, Pirrone, and Pitts took the lead in interrogating Mr. Respes.

78.    Soon after Mr. Respes arrived at the Homicide Unit, Defendants Gaul and Pirrone entered the room where he was detained.

79.    Defendant Gaul told Mr. Respes that he had already spoken with Mr. Cunningham, and Cunningham said Mr. Respes was present when Isaacs was killed.

80.    Defendant Gaul indicated that he already knew what happened to Dwayne Isaacs and that Mr. Respes needed to help the detectives with the investigation into Isaacs' killing.

81.    Defendant Gaul told Mr. Respes that if he did not comply, he would be in serious trouble.

10

82.    Mr. Respes truthfully told Defendants Gaul and Pirrone that he did not know what happened, that he did not know who shot and killed Dwayne Isaacs, and that all he could say was the shooter had a beard and dark skin, based on the extremely quick glance he got of the shooting.

83.    Defendants Gaul and Pirrone left the room.

84.    To foster the impression that Mr. Respes would be detained indefinitely and be in legal trouble if he did not comply with their demands, Defendants Gaul and Pirrone waited hours until they returned.

85.    In the meantime, Mr. Respes could not, and did not, sleep.

86.    That was the result that Defendants Gaul, Pitts, and Pirrone wanted by intentionally doing nothing to help Mr. Respes feel comfortable enough to sleep, knowing that sleep deprivation would weaken Mr. Respes' will to resist their coercive tactics.

87.    When Defendants Gaul and Pirrone finally did return, this time accompanied by Defendant Pitts,[3] Mr. Respes asked them if he could leave.

88.    They said he could not.

89.    They falsely told him he was going to be charged with conspiracy to murder Dwayne Isaacs.

90.    Then, Defendant Gaul read Mr. Respes his *Miranda*[4] rights, to create the false impression in Mr. Respes' mind that they were serious about charging him.

91.    To that end as well, Defendants Gaul, Pirrone, and Pitts told Mr. Respes that he would be sent to Curran-Fromhold Correctional Facility, a/k/a CFCF, a maximum-security prison in Philadelphia, and that he would never see his mother again.

---

[3] Before returning with Defendant Pitts, Defendants Gaul and Pirrone apprised him of their interactions with and abuse of Mr. Respes.
[4] 384 U.S. 486 (1966).

Case ID: 231002233
Control No.: 23114867

92.     But they made clear that if Mr. Respes cooperated with them, he might not face that fate.

93.     Mr. Respes felt compelled to do as they demanded.

94.     Defendant Gaul displayed to Mr. Respes a number of photos, including a photo of Mr. Goodwin.

95.     That photo was the same one on which Mr. Cunningham had identified Mr. Goodwin as Dwayne Isaacs' killer, and Defendants told Mr. Respes as much—but intentionally concealed the falsity of the identification and the coercive tactics they used to secure it.

96.     Defendants Gaul, Pirrone, and Pitts then told Mr. Respes that Mr. Goodwin had killed Dwayne Isaacs, and that they needed him to identify Mr. Goodwin as Dwayne Isaacs' killer.

97.     Mr. Respes told them he could not identify Mr. Goodwin as the shooter, because all he saw was the shooter's beard and dark complexion.

98.     Defendants Gaul, Pirrone, and Pitts then left the room, stoking fear in Mr. Respes that they would make good on their threats.

99.     Defendants Gaul, Pirrone, and Pitts later returned to the room and repeated their threats, making clear that Mr. Respes' would either identify Mr. Goodwin as the shooter, or be charged with conspiracy to murder Dwayne Isaacs.

100.    So coerced, Mr. Respes agreed to falsely identify Mr. Goodwin.

101.    Accordingly, Mr. Respes involuntarily assented to a false statement implicating Mr. Goodwin in the murder and stating or otherwise implying that Defendants Gaul, Pirrone, and Pitts had not employed abusive and coercive tactics against him.

102.    For instance, the statement falsely indicated:

12

Case ID: 231002233
Control No.: 23114867

    a.  that Mr. Respes had been at the Homicide Unit for more than twelve hours "due to unrelated murder investigations," when the truth was that Defendants held him there for that duration as a coercive tactic;

    b.  that Mr. Respes "felt good" physically; and

    c.  that no one from PPD or the Homicide Unit "threatened" him or "promised" him anything "to give this interview," and that Mr. Respes had cooperated with Defendants voluntarily.

103.    Then, at approximately 7:30 AM on July 22nd, following nearly thirteen hours of illegal detention and coercive, unlawful interrogation tactics, Defendants released Mr. Respes.

104.    To help ensure that their unlawful tactics were concealed, Defendants Verrecchio, Gaul, Pirrone, and Pitts did not document them, whether in the coerced statements of Mr. Cunningham and Mr. Respes or elsewhere.

105.    Nor did they document any evidence of the falsity of the identifications they coerced.

106.    On or about August 2, 2011, Defendant Verrecchio swore out an affidavit of probable cause (AOPC) to secure a warrant for Mr. Goodwin's arrest in connection with the killing of Dwayne Isaacs.

107.    The only assertions in the AOPC supporting a finding of probable cause were descriptions of the purported identifications of Mr. Goodwin by Mr. Cunningham and Mr. Respes.

108.    But Defendant Verrecchio intentionally omitted from the AOPC the illegal and coercive tactics he and his cohort employed to secure those identifications and the bevy of additional facts indicating those identifications were false and unreliable.

13

109.     Defendant Verrecchio transmitted the AOPC to the prosecution, but he intentionally concealed from the prosecution the truth about the interrogations of Mr. Cunningham and Mr. Respes.

110.     No other police officer supplied the prosecution with the truth.

111.     None the wiser, the prosecution approved the AOPC, paving the way for Mr. Goodwin's wrongful arrest.

112.     Defendant Verrecchio then presented the AOPC to a magistrate judge on August 2, 2011, but he concealed the truth about the interrogations of Mr. Cunningham and Mr. Respes from the judge as well.

113.     No other police officer supplied the judge with the truth.

114.     The judge approved the warrant for Mr. Goodwin's arrest.

115.     Hours later, Mr. Goodwin was arrested without incident in the park where Dwayne Isaacs was killed.

116.     Soon thereafter, Mr. Goodwin was arraigned on murder and related charges and held without bail in CFCF, the same jail where Defendants Gaul, Pirrone, and Pitts threatened to send Mr. Respes if he did not falsely implicate Mr. Goodwin.

117.     On October 25, 2011, Mr. Goodwin appeared before the Philadelphia Municipal Court for his preliminary hearing.

118.     His preliminary hearing had previously been continued because Mr. Respes did not come to court.

119.     Mr. Respes did not come to court because the police had forced him to falsely identify Mr. Goodwin, and he did not want to continue to be complicit in framing an innocent man for murder.

14

120.   This time, however, Defendants Gaul and Verrecchio secured a bench warrant for Mr. Respes.

121.   They executed the warrant by kicking down the door of his mother's house, handcuffing Mr. Respes, and placing him under arrest.

122.   They then brought Mr. Respes to the Homicide Unit and later to the Criminal Justice Center, where the Philadelphia Municipal Court was located.

123.   They told Mr. Respes that he had a choice: either testify consistently with his police statement, or stay in jail.

124.   Coerced once again, Mr. Respes falsely testified that Mr. Goodwin shot Dwayne Isaacs and that the detectives treated him decently.

125.   However, Mr. Respes did truthfully testify that he could only see the shooter's beard, that detectives told him that Mr. Goodwin killed Dwayne Isaacs, and told him they needed him to help them by identifying Mr. Goodwin.

126.   Defendant Gaul testified as well, falsely telling the judge that detectives did not identify Mr. Goodwin as the shooter before Mr. Respes did, that Mr. Respes was not forced to identify Mr. Goodwin or told to pick Mr. Goodwin, and that Mr. Respes never expressed doubt about Mr. Goodwin's identity as the shooter.

127.   Again, the prosecution and Mr. Goodwin were none the wiser.  Not only did Defendants continue to hide the truth about Mr. Respes' interrogation from them, but they also concealed their threat to jail Mr. Respes if he did not testify consistently with his false statement.

128.   As a result of Mr. Respes' coerced, false identification testimony and Defendant Gaul's perjury, Mr. Goodwin was bound over for trial for Dwayne Isaacs' murder.

**Mr. Goodwin Is Tried and Convicted for Dwayne Isaacs' Murder**
**Based on False Evidence and Sentenced to Die in Prison for a Crime He Did Not Commit**

15

129.    Mr. Goodwin remained incarcerated without bail at CFCF while he awaited trial, which took place from May 20th through May 28th of 2013, nearly two years after his arrest.

130.    No physical or forensic evidence connected Mr. Goodwin to Dwayne Isaacs' killing.

131.    Accordingly, the prosecution's case against Mr. Goodwin rested on the coerced, fabricated police statements of Mr. Cunningham and Mr. Respes and the lies that Defendants Gaul and Verrecchio told the jury to conceal the truth about their cohort's interrogations of Mr. Cunningham and Mr. Respes.

132.    Mr. Cunningham truthfully testified that he did not witness the shooting of Dwayne Isaacs, so he could not actually identify anyone as the shooter, and that he told the Homicide Unit detectives as much.

133.    Mr. Cunningham further truthfully testified that, through coercive methods including prolonged detention, threats of criminal prosecution, and physical abuse, he was forced to falsely implicate Mr. Goodwin and sign a statement that included numerous falsehoods, from identifying Mr. Goodwin as Dwayne Isaacs' shooter, to stating that no one from the PPD or the Homicide Unit threatened him into implicating Mr. Goodwin.

134.    Mr. Respes truthfully testified that, although he saw the immediate aftermath of the shooting for a split second, he could not identify the shooter, and that he told the Homicide Unit detectives as much.

135.    Mr. Respes also truthfully testified that, through coercive methods including prolonged detention and threats of criminal prosecution, he was forced to falsely implicate Mr. Goodwin and sign a statement that included numerous falsehoods, from identifying Mr. Goodwin

16

Case ID: 231002233
Control No.: 23114867

as Dwayne Isaacs' shooter, to stating that no one from the PPD or the Homicide Unit threatened him into implicating Mr. Goodwin.

136.    Because Pennsylvania Rules of Evidence permit the introduction of prior inconsistent statements as substantive evidence, the coerced, false police statements of Mr. Cunningham and Mr. Respes were admitted against Mr. Goodwin.

137.    So, too, was the false testimony of Defendants Gaul and Verrecchio.

138.    Defendant Gaul admitted that he was involved in taking the statements of Mr. Cunningham and Mr. Respes, and that Defendant Pitts "definitely had contact with Mr. Cunningham."

139.    But he offered little other truthful testimony concerning the interrogations of Mr. Cunningham and Mr. Respes or Homicide Unit interrogation practice more generally.

140.    Instead, he lied repeatedly to the jury to create the false impression that Mr. Cunningham and Mr. Respes voluntarily, and that they truthfully identified Mr. Goodwin as Dwayne Isaacs' shooter.

141.    Those lies included:

   a.  That he and his cohort took every precaution to ensure that Mr. Cunningham and Mr. Respes were kept comfortable and given anything they wanted;

   b.  That he and his cohort were simply attempting to build a positive rapport with Mr. Cunningham and Mr. Respes;

   c.  That he and his cohort did not threaten, physically abuse, or otherwise deploy coercive tactics against Mr. Cunningham and Mr. Respes;

   d.  That Defendant Pitts would not deploy physical abuse towards a witness or suspect, and therefore did not choke Mr. Cunningham;

17

    e.   That Mr. Cunningham and Mr. Respes never expressed doubt about their ability to identify or an inability to identify Dwayne Isaacs' shooter; and

    f.   That the answers in Mr. Cunningham's and Mr. Respes' statements were their own words, not his, Defendant Verrecchio's, Defendant Pirrone's, or Defendant Pitts'.

142.    Defendant Verrecchio spun similar falsehoods, telling the jury that neither he nor any detective in his presence threatened Mr. Cunningham, that he had no information anyone choked Mr. Cunningham, and that he had made unfruitful attempts to investigate Leroy Brown as a suspect in Dwayne Isaacs' killing.

143.    As before trial, Defendants Gaul, Verrecchio, Pirrone, and Pitts concealed the truth about their abusive, deceitful tactics from the prosecution and defense as well.

144.    They also concealed evidence from the prosecution and the defense that would have undermined Defendant Gaul's and Verrecchio's testimony that their cohort treated Mr. Cunningham and Mr. Respes respectfully and humanely, including Defendant Pitts' sustained PPD Internal Affairs (IA) complaints, Richard Carpenter's lawsuit against Defendant Gaul, and Recco Ford's lawsuit against Defendant Verrecchio. *See* ¶¶ 148–51, 168, & 169 , *infra*.

145.    Through the testimony of Anara Brown, Mr. Goodwin presented the above-described evidence of his innocence.[5]

146.    But it was not enough to overcome the lies that Defendants Verrecchio, Gaul, Pirrone, and Pitts had spun.

147.    As a result of their coercive, deceitful police work and their concealment of the same from the prosecution, the judiciary, the jury, and the defense, Mr. Goodwin was wrongfully

---

[5] *See* ¶¶ 18–21.

Case ID: 231002233
Control No.: 23114867

convicted of Dwayne Isaacs' murder on May 28, 2013 and sentenced to life without parole the same day.

**Mr. Goodwin Receives Federal Habeas Relief Based on
the Concealment of Defendant Pitts' History of Misconduct and Is Later Exonerated**

148.   In December 2021, over one decade into Mr. Goodwin's wrongful incarceration for Dwayne Isaacs' murder, the Philadelphia District Attorney's Office (DAO) disclosed Defendant Pitts' internal affairs ("IA") history to Mr. Goodwin.

149.   That IA history contains witness statements and conclusions of the PPD finding that Defendant Pitts had abused his authority.

150.   The prosecution concluded that these sustained findings of misconduct were, until December 2021, concealed from Mr. Goodwin.

151.   Those findings were:

   a.   That, on January 18, 2002, Defendant Pitts assaulted his then-wife, PPD Officer Michelle Dotson, and that Defendant Pitts' version of the events to IA, in which he accused Dotson of, among other things, striking him, was not credible;

   b.   That, in 2012, Defendant Pitts unjustifiably arrested and detained for over six hours Leroy Cook, an 84-year-old man whose grandson, Naim Cook, was a material witness in a homicide prosecution, that Defendant Pitts "utilized the detention [of the 84-year-old] as a tool to illicit [sic] cooperation from [the material witness]," and that, in so doing, Defendant Pitts abused his authority and unjustifiably damaged private property; and

   c.   That, beginning on June 1, 2013, Defendant Pitts unlawfully detained Zshani al-Rasul, who was sought in connection with a murder investigation,

19

at the Homicide Unit for approximately 47 hours without legal justification, failed to offer her a meal every eight hours, and abused his authority, and that Defendant Pitts' version of the events was not credible.[6]

152.    The prosecution also explained that, had this favorable evidence been disclosed to Mr. Goodwin, he could have discovered additional damning evidence of Defendant Pitts' abusive behavior in other homicide prosecutions, including Unique Drayton's and Amin Speakes'.[7]

153.    Equipped with this exculpatory and impeaching evidence, Mr. Goodwin, the prosecution explained, could have severely undermined the case against him and, thus, his due process rights were violated, entitling him to habeas corpus relief.

154.    Concluding that the suppression of this favorable evidence violated Mr. Goodwin's right to a fair trial, United States Magistrate Judge Lynne A. Sitarski recommended granting Mr. Goodwin habeas corpus relief, a recommendation United States District Court Judge Timothy J. Savage accepted less than one month later.

155.    Following additional investigation, the prosecution concluded that Mr. Goodwin was likely innocent and moved to withdraw all charges against Mr. Goodwin on February 16, 2013.

156.    That day, Philadelphia County Common Pleas Court Judge Barbara A. McDermott granted the prosecution's motion, finally vindicating Mr. Goodwin's claim of innocence.

---

[6] Disgraced former Detective Ronald Dove—who was sentenced to prison and probation for helping his girlfriend evade arret for the slaying of her ex-lover—was also involved in al-Rasul's mistreatment. Joseph A. Slobodzian, *Ex-Philly homicide detective pleads guilty to helping girlfriend flee murder charge*, THE PHILADELPHIA INQUIRER (Apr. 26, 2017), available at https://www.inquirer.com/philly/news/crime/Ex-Philly-homicide-detective-pleads-guilty-to-helping-girlfriend-flee-murder-charge.html.

[7] Defendant Pitts' shocking misconduct in Ms. Drayton's and Mr. Speakes' cases is detailed below at ¶¶ 171 & 173.

20

157.    Soon, for the first time in over eleven years, Mr. Goodwin was a free man.

### The PPD's Pattern and Practice
### of Unconstitutional Misconduct in Homicide Investigations, and
### Defendant Clark's Specific Endorsement and Encouragement of the Same

158.    For decades before the investigation of Dwayne Isaacs' murder and for years following it, the City of Philadelphia had in force and effect a policy, practice, and custom of unconstitutional misconduct in homicide investigations.

159.    That policy, practice, or custom involved: using coercive techniques in interviews and interrogations to obtain confessions; fabricating inculpatory evidence; withholding exculpatory evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees by, for example, feeding details about the crime that police knew (or believed to be true) to those witnesses, suspects, and arrestees.

160.    This policy, practice, or custom involved withholding and hiding evidence from the prosecution and defense lawyers for the accused leading up to and at trial and continuing with post-conviction counsel for decades, including, without limitation: interview reports, photographs, forensic analyses, circumstances of confessions, facts on how confessions were coerced, and what promises were made to obtain confessions or incentivize witnesses.

161.    This policy, practice, or custom involved the use of various techniques to coerce inculpatory statements, including, but not limited to: isolation; separating vulnerable suspects or witnesses from their friends and family; intentionally interrogating those in custody without first advising them of their *Miranda* rights; threatening witnesses and suspects with criminal prosecution; intentionally advising witnesses of their *Miranda* rights to create the impression that they would be charged with a crime if they did not comply with investigators' demands; subjecting individuals to needlessly and deliberately prolonged interrogations; unlawful

detention; denial of legal counsel; making false promises, including the promise that a suspect or witness will be allowed to go home if they make an inculpatory statement; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence; and providing false assurances, to vulnerable people and others, that they would benefit from making an inculpatory statement minimizing their own involvement.

162.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: fabricating detailed statements based on alleged facts previously known to police; providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation; selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation, and rehearsal; and misrepresenting that a suspect's or witness's formal statement was a verbatim statement in the their own words.

163.    At the time of the investigation into Dwayne Isaacs' murder, these practices had long been well known to the City of Philadelphia and its policymakers due to newspaper investigations (including Pulitzer Prize-winning reporting in the *Philadelphia Inquirer* in 1977 and 1978), governmental investigations, complaints from lawyers and civilians, and internal police investigations.

164.    The misconduct described in this Complaint was committed with the knowledge of and in full view of Homicide Unit and PPD supervisors, because of their deliberate indifference to it, or through affirmative encouragement and instruction.

Case ID: 231002233
Control No.: 23114867

165.    Even though he was responsible for ensuring that those detectives and their colleagues adhered to legal restrictions on their investigative methods, Defendant Clark made clear to Homicide Unit detectives—like Defendants Verrecchio, Gaul, Pitts, and Pirrone—that he supported and expected them to deploy the unconstitutional tactics described above to close homicide investigations.  And, as explained, they met these expectations in their investigation of Dwayne Isaacs' murder.

166.    Defendant Clark effectively fostered a culture of impunity among Homicide Unit personnel.  He either intentionally ignored or consciously disregarded constitutional and other legal restrictions on his and his subordinates' conduct, at least in part because he believed that those legal restrictions improperly interfered with their ability to close homicide investigations.  And he commended his subordinates for closing cases while knowing or recklessly disregarding the fact that they were closed through the deployment of unlawful tactics and falsely implicated innocent persons.

167.    Various cases demonstrate that the above-described misconduct was pervasive within the PPD at the time of the investigation into Dwayne Isaacs' murder.

168.    **Richard Carpenter** (No. 07-cv-0012-MMB (E.D. Pa.)).  In 2007, prosecutors admitted they made a mistake when they sought a murder conviction against Kevin Felder.  The case against Mr. Felder was based on four inculpatory witness statements, though all four witnesses recanted their statements and testified that the statements were the results of threats and intimidation by homicide detectives.  One of those witnesses was Richard Carpenter.  In 2006, **Defendant Gaul** physically abused Mr. Carpenter, threatened his family, and coerced him to falsely implicate Mr. Felder.  Without objection from the City of Philadelphia, Mr. Carpenter obtained an injunction against Defendant Gaul, prohibiting Defendant Gaul from contacting him

23

without his written consent or his counsel's presence.   The City settled Carpenter's suit for $30,000.

169.   **Recco Ford** (No. 12-cv-02150-JP (E.D. Pa.)).   In 2007, Recco Ford was arrested and charged with murder for the shooting death of Leon Blackwell.   He was ultimately acquitted in 2010 after serving three years in prison.   **Defendant Verrecchio** was one of the two detectives assigned to lead the investigation.   Mr. Ford's arrest was predicated on an arrest warrant secured by Defendant Verrecchio, who knew, or had reason to know, that the information in the affidavit in support of the arrest warrant was false and based on statements that two juvenile witnesses were coerced into signing.   Defendant Verrecchio did not disclose to prosecutors: (a) the fact that the juveniles were coerced into identifying Ford as the shooter; (b) that the juveniles written statements were fabricated; (c) that a recording of exculpatory police dispatch broadcasts was in police files; and (d) that two suspects in the shooting had been taken into custody on the day of the shooting, but were released shortly thereafter.   The City settled the lawsuit for $600,000.

170.   **Dwayne Thorpe** (CP-51-CR-0011433-2008; 2:19-cv-05094-GEKP).   On July 4, 2008, Hamin Span was shot and killed by a teenager in Kensington, while Mr. Thorpe, then 25 years old, was at a block party in a different Philadelphia neighborhood miles away.   But **Defendant Pitts**, **Detective Timothy Scally**, and others would soon pin Mr. Span's murder on Mr. Thorpe with the aid of unconstitutional investigative tactics.   Defendant Pitts and Detective Scally first coerced Senetra Stones to falsely implicate Mr. Thorpe in Mr. Span's killing, by deploying tactics including threatening to take her children away and threatening criminal prosecution for alleged contraband found in her apartment during an illegal search.   Pitts then turned to Allen Chamberlain, against whom he deployed physical violence, threats of a murder prosecution, and threats to take Mr. Chamberlain's children away to coerce him to falsely

24

implicate Mr. Thorpe in Mr. Span's killing.   Finally, Defendant Pitts and Detective Scally unlawfully induced Nyfeese Robinson, Mr. Span's 15-year-old brother, to falsely identify Mr. Thorpe as Span's killer.   Pitts, Scally, and their cohort concealed their tactics from the prosecution and the defense, as well as the jury that convicted Mr. Thorpe on the basis of Mr. Chamberlain's false implication of Mr. Thorpe to the police and Mr. Robinson's improper in-court identification.   In November 2017, the Honorable M. Theresa Sarmina of the Philadelphia Court of Common Pleas granted Mr. Thorpe a new trial, concluding that Pitts used "habitually coercive conduct towards witnesses in custodial interrogations" based on the testimony of numerous witnesses who had suffered such abuse at Pitts' hands.   After concluding that Mr. Robinson's identification was the product of suggestion and Mr. Chamberlain's purported statement to Pitts was unreliable, the prosecution dismissed all charges against Mr. Thorpe in March 2019, liberating him following almost 11 years of wrongful incarceration.   In early 2023, the City of Philadelphia, Defendant Pitts, Detective Scally, and other Homicide Unit Detectives implicated in Mr. Thorpe's wrongful prosecution and incarceration settled Mr. Thorpe's civil rights lawsuit for an undisclosed sum.

**171.   Unique Drayton** (CP-51-CR-0013794-2009).   Beginning on August 24, 2009, Unique Drayton was detained at the Homicide Unit by **Defendant Pitts**.   In a windowless interrogation room, where she was held for forty hours, Defendant Pitts threw her into and handcuffed her to a bolted chair.   When she tried to sleep, Pitts cursed at her.   She was not read her *Miranda* rights before Pitts began questioning her, and Pitts ignored her requests to call her attorney.   While interrogating her, Pitts repeatedly threatened her and cursed at her.   Ultimately, he fabricated a statement that she, under duress, agreed to sign.   Only after Ms. Drayton so agreed did Pitts issue her *Miranda* warnings.   A judge of the Philadelphia County Court of

25

Common Pleas concluded that Drayton's alleged confession was the product of "psychological coercion" and that Pitts' contrary testimony was "incredible." Following this ruling, the prosecution withdrew all charges against Drayton in 2011.

172.   **Jamaal Simmons** (CP-51-CR-0007218-2010; No. 5:19-cv-01648-GJP (E.D. Pa.)). Jamaal Simmons was convicted of third-degree murder and related charges based on false inculpatory statements of two alleged witnesses, Richard Taylor and Kareem Jenkins. On August 23 and 24, 2009, now-disgraced **Detective Philip Nordo**[8] and **Detective Norma Serrano** detained Mr. Taylor in a locked interrogation room at the Homicide Unit. On August 26, 2009, Nordo and Serrano did the same to Mr. Jenkins. The detectives fed Mr. Taylor and Mr. Jenkins details concerning the crime, and they failed to record statements both made that exculpated Mr. Simmons. Instead, Nordo and Serrano fabricated statements inculpating Mr. Simmons, and they used threats, physical force, and deception to coerce Mr. Taylor and Mr. Jenkins to sign these statements as if they had made them. For instance, they told Mr. Taylor and Mr. Jenkins that the fabricated statements were simply forms that needed to be signed to secure their own release from custody. Nordo also constantly confronted Mr. Taylor when he was not in police custody and told him that if he did not inculpate Mr. Simmons, Nordo would ensure his life was "fucked up." Nordo and Serrano also attempted to force, coerce, and intimidate Mr. Simmons into falsely confessing to the murder. Neither Nordo nor Serrano disclosed their methods to the prosecution. Years later, Simmons' conviction was vacated, and the DAO withdrew all charges against him.

---

[8] Former Detective Nordo is now serving a 24.5-to-49-year prison term for sexually assaulting witnesses and informants in murder cases. Chris Palmer, *Up to 49 years in prison for an ex-Philly homicide detective who sexually abused witnesses and informants*, THE PHILADELPHIA INQUIRER (Dec. 16, 2022), available at https://www.inquirer.com/news/philip-nordo-philadelphia-sex-assault-prison-20221216.html.

Case ID: 231002233
Control No.: 23114867

173.   **Amin Speakes** (No Docket Available).  Soon after the October 7, 2009 slaying of Timothy Ross, Shaquille Rainey, a 16-year-old child with a learning disability, was detained and transported to the Homicide Unit.   **Defendant Pitts** and **Detective Ohmar Jenkins** held Mr. Rainey there for more than six hours and interrogated him without a parent present, despite his repeated requests to call his aunt.  During the interrogation, Pitts pushed Mr. Rainey around the interview room, threatened to kick his ass, and repeatedly told him he would be charged with Ross' murder and spend the rest of his life in jail unless he implicated Mr. Speakes.  So coerced, Mr. Rainey signed a statement that falsely implicated Mr. Speakes in Ross' murder.  Fortunately, Mr. Speakes' innocence—and the falsity of Mr. Rainey's statement—was proven by video footage that placed both of them miles away from the scene of the crime when Mr. Ross was killed.   Following two years of pretrial detention, Mr. Speakes was acquitted at trial. Commenting to the Philadelphia Inquirer about the case, with full knowledge of what the trial had revealed, **Defendant James Clark** did not express contrition, regret, or concern about the appalling misconduct of his detectives, but instead said he was "very sorry to hear it was a not-guilty verdict."

174.   **Marvin Hill** (CP-51-CR-0005356-2011; No. 2:23-cv-01002-GJP).  On January 7, 2010, Stacey Linwood Sharpe, Jr., was shot and killed in the 1300 block of Cumberland Street in North Philadelphia, while, as evidenced by surveillance video obtained by the PPD the next day and the police dispatch report, Mr. Hill stood in the front of a corner store approximately one block away, completely uninvolved in the shooting.  Nonetheless, beginning on January 15, 2010, Mr. Hill was detained and brutally interrogated at the Homicide Unit by **Detective Nordo** and **Detective Kevin Judge** about his involvement in Mr. Sharpe's killing, beginning with Detective Judge rejecting Mr. Hill's repeated assertions that he did not know anyone by the name

27

Stacey Sharpe or recognize Mr. Sharpe's photo, and, with Detective Judge's knowledge, proceeded with Defendant Nordo engaging in a litany of coercive behavior over the ensuing days, ranging from threats to make Mr. Hill's "life a living hell" if he did not do as Nordo demanded, to a highly disturbing series of sexual advances, to the use of physical force against Mr. Hill. When Mr. Hill rejected Nordo's sexual advances, Nordo promised Mr. Hill he would "make sure [he] never [sees] daylight again" and left him in the interrogation room for another full day, before he was released. Defendant Nordo made good on his promise, coercing two purported witnesses to falsely implicate Mr. Hill, and fabricating a statement implicating Mr. Hill from a third witness. Following twelve years of wrongful incarceration, Mr. Hill was exonerated on February 21, 2023.

175. **Obina Onyiah** (CP-51-CR-0001632-2011; No. 2:22-cv-01556-JP (E.D. Pa.)). Based on the tip of Donnell Cheek, an opportunistic jailhouse informant seeking a reduction in his lengthy federal sentence, **Defendant Pitts**, **Detective Jenkins**, and **Detective Thorston Lucke** detained Mr. Onyiah for questioning on November 8, 2010 in connection with the October 21, 2010 murder of William Glatz, committed by two perpetrators—one who died at the scene and one who got away. The detectives agreed that Defendant Pitts, as was his practice, would employ coercive tactics, including physical force to threats, to convince Mr. Onyiah to confess the murder, and Defendant Pitts deployed these tools, at times, in the presence of Detectives Jenkins and Lucke. In response to Mr. Onyiah's proclamations of innocence, Defendant Pitts deployed violence and intimidating tactics against Mr. Onyiah, including punching him with a closed fist on his chest, hitting his shoulder, jabbing his shoulder with a pointed finger, and yelling and spitting no more than two inches from his face. After the interrogation, Defendant Pitts sat next to a computer to conduct a photo identification procedure,

Case ID: 231002233
Control No.: 23114867

during which Pitts grabbed the back of Mr. Onyiah's neck and forced it between Mr. Onyiah's own legs, demanding that he "stop lying and pick the right one." Years later, through analyzing video footage of Mr. Glatz's murder, experts in photogrammetry[9] determined that Mr. Onyiah *could not* have been the second perpetrator. Following eleven years of wrongful incarceration, Mr. Onyiah was exonerated in May 2021. Less than one year later, Defendant Pitts was arrested and charged with two counts of perjury for denying he touched or hit Mr. Onyiah or grabbed Mr. Onyiah's head and put it between Mr. Onyiah's legs, and one count of Obstructing the Administration of Law or Other Governmental Function for assaulting Mr. Onyiah without lawful justification on November 8, 2010.[10] Pitts' jury trial is scheduled to begin October 30, 2023.

> a. The grand jury that recommended charging Pitts heard evidence from one of Pitts' fellow Homicide Unit detectives, identified only as Detective #4 in the jury's presentment, who described Pitts' interrogation technique as "aggressive with yelling and kind of easing his way into the personal space of that person trying to get their attention." Detective #4 said Pitts would get "as close as [a] foot to a person" being interrogated, curse at them and call them names, and "threaten witnesses with jail time saying 'if you don't tell us the truth you might get locked up and you might not be able to see your kids again.'"

---

[9] Photogrammetry is the science and technology of obtaining reliable information about physical objects and the environment through the process of recording, measuring, and interpreting photographic images and patterns of electromagnetic radiant imagery and other phenomena.

[10] *Com. v. James Pitts*, CP-51-CR-0004729-2022, MC-51-CR-0003501-2022 (Phila. Ct. Com. Pl.).

Case ID: 231002233
Control No.: 23114867

    b. Detective #4 not only verified that Pitts regularly used such threats, but implied that it was a widespread practice, one that Detective #4 and the Homicide Unit widely employed, stating "you try to say things that get their heart going and say, hey, what's more important to you here, your family and your freedom," or not cooperating with the Homicide Unit.

    c. As to Pitts, the grand jury concluded "that while acting in his official capacity Detective Pitts habitually used coercive interrogation techniques when interviewing suspects and witnesses in the Homicide Unit of the Philadelphia Police Department, and lied under oath to conceal his criminal acts."

176.  **Cordero Smith** (CP-51-CR-0001649-2012).  Cordero Smith was convicted of first-degree murder and related charges based, in significant part, on a false inculpatory statement falsely attributed to Brandon Coley, which was obtained by the collective efforts of **Detectives Jenkins, Nordo, Gregory Singleton**, and **Frank Glenn**.  On August 3, 2011, Nordo and two other detectives detained and cuffed Mr. Coley, then a juvenile, while Coley was in Philadelphia Family Court, and brought him without his parents to the Homicide Unit.  Nordo and Singleton locked Mr. Coley in a small, windowless interrogation room for eight to nine hours.  Toward the end of that time, Singleton and Glenn supplied Mr. Coley with a false inculpatory narrative, and they threatened to charge him with the murder if he did not agree to it.  After Mr. Coley signed the statement under duress, he was released.  The detectives also supplied a false inculpatory narrative to the other key witness in the case, Aleisha Pope.

177.  **Keisha Jones** (CP-51-CR-0001050-2012).  On November 27, 2011, Keisha Jones was charged with murder after allegedly hitting her husband with a car and killing him.

Case ID: 231002233
Control No.: 23114867

That charge followed a lengthy, unconstitutional interrogation by **Defendant Pitts** and **Detective John Bamberski**. Jones was taken by police to the Homicide Unit shortly after her husband died, where Bamberski and Pitts locked her without her shoes in a windowless, frigid interrogation room for many hours. She complained of being cold and needing the bathroom, but her complaints were ignored. Pitts told Jones that if she did not implicate her brother in another homicide, they would charge her with killing her husband, that she would go to prison for life, and that her children would be placed in foster care. Pitts repeatedly called her a "bitch." Ultimately, Bamberski and Pitts fabricated a statement creating the false impression that Jones admitted to chasing the victim with the car, forcefully stepping on the gas, and hitting him with the car. Ms. Jones actually told them that she hit the gas pedal while looking for her husband in a vacant lot, did everything she could to stop the car, and did not even know her husband was hit because she did not see him walk in front of the car. Neither Bamberski nor Pitts recorded this version in their fabricated statement. Nor did they disclose the truth about Ms. Jones's statement to the prosecution. Ultimately, they coerced her – with threats and physical force – to sign the false confession. Instead of disclosing their interrogation tactics and Ms. Jones's protestations of innocence, Bamberski and Pitts concealed their misconduct. The fabricated inculpatory statement was integral to the Commonwealth's case, leading to a first-degree murder conviction and life without parole sentence. Ms. Jones's convictions and sentences were reversed on appeal due, in significant part, to the discrepancy between her exculpatory testimony at trial and the false inculpatory statement fabricated by the detectives.

178.   **Reuben White** (CP-51-CR-0003382-2013; No. 180202076). White was falsely charged with first-degree murder and related charges in connection with a drive-by shooting,

following the deployment of unconstitutional investigative tactics by **Detective Nate Williams**[11] and fellow Homicide **Detectives Micah Spotwood**, **Edward Tolliver**, and **James Griffin**.

179.    They first targeted **Ernest Davis**, whom they knew, based on video footage, could not have identified those responsible for the shooting.  Beginning in the evening of May 31, 2012, they held Mr. Davis against his will for approximately twenty hours in a Homicide Unit interrogation room.  During that time, Mr. Davis repeatedly and truthfully insisted he could not identify those responsible for the shooting, but the detectives told him they believed he could. They insisted he knew Mr. White was involved, and they told him he would be charged with the murder if he did not identify White as the driver of the car from which the shots were fired that killed the decedent.  Spotwood and Griffin typed up a statement for Mr. Davis, falsely asserting Davis implicated White, and told Davis he would not be allowed to leave until he signed it. Following twenty hours of confinement, Mr. Davis relented and signed the statement.  Neither Spotwood nor Griffin disclosed the truth or their tactics to the prosecution.

180.    Then, on July 22, 2012, Williams and Tolliver targeted **William Truxton**, the owner of the car used in the drive-by.  Even though they had no evidence Mr. Truxton to the shooting or any crime, Williams and Tolliver detained him at the Homicide Unit for thirty hours, questioning him repeatedly and insisting that they knew he had rented his car to Mr. White.  Mr. Truxton denied these accusations, insisting he had rented it to someone else.  Williams and Tolliver rejected his denials, and they told Mr. Truxton he would be charged with the murder if he did not identify Mr. White as the person to whom he rented the car.  At approximately 8:00

---

[11] On November 21, 2019, Detective Williams was fired from the PPD and charged with Tampering with Public Records or Information with the Intent to Defraud or Injure Another, Tampering with or Fabricating Physical Evidence, Unsworn Falsification to Authorities (four counts), and Obstructing Governmental Administration.  The erroneous dismissal of those charges for lack of evidence is now pending before the *en banc* Superior Court.  *Com. v. Nathaniel Williams*, No. 980 EDA 2021.

Case ID: 231002233
Control No.: 23114867

PM on July 23, 2012, **Williams** typed up a statement purporting to show that Mr. Truxton identified Mr. White as the person to whom he rented the car before the shooting. Having been detained for more than thirty hours, Mr. Truxton reluctantly signed the statement. Neither Williams nor Tolliver disclosed to the prosecution that they knew Mr. Truxton had not identified Mr. White as the renter. Nor did they disclose that he only signed the statement because he was held against his will for over a day and was threatened with criminal charges.

181.     On August 14, 2012, Spotwood and Tolliver prepared a false, typewritten statement for a third witness, **Ikim Graham**. As with Mr. Davis, the detectives knew, from video evidence, that Mr. Graham could not credibly identify those responsible for the shooting. Nonetheless, Spotwood and Tolliver detained Mr. Graham at the Homicide Unit and insisted he knew that White was the driver of the car from which the shots were fired. Mr. Graham repeatedly and truthfully insisted he did not know who was driving the car. Spotwood and Tolliver typed up a statement reflecting their false version of the events and made clear to Mr. Graham that, if he did not sign it, he would be charged with the murder and/or face federal firearms charges. Neither Spotwood nor Tolliver disclosed their tactics or the truth to the prosecution.

182.     Finally, on October 12, 2012, Mr. White was taken into custody and held for three days at the Homicide Unit, where Spotwood and Tolliver repeatedly questioned him to pressure and coerce him into making and signing a confession. White truthfully told them he was not involved in the murder.

183.     Aware of the tactics his subordinates deployed, **Lieutenant Melvin Williams** requested the prosecution charge Mr. White. However, he did not disclose his subordinates' misconduct to the prosecution, because this misconduct was consistent with Homicide Unit's

33

operations and policy, and because disclosure would prevent Mr. White from being charged.   The

charges were approved.

184.   Mr. Davis, Mr. Truxton, and Mr. Graham testified truthfully at Mr. White's jury

trial and advised the jury that they had been coerced into signing the false inculpatory statements.

On February 25, 2016, the jury acquitted White of all charges.

185.   **James   Frazier**   (CP-51-CR-0010069-2012,   CP-51-CR-0010070-2012;   No.

19-cv-1692 (E.D. Pa.)).   James Frazier was convicted of two counts of third-degree murder and

related charges based entirely on a false inculpatory confession falsely attributed to him.   That

false   confession   was   fabricated   by   **Defendant   Nordo**,   with   the   assistance   of   allegations

previously known to homicide investigators.   Nordo twice detained and interrogated Mr. Frazier

at the Homicide Unit in June 2012.   The first detention began on June 2, 2012 and lasted at least

three-and-a-half – if not five-and-a-half – days.   Mr. Frazier was permitted to defecate once, but

Nordo would not permit him to wipe, so feces remained on his body for days.   Nordo also made

sexual advances towards Mr. Frazier, which Frazier rejected.   Nordo threatened and intimidated

Mr. Frazier until he falsely confessed, despite his repeated protestations of innocence.   And

falsely confess he did, so that he would be permitted to leave, shower, and change his clothes.

Nordo   did   not   memorialize   this   false   confession,   understanding   it   would   be   deemed

unconstitutionally obtained.   Instead, Nordo detained and interrogated Mr. Frazier again on or

about June 19, 2012, lied to **Detective John Verrecchio** that Frazier had confessed, and recruited

Verrecchio to memorialize the false confession.[12]   Nordo never *Mirandized* Mr. Frazier.   Nor did

he disclose any of his unconstitutional tactics to the prosecution.   The prosecution only learned

of   Nordo's   misdeeds   following   Mr.   Frazier's   conviction   on   both   murders   and   years   of

imprisonment.   On April 4, 2019, following the prosecution's discovery of Nordo's misconduct

---

[12] This process was not captured on audio or video.

34

in Mr. Frazier's case, the Honorable Scott O'Keefe of the Philadelphia County Court of Common Pleas permitted the withdrawal of all charges against Frazier.

186. **Zshani al-Rasul.** In June of 2013, **Detectives Pitts** and **Ronald Dove** detained al-Rasul, an alleged witness to a homicide, for three days in a locked Homicide Unit interrogation room, where she was forced to sleep on a metal, bench-like chair. They denied her request for a phone call. Dove put a note on the door of the room to ensure she was not fed. Over the entire weekend, she was only permitted to have one pretzel and one Pepsi. While Ms. al-Rasul was detained, Dove and Pitts repeatedly insisted she had information about the homicide, and she insisted she did not. Pitts grabbed her arm and told her to remove her jewelry and shoelaces, and he threatened that she would go to prison and have her thirteen-year-old son taken away. Despite the detectives' efforts, Ms. al-Rasul did not sign a statement. In November 2013, al-Rasul filed a complaint with PPD's Internal Affairs Division (IAD), which concluded that Pitts abused his authority, improperly detained her, and failed to offer her a meal every eight hours. In August 2014, the City of Philadelphia paid $110,000 to settle Ms. al-Rasul's lawsuit concerning her brutal mistreatment.

187. **Sherman McCoy** (CP-51-CR-0002501-2014; No. 21-cv-1458 (E.D. Pa.)). On September 18, 2013, Shaheed Jackson was shot and killed in North Philadelphia by Lester Lanier and Rashawn Mack, as an eyewitness told **Detective Nordo** soon thereafter. Through various coercive tactics—including physical abuse (choking) and threats of the same, as well as threats of prosecution for Mr. Jackson's murder, prolonged detention, and deprivation of food, the bathroom, and sleep—**Detectives Nordo** and **Williams**, together with **Sergeant Robert Wilkins**, forced Lester Lanier to falsely implicate Mr. McCoy in Mr. Jackson's shooting death. Then, they turned their sights to Mr. McCoy, whom they knew was intellectually disabled.

35

Again through a litany of coercive tactics—including denying him water, food, and sleep; screaming at and spitting on him; authoritatively asserting his guilt; threatening indefinite detention if he did not cooperate; and promising him he could leave if he signed a statement implicating himself—**Nordo**, with the blessing of Williams and Wilkins, forced Mr. McCoy to falsely implicate himself in Mr. Jackson's murder. Before Mr. McCoy's trial, at which the sole evidence against him was his false confession, Lester Lanier was granted immunity for the purposes of testifying against Mr. McCoy. But Nordo deceived the jury, telling them that Mr. Lanier was not granted immunity. His and his fellow detectives' deception did not end there; indeed, they also concealed the truth about their mistreatment of Mr. McCoy and the fact that an eyewitness exculpated Mr. McCoy. Nearly six years after Mr. McCoy's arrest, he was granted a new trial based on Nordo's perjury concerning the immunity agreement and exonerated on the same day.

188. **Ruben Mora**. In 2014, Mora was arrested in connection with the drug-related murder of Miguel Gonzalez and spent thirteen months in jail, before prosecutors withdrew all charges against him. **Defendant Gaul** and **Detective Carl Watkins** coerced the sole alleged witness to identify Mora, by threatening to prosecute her criminally and take away her child if she did not identify Mora. Mr. Mora filed a civil suit alleging the same, which the City of Philadelphia settled for $45,000.

189. **Quintin Jones** (CP-51-CR-0006928-2015). Quintin Jones was charged with first-degree murder and related charges. A key piece of evidence was an inculpatory statement that **Detectives Nordo** and **Nate Williams** fabricated and falsely attributed to Mr. Jones, an intellectually disabled man, during a seventeen-hour detention and interrogation that took place on May 19 and 20, 2015. Nordo, in conspiracy and concert with Williams, interrogated Mr.

Case ID: 231002233
Control No.: 23114867

Jones for over five hours without providing *Miranda* warnings, and failed to record Jones's declarations of innocence. After a pretrial hearing in which Nordo invoked his privilege against self-incrimination and refused to testify, the Honorable Diana Anhalt of the Philadelphia County Court of Common Pleas found that Nordo fabricated Jones's inculpatory statement and falsely attributed it to Jones. At the time of Mr. Jones's interrogation, he had the following drugs in his system: Adderall, Theraquil, Abilify, Xanax, and PCP.

190.    At the time of the investigation and prosecution of Mr. Goodwin, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses in criminal investigations, without legal cause and with the intent of coercing statements from these persons, under threat of punishment, detention, physical harm and/or other sanctions or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and / or their attorney sought the right to consult. Exculpatory evidence obtained during these detentions and interrogations was concealed by the PPD from the prosecution, as were the forcible and coercive tactics the PPD employed in these investigations.

191.    This policy, practice, or custom – exemplified by the investigation in Mr. Goodwin's case and those detailed in paragraphs 168 through 189, *supra* – continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.

192.    This deliberate indifference is not simply evidenced by this case and the those detailed in paragraphs 168 through 189, *supra*, and others that are expected to be revealed through discovery, but also by the fact that, prior to January 1, 2014, the PPD did not have clear

Case ID: 231002233
Control No.: 23114867

internal guidance and / or rules in place concerning the constitutional rights of suspects and witnesses in the context of questioning and interrogation.

193.    For instance, there was no clear guidance or rules on how long a suspect or witness could lawfully be in custody *or* how to interview a suspect or witness consistent with constitutional mandates (e.g., that *Miranda* warnings must precede custodial interrogation).

194.    Additionally, prior to January 1, 2014, there was no directive or policy in place prohibiting the use of force, including low-level force,[13] in interrogations and interviews.

195.    Likewise, prior to January 1, 2014, the PPD did not mandate the recording of interrogations, even though they had access to audio and video recording equipment.  The absence of mandatory recording precluded *bona fide* supervisory review of interrogators' conduct and helped enable the deployment of unconstitutional tactics.

196.    Finally, as of the date of this filing, the PPD still does not have in place a policy or clear guidance on disclosing exculpatory or impeachment evidence of any sort to the prosecution, including, but not limited to, exculpatory evidence uncovered while questioning or interrogating a suspect or witness.[14]

197.    On January 1, 2014, after further proof of the unconstitutional policy, practice, and custom described above was provided to the PPD, the DAO, and the City of Philadelphia, the PPD began requiring the video recording of all Homicide Unit interrogations, and issued

___

[13] Low-level force encompasses police language (vocabulary, tone, or volume), physical positioning, or touching employed to threaten, coerce, or intimidate an individual to say or do something that individual would not say or do otherwise.  Examples of improper low-level force include threatening the imposition of criminal punishment or some other form of sanction, including taking one's children away.

[14] The PPD's current directive on the Rules of Discovery, Directive 5.21, includes obsolete citations to rules of criminal procedure, both local (Mun. Ct. R. Crim. P. 558) and statewide (Pa. R. Crim. P. 305), that no longer govern discovery.  It does not include any instructions on recording exculpatory or impeachment material or disclosing such material to the prosecution, notwithstanding clear legal precedent and authority from at least 1996.

Case ID: 231002233
Control No.: 23114867

Directive 5.23, which provided guidance for the detention and interrogation of witnesses and suspects.

**198.** Among other things, Directive 5.23 established that:

    a.  "Police personnel shall not use force of any kind, threats, of force, threats of deportation, threats of administrative action, improperly withhold property or conduct any other form of abusive coercion directed toward a victim complainant, witness or any family member thereof to make the victim, complainant or witness provide information";

    b.  "Under no circumstances are police personnel permitted to use force or any physically inhumane or abusive coercion against a suspect to make them provide incriminating information.   The use of physical force during an interrogation is expressly prohibited";

    c.  "All custodial interrogations shall be preceded by the issuance of the *Miranda* warning. ... If at any stage of the custodial questioning the suspect indicates by word or action that they want to stop talking or to consult with an attorney before continuing, the questioning shall stop";

    d.  Investigators must clearly notify witnesses, complainants, and victims being questioned in police facilities "that the questioning is non-custodial and that the person being questioned is free to discontinue and leave at any[]time"; and

    e.  Suspects[15] may not be detained indefinitely and must be released after thirty-six hours of detention without being charged; and

---

[15] Directive 5.23 does not define "suspect."

Case ID: 231002233
Control No.: 23114867

   f. Police detaining a suspect must follow a set of detailed procedures once an

    uncharged suspect is in custody for twelve, twenty-four, and thirty-six hours.

199.   The response to the enactment of Directive 5.23 shows just how integral the above-described unconstitutional policies, practices, and customs were to the operations of the PPD Homicide Unit.

200.   The clearance rate – the rate of cases cleared by arrest or other means – for homicide cases dropped precipitously after Directive 5.23 went into effect.

201.   Detectives in the Homicide Unit publicly spoke out against the Directive. **Defendant Clark**, commander of the Homicide Unit from 2007 through July of 2017, stated publicly that the Directive's policies "have really handcuffed, and made it very, very difficult, for my detectives to do their jobs."[16] According to these detectives and Defendant Clark, Directive 5.23 "made it difficult to **compel** anyone to provide information to the police."[17] (emphasis added).

202.   In other words, the PPD's Homicide Unit relied on the ability to violate the constitutional rights of suspects and witnesses to investigate and clear cases. Absent that freedom, the Homicide Unit lost among the most effective tools at its disposal, and its clearance rate dropped from over 70% between 2008 and 2013 to 58.1% in 2014, 51% in 2015, 45.4% in 2016, and 37.4% in 2017.[18] And, of course, the higher "clearance" rate included a significant number of false convictions—like Mr. Goodwin's—that would not have existed but for the

---

[16] Chris Palmer, *Head of Philly Police Homicide Unit Transferred*, THE PHILADELPHIA INQUIRER (July 31, 2017, 11:08 AM), https://www.inquirer.com/philly/news/crime/head-of-philly-police-homicide-unit-transferred-201 70713.html.

[17] *Id.*

[18] Given this reliance on violating constitutional rights as an indispensable investigative tool, it is no surprise that the Homicide Unit's five-year 70% clearance rate was nearly 10 points higher than the national average.

unconstitutional conduct of Homicide Unit detectives, including Defendants Clark, Verrecchio, Pirrone, Gaul, and Pitts.

203.    This policy, practice, or custom was not recently developed and implemented in the Homicide Unit.  Instead, it had been a central feature of the Homicide Unit's investigative practices for decades, as highlighted in the cases of Anthony Wright (2:16-cv-05020-GEKP), Walter Ogrod (2:21-cv-02499-JP), and Jimmy Dennis (2:18-cv-02689-JS), filed in the Federal District Court for the Eastern District of Pennsylvania, as well as many others.[19]

204.    In sum, at the time of the investigation and prosecution of Mr. Goodwin, the PPD had a practice, policy, or custom of:

a.  Engaging in unlawful interrogation of suspects, witness detentions and interrogations, fabrication of witness and suspect statements, and failing to record and disclose exculpatory and impeachment evidence;

b.  Failing to appropriately discipline or take corrective action against police officers who engaged in illegal or unconstitutional conduct;

c.  Failing to properly train and supervise officers on the constitutional limitations on their investigative, detention, and arrest powers;

d.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights during police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, arrests, coercion of witnesses, falsifying and fabrication of evidence, and suppression of exculpatory evidence; and

---

[19] Mr. Goodwin incorporates by reference the complaints filed the cases of Anthony Wright, Walter Ogrod, and Jimmy Dennis.

Case ID: 231002233
Control No.: 23114867

    e.  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and / or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police officers, including the defendant officers in this case, to violate the rights of citizens such as Mr. Goodwin.

205.    At the time of the investigation and prosecution of Mr. Goodwin, and for many years before and thereafter, the PPD and the City of Philadelphia have been deliberately indifferent to the need to train, supervise, and discipline police officers. The PPD's IAD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions. Instead, its disciplinary system is marred by the following deficiencies:

    a.  An arbitrary and inconsistent process that does not meet accepted standards;

    b.  Excessive and chronic delays in resolving disciplinary complaints;

    c.  A lack of consistent, rational, and meaningful disciplinary and remedial actions;

    d.  Persistent failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    e.  An incident-based, rather than progressive, approach to discipline, such that repeat violators are not penalized in proportion to the number of violations;

    f.  Insufficient training and supervision of IAD personnel in the proper conduct of IAD investigations, reflected by the poor quality of investigations conducted – including routinely failing to interview eyewitnesses and conducting interviews below accepted standards, by, e.g., failing to address key issues – and by the invalidity of investigative findings and conclusions;

Case ID: 231002233
Control No.: 23114867

g. A pattern of administrative conduct where the benefit of the doubt is given to the officer, as reflected in a global analysis of IAD's investigatory procedures;

h. The absence of an effective early warning system to identify, track, and monitor "problem" officers; and

i. Persistent failures to acknowledge the disproportionate use of force against civilians and duly classify the police officers' misconduct as impermissible uses of force.[20]

---

[20] On March 24, 2015, the Department of Justice issued a report critical of PPD policies and practices, finding that "[t]he department's disciplinary mechanism is inconsistent, subject to chronic delays, failed to impose meaningful disciplinary or remedial sanctions, and marred by inadequate investigations."

43

Case ID: 231002233
Control No.: 23114867

**Damages**

206.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Goodwin to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve nearly twelve years in prison for a crime he did not commit.

207.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin sustained injuries and damages, including loss of freedom and youth for nearly twelve years between the ages of twenty-one and thirty-two, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

208.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin was deprived of his familial relationships, romantic relationships, and friendships.

209.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin sustained economic injuries and damages, including loss of income and loss of career opportunities.

210.    As a direct result of Defendants' conduct and omissions, Mr. Goodwin sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

44

Case ID: 231002233
Control No.: 23114867

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983: Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (against all individual defendants excluding Defendant Clark)

211.    Plaintiff incorporates the preceding paragraphs by reference.

212.    The individual defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Goodwin for Dwayne Isaacs' murder, intentionally caused Mr. Goodwin to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Goodwin's clearly established Fourth and Fourteenth Amendment rights to be free from prosecution without probable cause.

213.    The individual defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

214.    The individual defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Goodwin's clearly established constitutional rights.  No reasonable officer in 2011 would have believed this conduct was lawful.

215.    The prosecution finally terminated in Mr. Goodwin's favor on February 16, 2023, when the Philadelphia County Court of Common Pleas permitted the Commonwealth of Pennsylvania to withdraw all charges against Mr. Goodwin.

216.    The individual defendants' acts and omissions described in the preceding paragraphs were the direct and proximate cause of Mr. Goodwin's injuries, because they knew, or should have known, that their conduct would result in the wrongful arrest, charging, prosecution, conviction, and incarceration of Mr. Goodwin.

Case ID: 231002233
Control No.: 23114867

**COUNT II**

**42 U.S.C. § 1983: Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation** (against all individual defendants excluding Defendant Clark)

217. Plaintiff incorporates the preceding paragraphs by reference.

218. The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Goodwin of his clearly established right to due process of law and a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including, without limitation, the false statements of Andre Cunningham and Aaron Respes.

219. The individual defendants deprived Mr. Goodwin of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense, including, without limitation, information regarding the true circumstances of the interrogations of Mr. Cunningham and Mr. Respes.

220. The individual defendants deprived Mr. Goodwin of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to duly investigate Leroy Brown as the real killer.

221. The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Goodwin's clearly established constitutional rights. No reasonable officer in 2011 would have believed this conduct was lawful.

222. Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries. Defendants knew, or should have

46

known, that their conduct would result in Mr. Goodwin's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV
### 42 U.S.C. § 1983: Civil Rights Conspiracy (against all individual defendants)

223.    Plaintiff incorporates the preceding paragraphs by reference.

224.    The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Goodwin of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

225.    In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Suggesting, coercing, and / or fabricating inculpatory evidence in the form of witness statements;

b.    Intentionally or with deliberate indifference failing to comply with their duty to disclose exculpatory and impeachment material during the pendency of this case;

c.    Wrongfully prosecuting Mr. Goodwin while knowing that they lacked probable cause; and

d.    Committing perjury during hearings and trials.

226.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries. Defendants knew, or should have

47

known, that their conduct would result in Mr. Goodwin's wrongful arrest, charging, prosecution, conviction, and incarceration.

## COUNT V
**42 U.S.C. § 1983: Failure to Intervene** (against all individual defendants)

227.     Plaintiff incorporates all the preceding paragraphs by reference.

228.     By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment with the PPD, had opportunities to intervene on behalf of Mr. Goodwin to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law. Yet, with deliberate indifference, they declined to do so.

229.     These Defendants' failures to intervene violated Mr. Goodwin's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 2011 would have believed that failing to intervene to prevent these Defendants from any of the following actions was lawful: coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, conducting custodial interrogations without giving *Miranda* warnings, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, or causing Mr. Goodwin to be arrested, prosecuted, convicted, and sentenced without probable cause.

230.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries. Defendants knew, or should have

48

known, that their conduct would result in Mr. Goodwin's wrongful arrest, charging, prosecution, conviction, and incarceration.

## COUNT VI
### 42 U.S.C. § 1983: Supervisory Liability (against Defendant Clark)

231.    Plaintiff incorporates the preceding paragraphs by reference.

232.    Defendants Verrecchio, Gaul, Pirrone, and Pitts acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Clark, both in this case and as a matter of practice and custom.

233.    Defendant Clark acted recklessly and with deliberate indifference to Mr. Goodwin's constitutional rights by failing to adequately train, supervise, and discipline the PPD Homicide detectives assigned to investigate Dwayne Isaacs' murder, thereby allowing and causing these detectives to deprive Mr. Goodwin of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

234.    Defendant Clark, as the Captain of the Homicide Unit, developed, implemented, and affirmatively encouraged the use of unconstitutional investigative tactics by, for example, instructing his subordinates, to employ such tactics, commending his subordinates for "solving" cases through use of such tactics, and refusing to discipline his subordinates for employing such tactics.

235.    The reckless and deliberately indifferent conduct of Defendant Clark violated their clearly established duty in 2011 to supervise Defendants Verrecchio, Gaul, Pirrone, and Pitts, and no reasonable police supervisor in 2011 would have believed that reckless and

deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

236.    The acts and omissions of Defendant Clark, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Goodwin's injuries.   Defendant Clark knew, or should have known, that his conduct would result in Mr. Goodwin's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VII
### 42 U.S.C. § 1983: Municipal Liability (against Defendant City of Philadelphia)

237.    Plaintiff incorporates the preceding paragraphs by reference.

238.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Goodwin's  wrongful  arrest and conviction, and for many years preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular: the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; and the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory and impeachment evidence.

239.    The City of Philadelphia's final policymakers had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; and fabricating inculpatory evidence (e.g., fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime).   Despite being on notice

50

of these unconstitutional practices, policies, or customs, the City of Philadelphia failed to take appropriate remedial and / or disciplinary actions to curb this pattern of misconduct.

240.    Such unconstitutional municipal customs, practices, and / or policies were the moving force behind Mr. Goodwin's false arrest, charging, prosecution, and more than 11.5 years of incarceration, as well as the other injuries and damages set forth above.

### COUNT VIII
**Malicious Prosecution under Pennsylvania Law** (against all individual defendants excluding Defendant Clark)

241.    Plaintiff incorporates the preceding paragraphs by reference.

242.    The defendants, acting alone, jointly, and/or in concert and conspiracy knowingly, intentionally, negligently, maliciously and/or recklessly caused, initiated, or continued proceedings against Mr. Goodwin's without probable cause, and the proceedings ultimately terminated in Mr. Goodwin's favor on February 16, 2023, when the prosecution withdrew all charges against him.

243.    As a result of this malicious prosecution, Mr. Goodwin sustained the injuries and damages set forth above.

### COUNT IX
**Outrageous Conduct Causing Severe Emotional Distress under Pennsylvania Law** (against all individual defendants excluding Defendant Clark)

244.    Plaintiff incorporates the preceding paragraphs by reference.

245.    Defendants, acting alone, jointly, and/or in concert and conspiracy, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Mr. Goodwin.

51

246.   The acts or omissions of the defendants as alleged in the preceding paragraphs constitute the tort of Outrageous Conduct Causing Severe Emotional Distress, all to Mr. Goodwin's great detriment and loss.

247.   As a result of the defendants' conduct, Mr. Goodwin suffered and continues to suffer damages as described above.

## COUNT X
**Civil Conspiracy under Pennsylvania Law** (against all individual defendants)

248.   Plaintiff incorporates the preceding paragraphs by reference.

249.   Defendants acting alone, jointly, and/or in concert and conspiracy committed tortious and other unlawful acts against Mr. Goodwin, including malicious prosecution and outrageous conduct causing severe emotional distress.

250.   As a result of the defendants' conduct, Mr. Goodwin suffered and continues to suffer damages as described above.

## RELIEF DEMANDED

WHEREFORE, Christopher Goodwin respectfully requests that the Court grant the following relief:

A.   A declaratory judgment that Defendants violated Mr. Goodwin's rights under the Fourth and Fourteenth Amendments and Pennsylvania law;

B.   An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

C.   An award of nominal damages against all Defendants in an amount to be determined by the finder of fact;

Case ID: 231002233
Control No.: 23114867

D.     An award of punitive damages against Defendants Clark, Verrecchio, Gaul, Pirrone, and Pitts in an amount to be determined by the finder of fact;

E.     Reasonable attorney's fees and costs; and,

F.     Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

/s/ Jon Cioschi
/s/ Alan Tauber
WISEMAN & SCHWARTZ, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 360-3988
cioschi@wisemanschwartz.com
atauber@atauberlaw.com

Case ID: 231002233
Control No.: 23114867

DocuSign Envelope ID: 682CEF44-A7C1-410F-A2B0-3385EDFCFEA9

## VERIFICATION

I, ___Christopher Goodwin_____, verify that the statements
contained in the foregoing Complaint are true and correct to the best of my
knowledge or information and belief. I understand that any false statement in the
Complaint is made subject to the penalties of 28 U.S.C. § 1746 and 18 Pa. Cons.
Stat. Ann. § 4904, relating to unsworn falsification to authorities.

Dated: _10/22/2023_____       _____

FILED
21 NOV 2023 04:08 pm
Civil Administration
J. BOYD

# EXHIBIT B

Case ID: 231002233
Control No.: 23114867

**Confidential
Investigative
Services, Inc.**

Plaintiff:   **Christopher Goodwin**

County:  **Philadelphia**

vs.

Term #:  **October 2023 Term, 02233**
Defendant:  **City of Philadelphia, James Pitts, et al.**
Locate:   **James Pitts**
Address Given:   **5745 Hazel Avenue, Philadelphia, PA 19143**

ATTN:  **Alan J. Tauber, Esquire**
**Law Office of Alan J. Tauber**
**Two Penn Center, Suite 900**
**Philadelphia, PA 19102**

## AFFIDAVIT OF GOOD FAITH INVESTIGATION

SEARCH OF INVESTIGATIVE DATABASE SOURCES
Searches conducted identified three last known addresses of James Pitts: 7524 Gilbert Street, Philadelphia, PA 19150; 1502 North Robinson Street, Philadelphia, PA 19151 and 4854 Gransback, Street, Philadelphia, PA 19120.  5745 Hazel Avenue in Philadelphia, PA is not reported by investigative database sources as the subject's last known address.  See exhibit attached.

REQUEST OF THE PHILADELPHIA BOARD OF ELECTIONS – VOTERS REGISTRATION DIVISION
A request was made of the Voter Registration Division to provide information regarding the registered address of James Pitts.  The subject originally registered in 2003 and at that time, his address was reported of 512 High Street, Philadelphia, PA 19144.  Voting requirements do not require individuals to update their registration address.  Mr. Pitts last voted in May of 2021.  See exhibit attached.

INQUIRY OF THE PENNSYLVANIA DEPARTMENT OF TRANSPORTATION
Search was requested to determine vehicles registered to James Pitts at 5745 Hazel Avenue, Philadelphia, PA 19143.  The response was received indicating there is no record of vehicles registered to the subject at that address.

Please note that the company which requested the information from the Department of Transportation at my request indicates that there are only two records of individuals named James Pitts in Philadelphia with vehicles registered in their name.  They are James H. Pitts of 3267 North Dover Street and James Pitts, Jr. of 923 West Dakota Street, both in Philadelphia, PA.  The defendant in this matter has never been reported to be a resident of the North Dover Street address and the West Dakota Street address is believed to be the subject's son's residence.  Performing searches, it was confirmed that James Pitts of the North Dover Street address is another individual known by the same name.

SEARCH OF PHILADELPHIA COUNTY AND UNITED STATES DISTRICT COURT RECORDS
Review of the defendant's criminal case file indicates that his address is reportedly 5745 Hazel Avenue, Philadelphia, PA 19143.  That address was reported in a Certification of Bail and Discharge of March 3, 2022, as well as on a Philadelphia Arrest Record of March 3, 2022 identifying the current address.  See exhibit attached.

Searches conducted of the District Court for the Eastern District of Pennsylvania uncovered record of a Petition for Alternative Service of Process on defendant James Pitts filed by Attorney Alan E. Denenberg, Esquire.  The attached Affidavit of the attorney indicates the attorney made a good faith effort through a process server to effect service of process upon the subject at 5745 Hazel Avenue, Philadelphia, PA.  That address was also provided to Attorney Denenberg by the City Law Department.  Additional information is provided in the petition confirming that good faith efforts were made to effect service of process of James Pitts.  See exhibit attached.

Case ID: 231002233
Control No.: 23114867

Affidavit of Good Faith cont'd (Pitts, James)
Page Two

## EFFORTS AT SERVICE OF PROCESS

Efforts have been made to effect service of process upon James Pitts at 7524 Gilbert Street; 1502 North Robinson Street and 4854 North Gransback Street, all located in Philadelphia, PA. Attempts were made on four separate occasions since receipt of the complaint dated October 22, 2023. There was no answer to knocks at the door at any of the above noted addresses.

Efforts have also been made to effect service of process at 5745 Hazel Avenue in Philadelphia, PA. On each occasion since receipt of the complaint, I have found no answer at the door. The property has been dark in the evening hours and during the day, there has been no response. Efforts were made at service of process at 5745 Hazel Avenue on six separate occasions since receipt of the complaint on October 24, 2023.

Effort was made on October 27, 2023 at 7:00 p.m. There was no response at the residence and there were no lights inside the residence.

Effort was also made on October 29, 2023 at 3:30 p.m. Again, there was no response at the residence.

Service of process was attempted on November 1, 2023 at 4:00 p.m. There was no response at the residence.

On November 3, 2023, service was attempted at 6:30 p.m. There was no response at the residence.

On Saturday, November 4, 2023, at 2:00 p.m., an attempt was made to effect service of process. There was no response to knocks at the door.

On November 9, 2023 at 6:30 p.m., effort was also made to contact Mr. Pitts at the residence and again the house was dark and there was no response to knocks at the door.

## CONTACTS

On the occasions when daylight contacts were made in the 5700 block of Hazel Avenue, efforts were made to speak to neighbors residing directly adjacent and across the street. No one would offer any information to confirm whether Mr. Pitts is a current resident.

I CERTIFY UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT, TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND THAT FALSE STATEMENTS HEREIN ARE MADE SUBJECT TO THE PENALTIES RELATING TO UNSWORN FALSIFICATION TO AUTHORITIES.

AFFIANT: _[signature]_

DIANE COWAN, CLI

235 South 13th Street
Philadelphia, PA 19107
(215) 546-7400
(800) 503-7400
Fax (215) 985-0169

SWORN & SUBSCRIBED BEFORE ME THIS _14th_
OF _November_ 2023

_[signature]_
NOTARY PUBLIC

Commonwealth of Pennsylvania - Notary Seal
Erica Robertson, Notary Public
Philadelphia County
My Commission Expires December 15, 2026
Commission Number 1259604

Case ID: 231002233
Control No.: 23114867

**JAMES PITTS SR , 53 Years Old**

SSN 1:

SSN: ▮▮▮▮▮▮▮▮

Issued: **PENNSYLVANIA 1975-1977**

**Date of Birth**

DOB: **09/07/1970**

Age: **53**

**Address History**

**7524 GILBERT ST, PHILADELPHIA, PA 19150-2604 (PHILADELPHIA COUNTY)** (10/02/2015 to 11/07/2023)

**1502 N ROBINSON ST, PHILADELPHIA, PA 19151-4244 (PHILADELPHIA COUNTY)** (09/2017 to 09/2021)

Current Other Phone at address

**(215) 477-1742(ET) - CHARLES SHARPER**

**4854 GRANSBACK ST, PHILADELPHIA, PA 19120-4303 (PHILADELPHIA COUNTY)** (06/03/2021 to 06/03/2021)

Case ID: 231002233
Control No.: 23114867



# CITY OF PHILADELPHIA

**City Commissioners**
Lisa Deeley - Chair
Seth Bluestein
Omar Sabir

**Records Department: Deborah McAleer**
**Phone:(215) 686-1500**
**Fax : (215) 686-1542**
**deborah.mcaleer@phila.gov**

To Whom It May Concern:

The following voter information is a result of your request for a search of the voter registration files in Philadelphia County:

DATE: November 6, 2023

NAME: James Pitts

ADDRESS: 512 High St

CITY, STATE & ZIP: Philadelphia, PA 19144

DOB: 09/07/1970

ORIGIN/AL REG. DATE: 10/06/2003

DATE REG THIS ADDRESS: 09/10/2019

LAST VOTED: 5/18/2021

We hope this information will assist you in locating the individual (s) you are searching for. If you have any questions, please do not hesitate to call our office at the number listed above.

Sincerely,

*Kevin Richardson*

Administrator

**City Commissioners**
Rooms 130, 132, 134 City Hall
Philadelphia, PA 19107
Phone: (215) 686-3460, 3462, 3464
Website: www.phillyelection.com

**County Board of Elections**
Room 142 City Hall
Philadelphia, PA 19107
Phone: (215) 686-3943

**Voter Registration Division**
Riverview Place, 5th Floor
520 N. Delaware Avenue,
Philadelphia, PA 19123
Phone: (215) 686-1600

Case ID: 231002233
Control No.: 23114867

```
          COMMONWEALTH OF PENNSYLVANIA
          DEPARTMENT OF TRANSPORTATION
            DRIVER & VEHICLE SERVICES
             HARRISBURG, PA 17123
              11/07/23  14:18
```

                                        233110311000043 001

Dear Customer:


        The Bureau of Motor Vehicles has received your request for information.
We are not able to provide this information because the record you requested,
as indicated below, does not exist in our files.

NAME : *PITTS,JAMES

        If you have any questions concerning this information, please contact
Vehicle Record Services at the address or telephone number listed below.


                              Sincerely,

                              Customer Service Team
                              Bureau of Motor Vehicles

ADDRESS CORRESPONDENCE TO:        INFORMATION:    (8:00 AM TO 5:00 PM)
Department of Transportation      IN STATE            1-800-932-4600
Vehicle Record Services           OUT-OF-STATE          717-412-5300
PO Box 68691                      TDD IN STATE        1-800-228-0676
Harrisburg, PA 17106-8691         TDD OUT-OF-STATE      717-412-5380
                                  www.dot.state.pa.us

Case ID: 231002233
Control No.: 23114867

Page 1 of 1    *PARS*

# CERTIFICATION OF BAIL AND DISCHARGE

DKT #:MC51-CR-0003501-2022

BOND #:          DC #: 22-71-000034      OTN#: U2486665      CP #:

Commonwealth VS.  JAMES PITTS

Addr: 5745  hazel AV

     Philadelphia    PA  19143

DATE OF CHARGES: 03/03/2022

DEBRA   RAINEY
_____
(JUDGE OR ISSUING AUTHORITY)

CHARGES:

| Code | OC Description | Grade | Counts |
|------|----------------|-------|--------|
| CC4902A | PERJURY | F3 | 002 |
| CC5101 | OBSTRUCTING JUSTICE | M2 | 003 |

Bail Set at:  $10,000.00       SOB

Conditions of release: (Aside from appearing at court when required)

  (Attached addendum if necessary).

     $10,000.00         SOB

DA Recommends No Cas!

Defendants are released on bail subject to fingerprinting photographing and identification as well as court bail agency interview, prior to being released.

## APPEARANCE OR BAIL BOND:

THIS BOND IS VALID FOR THE ENTIRE PROCEEDINGS AND UNTIL FULL AND FINAL DISPOSITION OF THE CASE INCLUDING FINAL DISPOSITION OF ANY PETITION FOR WRIT OF CERTIORARI OR APPEAL TIMELY FILED IN THE SUPREME COURT.

### NEXT COURT ACTION:

Date & Time: 03/17/2022 08:00

Location:  906: 1301 Filbert Street, Stout Center

The CONDITIONS of this bond are that the defendant will:

(1) Appear before the issuing authority and in the Courts of the County Philadelphia, Pennsylvania, at all times as his presence may be required, ordered, or directed, until full and final disposition of the case, to plead, to answer and defend as ordered the aforesaid charge or charges.

(2) Submit self to all orders and processes of the issuing authority or Court.

(3) The DEFENDANT and the SURETY must give written notice to the issuing authority, Clerk of Courts, SCCJ,1301 Filbert St,3rd Fl; the District Attorney AND the Office of Judicial Records Bail Acceptance Unit, SCCJ 1301 Filbert Street, Basement (215)-683-7726/7727, of any change in his address within forty-eight hours of the date of his address change.

(4) Neither do, nor cause to be done, nor permit to be done on his or her behalf, any act proscribed by Crime Codes section 4952 (relating to intimidation of witnesses or victims) or sections 4953 (relating to retaliation against witnesses or victims) (18 Pa. C.S. #4953). Effective July 1, 1982.

(5) Refrain from criminal activity.

(6) Comply with any specific requirement of release imposed by the issuing authority or Court, such as a satisfactory participation in a designated program.

(7) Obey such other conditions as the Court, or Court Bail Agency with leave of issuing authority or Court, may impose.

If defendant performs the conditions as set forth herein, then this bond is to be void, otherwise the same shall remain in full force and this bond in the full sum thereof shall be forfeited.

- In the case of "Percentage Cash Bail" or "Nominal Bail", Power of Attorney is not required.

And further, in accordance with law, we do hereby empower any attorney of any court of record within the Commonwealth of Pennsylvania or elsewhere to appear for us at any time, and with or without declarations filed, and whether or not the said obligation be in default, to confess judgment against us, and in favor of the Commonwealth of Pennsylvania for use of the aforesaid County and its assigns, as of any term or session of a court of record of the aforesaid County for the above sum and costs, with release of all errors, without stay of execution, and inquisition on and extension upon any levy or real estate is hereby waived, and condemnation agreed to, and the exemption of personal property from levy and sale on any execution hereon is also hereby expressly waived, and no benefit of exemption is claimed under and by virtue of any exemption law now in force or which may be passed hereafter.

And for so doing this shall be sufficient warrant.  A copy of this bond and warrant being filed in said action, it shall not be necessary to file the original as a warrant of attorney, any law or rule of the Court to the contrary, notwithstanding.

I ACKNOWLEDGE THAT I AM LEGALLY RESPONSIBLE FOR THE FULL AMOUNT OF THE BAIL, IF ANY, AND ALL TERMS AND CONDITIONS OF THIS BOND.

THIS BOND IS ISSUED AND SIGNED

at PHILADELPHIA, PENNSYLVANIA.

X _____
           SIGNATURE OF DEFENDANT

Rev. 11/96  COPY (# 1)           03/03/2022 20:46:01        Case ID: 231002233
Control No.: 23114867



**Fir◯Judicial District of Pennsyl◯ia**
**Pretrial Service Division**
**Investigation Report**

*PARS*

## Arraignment

| Name | | | | Arraignment Court | | Arraign Date |
|---|---|---|---|---|---|---|
| JAMES PITTS | | | | Municipal-Stout Center, Rm. B08 | | 03/03/2022 20:43 |

| Arrest Date | CBN | PID | SID  SID 1: | District | Holding Facility |
|---|---|---|---|---|---|
| 03/03/22 | 1669069 | 1229794 | | District Attorney | PDU CCTV (750 Race St.) |

| Defendant | District no. | Charge | Grade | Description |
|---|---|---|---|---|
| 38919294 | 2271000034 | 94757 | F3 | PERJURY |

## Defendant Information

| Sex | Race | Birthdate | Age | Height | Weight | |
|---|---|---|---|---|---|---|
| M | B | 09/07/70 | 51 | 601 | 250 | |

| DEFENDANT: PITTS, JAMES<br>CURRENT ADDRESS:<br>5745 hazel AV<br>Philadelphia PA 19143-<br><br>LIVING WITH:<br>RELATIONSHIP: | DLN 1:<br><br>Primary Language<br>English<br><br>Residence in Philadelphia (YY/MM)<br>51/00 | ID Number<br><br>Type<br>Drivers License |
|---|---|---|

| Marital Status | How Long (YY/MM) | Children | Support | Amount | Voluntary/Court-Ordered |
|---|---|---|---|---|---|
| Divorced | 15/00 | 1 | No | | |

| Employment/Support | Military Service | Discharge |
|---|---|---|
| See Page 2 | Army<br><br>Education<br>Some College | Honorable |

COMMENTS: Defendant is responsible for $500 a month in rent. Address not verified. No reference provided. All reference numbers are in the defendants cell phone.

### Reasons for guidelines deviation :

DA Recommends No Cash Bail

SOB

DA  AND DEFENDANT pvt HAD PREVIOUS AGREEMENT ON BAIL

## Defendant

DEFENDANT: PITTS, JAMES
CURRENT ADDRESS:
5745 hazel AV
Philadelphia PA 19143-

LIVING WITH:
RELATIONSHIP:

MC-51-CR-0003501-2022 Comm. v. Pitts, James
Pre-Trial Investigation Report



6164212

| Block | Guideline Category |
|---|---|
| 18 | ROR- Standard Conditions |

PITTS,JAMES CBN - 1669069 PID - 1229794 DC#2271000034
Rev. 1/2004   *ORIGINAL DOCUMENT*                03/03/2022 20:46:03

Case ID: 231002233
Control No.: 23114867

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OBINA ONYIAH** | : |
| **Plaintiff** | : |
| **vs.** | : **CIVIL NO. 2:22-CV-01556** |
| **JAMES PITTS, ET AL.** | : |
| **Defendants** | : |

## O R D E R

     **AND NOW**, this     day of      , 2023, this Court having considered Plaintiff's Petition

for Alternative Service; and any Response thereto; it is hereby **ORDERED AND DECREED** that

this Motion is **GRANTED**.

     It is further Ordered that Plaintiff is Granted leave to Serve Plaintiff's Civil Action

Complaint by regular and certified mail, return receipt requested, and posting on the premises of

Defendant, James Pitts, at his last known address of 5745 Hazel Ave, Philadelphia, PA 19143.

     In the alternative, Plaintiff request the Court Order that service be made by a United States

Marshal or Deputy Marshal.


                         BY THE COURT:


                                                             J.

Case ID: 231002233
Control No.: 23114867

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OBINA ONYIAH** | : |
| **Plaintiff** | : |
| | : |
| **vs.** | : **CIVIL NO. 2:22-CV-01556** |
| **JAMES PITTS, et al.** | : |
| **Defendants** | : |

### PLAINTIFF OBINA ONIYAH'S PETITION FOR
### ALTERNATIVE SERVICE OF PROCESS ON DEFENDANT JAMES PITTS

Plaintiff, Obina Onyiah, by and through his attorney, Alan E. Denenberg, Esquire, hereby petitions this Court for Alternative Service pursuant to F.R.C.P. 4(e) and Pa.R.C.P. 430 to enter an Order in the form attached and in support thereof relies on the attached Affidavit and accompanying Exhibits.

**WHEREFORE,** Plaintiff respectfully requests this Court to enter an Order for Special Services of Process in accordance with the form Order attached hereto allowing Plaintiff's counsel to serve Defendant, former Detective James Pitts, by regular and certified mail, return receipt requested, and posting on the premises of Defendant, James Pitts, at his last known address of 5745 Hazel Ave, Philadelphia, PA 19143.

In the alternative, Plaintiff request the Court Order that service be made by a United States Marshal or Deputy Marshal.

**ABRAMSON & DENENBERG, P.C.**


BY: *Alan Denenberg*
          **ALAN E. DENENEBRG, ESQ.**
          **ATTORNEY FOR PLAINTIFF**
          **ABRAMSON & DENENBERG, P.C.**
          **1315 WALNUT STREET, SUITE 500**
          **PHILADELPHIA, PA 19107**
          **TEL: (215) 546-1345**

Case ID: 231002233
Control No.: 23114867

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBINA ONYIAH : | |
|      **Plaintiff** : | |
|     **vs.** : | **CIVIL NO. 2:22-CV-01556** |
| JAMES PITTS, et al. : | |
|     **Defendants** : | |

### <u>AFFIDAVIT OF ALAN E. DENENBERG, ESQUIRE</u>

Alan E. Denenberg, Esquire, being duly sworn according to law, upon his oath, deposes and says:

1.    I am an attorney in good standing licensed to practice in the Commonwealth of Pennsylvania and admitted to practice in the United States District Court for the Eastern District of Pennsylvania.

2.    I am the attorney from Abramson & Denenberg assigned to handle the litigation of Obina Onyiah and am most familiar with his file.

3.    On April 21, 2022, Plaintiff instituted a Civil Action for damages pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the statutory and common laws of the Commonwealth of Pennsylvania, for damages sustained as a result being maliciously prosecuted by Defendants. (See Docket Entry No. 1).

4.    On April 21, 22 Plaintiff's counsel reached out to the City Law Department immediately after filing Plaintiff's complaint, to accept service for all Defendants. (Email chain attached as Exhibit "A").

5.    On May 10, 2022, Plaintiff Counsel Forwarded the Summonses to Defense Counsel, Danielle Walsh (See Exhibit "B")

6.      Defense Counsel Danielle Walsh advised that she would be accepting service for all Defendants except for Defendant, former Detective James Pitts.

7.      On May 16, 2022, Defense Counsel Danielle Walsh provided former Detective James Pitts' last known address. (See Exhibit "C")

8.      On June 6, 2022, the Waiver of Service of Summonses for all Defendants except former Detective James Pitts were filed. (See Docket No. 4)

9.      On June 21, 2022, Defense counsel filed a Motion to Stay on behalf of "Defendants" and her appearance was inadvertently entered for former Detective Pitts. (See Docket Entry No. 5).

10.     On August 13, 14, and 17, 2022, Plaintiff's counsel did attempt service of the Complaint upon Defendant, James Pitts, at his last known address of 5745 Hazel Ave, Philadelphia, PA 19143 via professional process server and was not successful.

11.     Despite numerous attempts, the process server was unable to complete service. (See Exhibit "D").

12.     From August until December Plaintiff's counsel ceased any efforts to serve Defendant, James Pitts as it appeared that Defense Counsel Danielle Walsh had been entered for former Detective James Pitts.

13.     On December 22, 2022, Plaintiff's attorney mailed a waiver of service to Defendant, James Pitts at his last known address of 5745 Hazel Ave, Philadelphia, PA 19143 via first class and certified mail. Plaintiff's attorney never received a response. (See Exhibit E).

14.     On December 26, 2022, Defense Counsel Danielle Walsh filed a Motion to Withdraw as counsel for former Detective James Pitts. (See Docket Entry 18).

15.     Plaintiff intended to serve Defendant at the Criminal Justice Center when he appeared for his Jury trial scheduled on March 20, 2023, in Commonwealth vs. Pitts, CP-51-

0004729-2022. However, the trial has been rescheduled to October 30, 2023. (See Exhibit "F").

16.     On April 18, 2023, following the Rule 16 Conference, Plaintiff's Counsel reached out to Joseph Santarone, Esq. who had been identified as representing former Detective James Pitts in other civil lawsuits in his capacity as a Detective with the City of Philadelphia. Mr. Santarone was not authorized to confirm if Mr. Pitts still resides at the last known address provided by Danielle Walsh. (See Exhibit G).

17.     Plaintiff's counsel attempted to locate former Detective Pitts using a LexisNexis database search. This search shows multiple possible addresses including the one provided by Danielle Walsh as Pitts' last known. (See Exhibit H).

18.     Despite diligent efforts by the Plaintiff's attorney, Alan E. Denenberg, Esquire, defendant, James Pitts, has not been served.

19.     Plaintiff, Obina Onyiah through his attorney, Alan E. Denenberg, Esquire, has conducted a good faith investigation to ascertain the present residence of the defendant in that:

　　　a.  Plaintiff's counsel used Defendant's address obtained from the attorney for the City of Philadelphia.

　　　b.  Plaintiff's counsel hired a process server to serve the defendant, former Detective Pitts at said address. The process server advised Plaintiff's attorney that after several attempts he was unable to complete service.

　　　c.  Plaintiff's attorney mailed a waiver of service to defendant at said address.

　　　d.  Plaintiff's attorney believes 5745 Hazel Ave, Philadelphia, PA 19143 is a good address as the Zip code on the Hazel Ave. address is the only address that matches the zip code on the Criminal Court Summary and Mr. Pitts is required to provide his current address to the Criminal Court. (See Exhibit I).

20.     As of the date of the filing of this Petition, despite above listed efforts,

Defendant, former Detective James Pitts, has not been served with a copy of said Summons in Civil Action and Complaint.

21.     In accordance with F.R.C.P. 4(e), and after Plaintiff, Obina, Onyiah made good faith attempts to serve Defendant, former Detective James Pitts, Plaintiff petitions this Court for leave in order to issue special service of process by first-class mail and certified mail, returned receipt requested and to post the premises at 5745 Hazel Ave, Philadelphia, PA 19143.

22.     In the alternative, Plaintiff requests the Court Order that service be made by a United States Marshal or Deputy Marshal.

**WHEREFORE**, Plaintiff, Obina Onyiah respectfully requests that this Honorable Court enter the attached Order granting Plaintiff leave to effectuate service of legal process upon Defendant, James Pitts, last known address of 5745 Hazel Ave, Philadelphia, PA 19143, and by posting the Complaint to the premises of the Defendant's registered address of 5745 Hazel Ave, Philadelphia, PA 19143. In the alternative, Plaintiff request the Court Order that service be made by a United States Marshal on Deputy Marshal.

**ABRAMSON & DENENBERG, P.C.**

BY: *Alan Denenberg*
**ALAN E. DENENBERG, ESQ.**
**ATTORNEY FOR PLAINTIFF**
**ABRAMSON & DENENBERG, P.C.**
**1315 WALNUT STREET, SUITE 500**
**PHILADELPHIA, PA  19107**
**TEL: (215) 546-1345**

Date: April 21, 2023

Case ID: 231002233
Control No.: 23114867

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBINA ONYIAH | : |
|      **Plaintiff** | : |
|     vs. | : NO. 2:22-CV-01556 |
| JAMES PITTS, et al. | : |
|      **Defendants** | : |

### MEMORANDUM OF LAW

Federal Rule of Civil Procedure 4 (e) provides that an individual may be served "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located"

Pennsylvania Rule of Civil Procedure 430 provides:

> "If a service cannot be made under the applicable rule the plaintiff may move the court for a special order directing the method of service. The motion shall be accompanied by an affidavit stating the nature and extent of the investigation which has been made to determine the whereabout of the defendant and the reasons why service cannot be made."

For the reasons set forth in the attached Affidavit, Plaintiff is requesting that the court grant his Motion for Alternative Service.

Respectfully submitted,

ABRAMSON & DENENBERG, P.C.

BY: *Alan Denenberg*

ALAN E. DENENBERG, ESQ.
ATTORNEY FOR PLAINTIFF
ABRAMSON & DENENBERG, P.C.
1315 WALNUT STREET, SUITE 500
PHILADELPHIA, PA  19107
(215) 546-1345

Case ID: 231002233
Control No.: 23114867

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBINA ONYIAH | : |
|           Plaintiff | : |
|        vs. | :  **CIVIL NO. 2:22-CV-01556** |
| JAMES PITTS, et al. | : |
|           Defendants | : |

## VERIFICATION

      I, Alan E. Denenberg, Esquire, being duly sworn according to law, hereby affirms that the

allegations set forth in the enclosed Petition for Alternative Service are true and correct to the best

of my knowledge, information, and belief.

By: *Alan Denenberg*
         **ALAN E. DENENBERG, ESQ.**

Date: April 21, 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **OBINA ONYIAH** | : | |
| **Plaintiff** | : | |
| **vs.** | : | **CIVIL NO. 2:22-CV-01556** |
| **JAMES PITTS, et al.** | : | |
| **Defendants** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, a true and correct copy of the Motion was filed via

the Court's electronic filing system and is available for downloading.

By: *Alan Denenberg*

ALAN E. DENENBERG, ESQ.

Date: April 21, 2023

 Gmail                              **Alan Denenberg <adenenberg@adlawfirm.com>**

## Onyiah v. City of Philadelphia, et al.; CCP: 2:22-cv-01556

**Alan Denenberg** <adenenberg@adlawfirm.com>              Fri, Apr 22, 2022 at 3:18 PM
To: City Closure Complaints <City_Closure_Complaints@phila.gov>
Cc: Jason Parris <jparris@adlawfirm.com>, "Teri B. Himebaugh, Esq."
<thimebaughesq@earthlink.net>, Sophia Parsons <sparsons@adlawfirm.com>

Please see attached Summons and Complaint. Please advise if you will accept service
on behalf of the City of Philadelphia, Former Commissioner Charles Ramsay, Former
Detective James Pitts, Detective Ohmarr Jenkins, and Detective Thorston Lucke .
Thanks
[Quoted text hidden]

**4 attachments**

 **Summons.pdf**
277K

**Designation Form.pdf**
272K

**Civil Cover Sheet.pdf**
1052K

**Complaint-Filed.pdf**
567K

Case ID: 231002233
Control No.: 23114867

 **Gmail**        **Alan Denenberg <adenenberg@adlawfirm.com>**

---

# OBINA ONIYAH

**Alan Denenberg** <adenenberg@adlawfirm.com>      Tue, May 10, 2022 at 4:05 PM

To: danielle.walsh@phila.gov
Cc: "Teri B. Himebaugh, Esq." <thimebaughesq@earthlink.net>

Danielle:
   Attached please find a copy of the Summons. This will also confirm that I have granted you a 30 day extension to file an answer to the complaint.
   I understand based on our conversation that you will be entering for all defendants, except Pitts. Please forward his last known address at your earliest convenience. Thanks and I look forward to working with you.
Alan
--
Please Note Our New Address

Alan E. Denenberg
Abramson & Denenberg, P.C.
1315 Walnut Street, Suite 500
Philadelphia, PA 19107
215.546.1345 ext. 104
215.546.5355 (FAX)

---

📄 **Summons.pdf**
   277K

Case ID: 231002233
Control No.: 23114867

 Gmail

**Alan Denenberg <adenenberg@adlawfirm.com>**

---

## OBINA ONIYAH

---

**Danielle Walsh** <Danielle.Walsh@phila.gov>                    Mon, May 16, 2022 at 4:29 PM
To: Alan Denenberg <adenenberg@adlawfirm.com>
Cc: Teri Himebaugh <thimebaughesq@earthlink.net>

Thank you Alan,

I was able to get the following as the last known address for Pitts:

5745 Hazel Avenue, Phila., PA 19143

If you would like me to do an official waiver of service just let me know (or draft a stipulation for the Court re: the extension).

Thanks again,

Danielle E. Walsh

Divisional Deputy City Solicitor

City of Philadelphia Law Department

Civil Rights Unit – Overturned Conviction Division

1515 Arch Street, 14th Floor

Philadelphia, PA 19102

(215) 686-0464 (phone)

(215) 683-5299 (fax)

danielle.walsh@phila.gov

Case ID: 231002233
Control No.: 23114867

# AFFIDAVIT OF NON-SERVICE

| | |
|---|---|
| Oniyah Obina | : **UNITED STATES DISTRICT COURT** |
| v. | : **EASTERN DISTRICT OF PA.** |
| | : |
| James Pitts et al | : **NO. 22-CV-01556** |
| | : |

On the date(s) and time as described below, service of a Complaint was attempted, but not completed on James Pitts, at 5745 Hazel Ave Philadelphia PA 19143

___ Personally Served
___ Adult in charge of residence/business whose name is:_____
___ Adult in charge of residence/business who refused to give name or relationship
___ Manager/clerk of place of residence lodging
___ Agent or person authorized to accept service: _____

X  Other

**Description of Person** _____

**Other details:**

    X Not served: <u>Process server made 3 attempts as listed below</u>

___ 1st attempt-Date _8/13/22_____
___ 2nd attempt-Date _8/14/22_____
___ 3rd attempt-Date _8/17/22_____
___ Other

The Process Server, was at the time of service a competent adult, over 18 years of age, and not having a direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Process Server/Sheriff:

_Stuart B. Doctorovitz_      Date: _8/17/22_
Signature

_Stuart Doctorovitz_
Print Name

### ABRAMSON & DENENBERG, P.C.
*Attorneys-at-Law*

| | | | |
|---|---|---|---|
| Thomas Bruno, II*° | *Ext: 103* | 1315 Walnut Street | A Pennsylvania Corporation<br>registered in New Jersey |
| David H. Denenberg*▲ | *Ext: 105* | Suite 500 | |
| Alan E. Denenberg*° | *Ext: 104* | Philadelphia, PA 19107 | |
| D. Ben van Steenburgh* | *Ext: 102* | (215)546-1345 | Benjamin Abramson (1932 –1978) |
| Jason E. Parris* | *Ext: 122* | Fax: (215) 546-5355 | |
| Jonathan Kaminsky* | *Ext: 109* | | Simon J. Denenberg (1961-2015) |
| L. Kenneth Chotiner* | *Ext: 116* | | |

EMAIL: adenenberg@adlawfirm.com

www.abramsondenenberg.com

\* Member PA Bar
° Member NJ Bar
▲ Member DC Bar

Of Counsel: Francis T. Flannery*
Armando A. Pandola, Jr.*
215-568-5010

December 22, 2022

Mr. James Pitts
5745 Hazel Ave
Philadelphia, PA 19143

        RE:    **Oniyah Obina v. James Pitts, et al**
                 **U.S. District Court Eastern District of Pa. - Civil No. 2:22-CV-01556**

Dear Mr. Pitts:

      Enclosed you will find the following:

      1. The original of the Notice of Lawsuit and Request for Waiver of Summons;

      2. An original and a copy of the Waiver of Service of Summons;

      3. Copy of the Complaint which was filed in the United States District Court for the Eastern District of Pennsylvania on April 21, 2022.

      4. A self-addressed, postage-paid envelope.

      Please sign and date one copy of the Waiver of Service of Summons.  Then return it to our office within 30 days in the enclosed, self-addressed, postage-paid envelope.  By responding within this time period, you will eliminate the unnecessary costs of formal service.

      Thank you for your prompt attention to this matter.

                          Very truly yours,

                          Alan E. Denenberg

AED/mvf
Encs.
*First Class Mail and Certified Mail #: 7022 2410 0003 2500 1629*

Case ID: 231002233
Control No.: 23114867

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the

### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OBINA ONIYAH | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 22-CV-1556 |
| CITY OF PHILADELPHIA, ET AL | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:    JAMES PITT
    *(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within **30** days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:    DECEMBER 22, 2022

                                     _____
                                     *Signature of the attorney or unrepresented party*

                                     ALAN E. DENENBERG, ESQUIRE
                                     *Printed name*
                                     1315 WALNUT STREET, SUITE 500
                                     PHILADELPHIA, PA. 19107
                                     *Address*
                                     adenenberg@adlawfirm.com
                                     *E-mail address*
                                     (215) 546-1345, Ext. 104
                                     *Telephone number*

Case ID: 231002233
Control No.: 23114867

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBINA ONIYAH | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. **22–CV–1556** |
| CITY OF PHILADELPHIA, ET AL | ) |
| *Defendant* | ) |

### WAIVER OF THE SERVICE OF SUMMONS

To:     ALAN E. DENENBERG, ESQUIRE
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from **DECEMBER 22, 2022**, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____                    _____
                                             *Signature of the attorney or unrepresented party*

JAMES PITT                                   _____
*Printed name of party waiving service of summons*        *Printed name*

                                             _____
                                             *Address*

                                             _____
                                             *E-mail address*

                                             _____
                                             *Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Case ID: 231002233
Control No.: 23114867

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the

### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBINA ONIYAH | ) |
| _Plaintiff_ | ) |
| v. | )    Civil Action No. 22-CV-1556 |
| CITY OF PHILADELPHIA, ET AL | ) |
| _Defendant_ | ) |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  JAMES PITT
_(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)_

#### Why are you getting this?

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within 30 days _(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)_ from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

#### What happens next?

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:  DECEMBER 22, 2022

_Signature of the attorney or unrepresented party_

ALAN E. DENENBERG, ESQUIRE
_Printed name_

1315 WALNUT STREET, SUITE 500
PHILADELPHIA, PA.  19107

_Address_

adenenberg@adlawfirm.com
_E-mail address_

(215) 546-1345, Ext. 104
_Telephone number_

Case ID: 231002233
Control No.: 23114867

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF PENNSYLVANIA

OBINA ONIYAH
_____
Plaintiff
v.
CITY OF PHILADELPHIA, ET AL
_____
Defendant

)
)
)
)
)

Civil Action No.   22-CV-1556

## WAIVER OF THE SERVICE OF SUMMONS

To:   ALAN E. DENENBERG, ESQUIRE
_____
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from   DECEMBER 22, 2022___, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

JAMES PITT
_____
*Printed name of party waiving service of summons*

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: CP-51-CR-0004729-2022**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James  Pitts

Page 1 of 8

## CASE INFORMATION

| | |
|---|---|
| **Judge Assigned:** Kyriakakis, Anthony George | **Date Filed:** 06/21/2022    **Initiation Date:** 06/21/2022 |
| **OTN:** U 248666-5       **LOTN:** | **Originating Docket No:** MC-51-CR-0003501-2022 |
| **Initial Issuing Authority:** The Honorable Mia Roberts Perez | **Final Issuing Authority:** |
| **Arresting Agency:** Philadelphia Pd | **Arresting Officer:** Miller-Green, Valarie |
| **Complaint/Citation No.:** 2271000034-0003501 | **Incident Number:** 2271000034 |
| **County:** Philadelphia | **Township:** Philadelphia City |
| **Case Local Number Type(s)** | **Case Local Number(s)** |
|     Originating Docket Number |     MC-51-CR-0003501-2022 |
|     District Control Number |     2271000034 |
|     Originating Document Number |     2271000034-0003501 |

## STATUS INFORMATION

**Case Status:** Active

| Status Date | Processing Status | |
|---|---|---|
| | | **Arrest Date:** 03/03/2022 |
| 03/15/2023 | Awaiting Trial Readiness Conference | |
| 03/08/2023 | Awaiting Trial Readiness Conference | |
| 02/10/2023 | Awaiting Scheduling Conference | |
| 11/04/2022 | Awaiting Trial Readiness Conference | |
| 08/05/2022 | Awaiting Trial Readiness Conference | |
| 06/29/2022 | Awaiting Pre-Trial Conference | |
| 06/21/2022 | Awaiting Filing of Information | |
| | | **Complaint Date:** 03/03/2022 |

CPCMS 9082

Printed: 03/28/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET

**Docket Number: CP-51-CR-0004729-2022**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James Pitts

Page 2 of 8

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Formal Arraignment | 07/01/2022 | 11:00 am | 1104 | Trial Commissioner Cynthia S. Gregg | Scheduled |
| Pre-Trial Conference | 07/20/2022 | 9:00 am | 1005 | Judge Robert P. Coleman | Scheduled |
| Status | 08/05/2022 | 9:00 am | 905 | Judge Zachary C. Shaffer | Continued |
| Motions Hearing | 09/23/2022 | 9:00 am | 801 | Judge Mia Roberts Perez | Scheduled |
| Status | 10/19/2022 | 9:00 am | 801 | Judge Mia Roberts Perez | Moved |
| Status | 11/28/2022 | 9:00 am | 801 | Judge Mia Roberts Perez | Scheduled |
| Status | 12/15/2022 | 9:00 am | 905 | Judge Zachary C. Shaffer | Moved |
| Status | 12/19/2022 | 10:00 am | 200 | Judge Mia Roberts Perez | Scheduled |
| Status | 01/20/2023 | 9:00 am | 607 | Judge Charles A. Ehrlich | Continued |
| Status | 01/20/2023 | 9:00 am | 905 | Judge Zachary C. Shaffer | Moved |
| Status | 01/27/2023 | 9:00 am | 607 | Judge Charles A. Ehrlich | Continued |
| Status | 02/10/2023 | 9:00 am | 607 | Judge Charles A. Ehrlich | Scheduled |
| Scheduling Conference | 02/28/2023 | 9:00 am | 905 | Judge Zachary C. Shaffer | Scheduled |
| Scheduling Conference | 03/08/2023 | 9:00 am | 802 | Judge Lucretia Clemons | Scheduled |
| Trial Readiness Conference | 03/15/2023 | 10:00 am | 801 | Judge Monica Gibbs | Cancelled |
| Trial Readiness Conference | 03/15/2023 | 10:00 am | 905 | Judge Zachary C. Shaffer | Moved |
| Jury Trial | 03/20/2023 | 9:30 am | 801 | Judge Monica Gibbs | Cancelled |
| Jury Trial | 03/20/2023 | 9:30 am | 905 | Judge Zachary C. Shaffer | Moved |
| Trial Readiness Conference | 10/25/2023 | 9:00 am | 708 | Judge Giovanni O. Campbell | Moved |
| Trial Readiness Conference | 10/25/2023 | 9:00 am | 1008 | Judge Anthony George Kyriakakis | Scheduled |
| Jury Trial | 10/30/2023 | 9:00 am | 708 | Judge Giovanni O. Campbell | Moved |
| Jury Trial | 10/30/2023 | 9:00 am | 1008 | Judge Anthony George Kyriakakis | Scheduled |

## DEFENDANT INFORMATION

Date Of Birth:   09/07/1970   City/State/Zip:  Philadelphia, PA 19143

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Pitts, James |

CPCMS 9082

Printed: 03/28/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: CP-51-CR-0004729-2022**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James Pitts

Page 3 of 8

## BAIL INFORMATION

Pitts, James

Nebbia Status: None

| Bail Action | Date | Bail Type | Originating Court | Percentage | Amount |
|---|---|---|---|---|---|
| Set | 03/03/2022 | Unsecured | Municipal Court | | $10,000.00 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 4902 | Perjury | 03/03/2022 | U 248666-5 |
| 2 | 2 | | 18 § 4902 | Perjury | 03/03/2022 | U 248666-5 |
| 3 | 3 | | 18 § 5101 | Obstruct Admin Law/Other Govt Func | 03/03/2022 | U 248666-5 |
| 4 | 4 | | 18 § 5101 | Obstruct Admin Law/Other Govt Func | 03/03/2022 | U 248666-5 |
| 5 | 5 | | 18 § 5101 | Obstruct Admin Law/Other Govt Func | 03/03/2022 | U 248666-5 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|---|---|---|
| Sequence/Description | Offense Disposition | Grade  Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Lower Court Proceeding (generic)**

| Preliminary Hearing | 06/17/2022 | Not Final | |
|---|---|---|---|
| 1 / Perjury | | Held for Court | 18 § 4902 |
| 2 / Perjury | | Held for Court | 18 § 4902 |
| 3 / Obstruct Admin Law/Other Govt Func | | Held for Court | 18 § 5101 |
| 4 / Obstruct Admin Law/Other Govt Func | | Held for Court | 18 § 5101 |
| 5 / Obstruct Admin Law/Other Govt Func | | Held for Court | 18 § 5101 |

**Proceed to Court**   Defendant Was Not Present

| Information Filed | 07/15/2022 | Not Final | |
|---|---|---|---|
| 1 / Perjury | | Proceed to Court | 18 § 4902 |
| 2 / Perjury | | Proceed to Court | 18 § 4902 |
| 3 / Obstruct Admin Law/Other Govt Func | | Proceed to Court | 18 § 5101 |
| 4 / Obstruct Admin Law/Other Govt Func | | Proceed to Court | 18 § 5101 |
| 5 / Obstruct Admin Law/Other Govt Func | | Proceed to Court | 18 § 5101 |

CPCMS 9082

Printed: 03/28/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET

**Docket Number: CP-51-CR-0004729-2022**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James Pitts

Page 4 of 8

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: | Name: William Ryan McLaughlin |
| | Court Appointed |
| Supreme Court No: | Supreme Court No: 093875 |
| | Rep. Status: Active |
| | Phone Number(s): |
| | 215-242-9000        (Phone) |
| | Address: |
| | McLaughlin Law Office Pc |
| | 6701 Germantown Ave Ste 2107 |
| | Philadelphia, PA 19119 |
| | Representing: Pitts, James |

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 06/21/2022 | | Court of Common Pleas - Philadelphia County |
| Held for Court | | | |
| 3 | 06/21/2022 | | McLaughlin, William Ryan |
| Waiver of Appearance at Arraignment | | | |
| 4 | 06/29/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 07/01/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 07/15/2022 | | Krasner, Larry |
| Information Filed | | | |
| 3 | 07/20/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 07/28/2022 | | McLaughlin, William Ryan |
| Motion for Discovery | | | |

CPCMS 9082

Printed: 03/28/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial
System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed
data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can
only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record
Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: CP-51-CR-0004729-2022**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James Pitts

Page 5 of 8

ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 2 | 08/05/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 4 | 08/05/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 8 | 08/05/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 9 | 08/05/2022 | | Shaffer, Zachary C. |
| Scheduling Order - Jury | | | |
| 1 | 08/15/2022 | | Court of Common Pleas - Philadelphia County |
| Appointment Notice | | | |
| 3 | 09/23/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 6 | 09/23/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 7 | 09/23/2022 | | Perez, Mia Roberts |
| Status Listing | | | |
| 1 | 10/19/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 2 | 10/19/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 3 | 10/19/2022 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |

Printed: 03/28/2023

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: CP-51-CR-0004729-2022**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James Pitts

Page 6 of 8

ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 6<br>Status Listing | 10/19/2022 | | Perez, Mia Roberts |
| 2<br><br>Hearing Notice | 11/04/2022 | | Court of Common Pleas -<br>Philadelphia County |
| 4<br><br>Hearing Notice | 11/04/2022 | | Court of Common Pleas -<br>Philadelphia County |
| 1<br>Sealed Motion Filed | 11/28/2022 | | Perez, Mia Roberts |
| 2<br><br>Hearing Notice | 11/28/2022 | | Court of Common Pleas -<br>Philadelphia County |
| 5<br><br>Hearing Notice | 11/28/2022 | | Court of Common Pleas -<br>Philadelphia County |
| 6<br><br>Hearing Notice | 11/28/2022 | | Court of Common Pleas -<br>Philadelphia County |
| 7<br>Status Listing | 11/28/2022 | | Perez, Mia Roberts |
| 1<br>Miscellaneous Motion Filed | 12/19/2022 | | McLaughlin, William Ryan |
| 2<br>Status Listing | 12/19/2022 | | Kyriakakis, Anthony George |
| 5<br><br>Hearing Notice | 12/19/2022 | | Court of Common Pleas -<br>Philadelphia County |

CPCMS 9082

Printed: 03/28/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial
System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed
data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can
only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record
Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: CP-51-CR-0004729-2022**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

James Pitts

Page 7 of 8

ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 01/13/2023 | | Philadelphia County District Attorney's Office |
| Answer/Response | | | |
| 1 | 01/20/2023 | | Ehrlich, Charles A. |
| Motion Taken under Advisement | | | |
| 5 | 01/20/2023 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 1 | 01/26/2023 | | Philadelphia County District Attorney's Office |
| Letter in Brief | | | |
| 6 | 01/27/2023 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 7 | 01/27/2023 | | Ehrlich, Charles A. |
| Order Denying Motion to Modify Protective Order | | | |
| 8 | 01/27/2023 | | Court of Common Pleas - Philadelphia County |
| Short Certificate | | | |
| 3 | 02/10/2023 | | Ehrlich, Charles A. |
| Status Listing | | | |
| 1 | 02/28/2023 | | Shaffer, Zachary C. |
| Court Request For Continuance Judicial Recusal | | | |
| 1 | 03/08/2023 | | Clemons, Lucretia |
| Scheduling Conference Held | | | |
| 3 | 03/08/2023 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |

Printed: 03/28/2023

CPCMS 9082

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet Information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

DOCKET

**Docket Number: CP-51-CR-0004729-2022**
## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania
v.
James Pitts

Page 8 of 8

ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 5 | 03/08/2023 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 2 | 03/15/2023 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |
| 4 | 03/15/2023 | | Court of Common Pleas - Philadelphia County |
| Hearing Notice | | | |

CPCMS 9082

Printed: 03/28/2023

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case ID: 231002233
Control No.: 23114867

 Gmail                                     Alan Denenberg <adenenberg@adlawfirm.com>

## OBINA ONYIAH vs JAMES PITTS
6 messages

**Alan Denenberg** <adenenberg@adlawfirm.com>                 Tue, Apr 18, 2023 at 3:41 PM
To: "Santarone, Joseph J." <jjsantarone@mdwcg.com>

Joe:
   I recently found out you are representing former Detective Piss in various litigation. I have been
trying to serve him, but have been unsuccessful. See attached. Would you accept service or
provide his address? Thanks
Alan
--

Alan E. Denenberg
Abramson & Denenberg, P.C.
1315 Walnut Street, Suite 500
Philadelphia, PA  19107
215.546.1345 ext. 104
215.546.5355 (FAX)

---

3 attachments

📄 **17 Amended Complaint.pdf**
3956K

📄 **Exhibit E - Affidavit of Non-Service .pdf**
673K

📄 **Ltr to Pitts with Waiver 12-22-22.pdf**
4738K

---

**Santarone, Joseph J.** <JJSantarone@mdwcg.com>            Wed, Apr 19, 2023 at 2:42 PM
To: Alan Denenberg <adenenberg@adlawfirm.com>

Hi Alan

We're not going to be involved in this case to my understanding.  I checked with Danielle and Anne, they said they had provided
you with James last known address.

I'm going to assume Det. Piss was a typo!

Take care

Joe

Case ID: 231002233
Control No: 23114867



**Joseph J. Santarone, Esq.**
*Chair, Civil Rights & Philadelphia Professional Liability Practice Group*
2000 Market Street, Suite 2300, Philadelphia, PA 19103
Direct: (215) 575-2626 | Main: (215) 575-2600 | Fax: (215) 575-0856
bio | e-mail | website

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to JJSantarone@MDWCG.com, or by telephone at (215) 575-2626 and then delete the message and its attachments from your computer.

**From:** Alan Denenberg <adenenberg@adlawfirm.com>
**Sent:** Tuesday, April 18, 2023 3:42 PM
**To:** Santarone, Joseph J. <JJSantarone@MDWCG.com>
**Subject:** OBINA ONYIAH vs JAMES PITTS

> **WARNING: This email originated outside MDWCG. BE CAUTIOUS before clicking any link or attachment.**

[Quoted text hidden]

---

**Alan Denenberg** <adenenberg@adlawfirm.com>                    Wed, Apr 19, 2023 at 6:10 PM
To: "Santarone, Joseph J." <JJSantarone@mdwcg.com>

Joel:

   My apologies. That was not an intentional mistake. I did attempt to make service on three separate occasions at the address provided by Danielle Walsh. Would you be able to at minimum confirm if he still resides at the location provided by the city. Much appreciated.
Alan

Alan Denenberg
1315 Walnut Street
Suite 500
Philadelphia Pa. 19107
215-546-1345 Ext. 104


On Apr 19, 2023, at 2:42 PM, Santarone, Joseph J. <JJSantarone@mdwcg.com> wrote:



Hi Alan


Case ID: 231002233
Control No.: 23114867

We're not going to be involved in this case to my understanding.  I checked with Danielle and Anne, they said they had provided you with James last known address.

I'm going to assume Det. Piss was a typo!

Take care

Joe

**Joseph J. Santarone, Esq.**
*Chair, Civil Rights & Philadelphia Professional Liability Practice Group*
2000 Market Street, Suite 2300, Philadelphia, PA 19103
Direct: (215) 575-2626 | Main: (215) 575-2600 | Fax: (215) 575-0856
bio | e-mail | website



[Quoted text hidden]

---

**Alan Denenberg** <adenenberg@adlawfirm.com>                 Thu, Apr 20, 2023 at 5:01 PM
To: "Santarone, Joseph J." <JJSantarone@mdwcg.com>

Joe:
  Can you confirm that Mr. Pitts still lives at 5745 Hazel Avenue, Phila., PA 19143 which was the address provided by Danielle Walsh in the attached email. Thanks
Alan
[Quoted text hidden]

📎 **Email with Last Known Address- OBINA ONIYAH.pdf**
66K

---

**Santarone, Joseph J.** <JJSantarone@mdwcg.com>              Fri, Apr 21, 2023 at 8:36 AM
To: Alan Denenberg <adenenberg@adlawfirm.com>

Alan

I'm not authorized by my client to give out any information

Joe

**MD**
**MARSHALL**
**DENNEHEY**

**Joseph J. Santarone, Esq.**
*Chair, Civil Rights & Philadelphia Professional Liability Practice Group*
2000 Market Street, Suite 2300, Philadelphia, PA 19103
Direct: (215) 575-2626 | Main: (215) 575-2600 | Fax: (215) 575-0856
bio | e-mail | website

[Quoted text hidden]

---

**Alan Denenberg** <adenenberg@adlawfirm.com>                 Fri, Apr 21, 2023 at 11:38 AM
To: "Santarone, Joseph J." <JJSantarone@mdwcg.com>

Case ID: 231002233
Control No.: 23114867

Thank you for letting me know.
[Quoted text hidden]

Case ID: 231002233
Control No.: 23114867



**Search:**   Public Records : Locate a Person (Nationwide)
**Terms:**    first-name(James) last-name(Pitts) state(ALL) radius(30) dob(9/XX/1970)

| No. | Full Name | Address/Phone | SSN |
|-----|-----------|---------------|-----|
| | | | SSN 1: |
| 1. | PITTS, JAMES<br>PITTS, JAMES SR<br>PITTS, JAMES C<br>PITTS, JANES<br>(Gender: Male)<br>(DOB: 09/1970)<br>(Age: 52) | 1502 N ROBINSON ST<br>PHILADELPHIA, PA 19151-4244<br>PHILADELPHIA COUNTY<br>(09/2017-Current)<br>215-473-3167<br>PITTS JAMES<br>(Current Listing Name) | (PA:1975-1977)<br><br>LexID(sm):001984209357 |
| | | 7524 GILBERT ST<br>PHILADELPHIA, PA 19150-2604<br>PHILADELPHIA COUNTY<br>(02/2015-02/2023) | |
| | | 6161 N FAIRHILL ST # 2<br>PHILADELPHIA, PA 19120-1326<br>PHILADELPHIA COUNTY<br>(09/2002-11/2016)<br>215-224-3678<br>🕿 Phone may be disconnected | |
| | | 6161 N FAIRHILL ST APT 2F<br>PHILADELPHIA, PA 19120-1326<br>PHILADELPHIA COUNTY<br>(08/2005-08/2005) | |
| | | 3700 GATEWAY DR APT 617<br>PHILADELPHIA, PA 19145-5904<br>PHILADELPHIA COUNTY<br>(05/2001-01/2007) | |
| | | 1647 MARGARET ST<br>PHILADELPHIA, PA 19124-2741<br>PHILADELPHIA COUNTY<br>(09/1988-11/2016) | |
| | | 2112 S BEECHWOOD ST<br>PHILADELPHIA, PA 19145-3408<br>PHILADELPHIA COUNTY<br>(09/1997-06/2004) | |
| | | 2112 BLACKWOOD DR<br>PHILADELPHIA, PA 19145-5715<br>PHILADELPHIA COUNTY<br>(08/1997-10/2000) | |
| | | 8112 BEECHWOOD ST<br>PHILADELPHIA, PA 19145<br>PHILADELPHIA COUNTY<br>(09/1999-09/1999) | |
| | | 423 N 33RD ST APT 2<br>PHILADELPHIA, PA 19104-2547<br>PHILADELPHIA COUNTY<br>(02/1996-02/1997) | |

Case ID: 231002233
Control No.: 23114867

| No. | Full Name | Address/Phone | SSN |
|---|---|---|---|
| | | 423 N 33RD ST APT 2N<br>PHILADELPHIA, PA 19104-2547<br>PHILADELPHIA COUNTY<br>(03/1996-05/1998) | |
| | | 414 W MANHEIM ST APT<br>PHILADELPHIA, PA 19144-4716<br>PHILADELPHIA COUNTY<br>(07/1992-02/1994) | |
| | | 414 70 MANHEIM 41 B<br>PHILADELPHIA, PA 19144<br>PHILADELPHIA COUNTY<br>(03/1996-06/1997) | |
| | | 3412 SPRING GARDEN ST APT B1<br>PHILADELPHIA, PA 19104-2060<br>PHILADELPHIA COUNTY<br>(11/1988-05/1996) | |
| | | 5612 BEAUMONT AVE<br>PHILADELPHIA, PA 19143-4711<br>PHILADELPHIA COUNTY<br>(11/1988-11/1995) | |
| 2. | PITTS, JAMES<br>(Gender: Male)<br>(DOB: 09/1970)<br>(Age: 52) | 512 E HIGH ST APT<br>PHILADELPHIA, PA 19144-1129<br>PHILADELPHIA COUNTY<br>(11/2020-Current) | LexID(sm):240970600778 |
| 3. | P, JAMES JR<br>REDMOND, JAMES<br>REDMOND, JAMES O<br>REDMOND, JAMES Q<br>REDMOND, JAMES QUINN<br>(Gender: Male)<br>(DOB: 09/1970)<br>(Age: 52)<br>(DOB: 09/1970)<br>(Age: 52) | 1304 SIX MILE RD<br>MOUNT PLEASANT, SC 29466-6804<br>CHARLESTON COUNTY<br>(03/2018-Current)<br><br>1621 JESSAMINE RD APT B<br>CHARLESTON, SC 29407-5213<br>CHARLESTON COUNTY<br>(02/2015-Current)<br><br>2623 CLEMENTS FERRY RD<br>CHARLESTON, SC 29492-7743<br>BERKELEY COUNTY<br>(07/2011-02/2023)<br><br>31500 GRAPE ST STE 3<br>LAKE ELSINORE, CA 92532-9702<br>RIVERSIDE COUNTY<br>(05/2008-02/2023)<br>[a] Addressing & Letter Service<br>951-471-0090<br><br>[CMRA]<br>THE UPS STORE<br>(Current Listing Name)<br>31500 GRAPE ST APT 3235<br>LAKE ELSINORE, CA 92532-9702 | SSN 2:<br>█████████<br>(FL:1980-1981)<br><br>LexID(sm):002090525641 |

Case ID: 231002233
Control No.: 23114867

| No. | Full Name | Address/Phone | SSN |
|---|---|---|---|
| | | RIVERSIDE COUNTY<br>(05/2005-01/2023) | |
| | | PO BOX 193<br>FOUNTAIN, FL 32438-0193<br>BAY COUNTY<br>(04/1999-10/1999) | |

Key

△ High Risk Indicator. These symbols may prompt you to investigate further

┆┅ Moderate Risk Indicator. These symbols may prompt you to investigate further

🏳 General Information Indicator. These symbols inform you that additional information is provided

✓ The most recent telephone listing as reported by the EDA source

Terms:          first-name(James) last-name(Pitts) state(ALL) radius(30) dob(9/XX/1970)
Date/Time:      Monday, April 3, 2023 12:26 PM
Permissible Use:   **Your DPPA Permissible Use: Litigation**
                **Your GLBA Permissible Use: Legal Compliance**

Copyright © 2023 LexisNexis, a division of Reed Elsevier Inc. All Rights Reserved.

**End of Document**

Case ID: 231002233
Control No.: 23114867



**First Judicial District of Pennsylvania**
**Court Summary**

---

**Pitts, James**                                   DOB: 09/07/1970            Sex: Male
Philadelphia, PA 19143                                                       Eyes: Brown
Aliases:                                                                     Hair: Black
James Pitts                                                                  Race: Black

**Active**
  **Philadelphia**
    **CP-51-CR-0004729-2022**        Proc Status: Awaiting Pre-Trial Conference    DC No: 2271000034    OTN:U 248666-5
    Arrest Dt: 03/03/2022      Trial Dt:              Legacy No:
    Def Atty: McLaughlin, William Ryan - (CA)
    Last Action: Pre-Trial Conference    Last Action Date: 07/20/2022    Last Action Room: 1005
    Next Action: Status                  Next Action Date: 08/05/2022    Next Action Room: 905

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 4902 | | Perjury | |
| 2 | 18 § 4902 | | Perjury | |
| 3 | 18 § 5101 | | Obstruct Admin Law/Other Govt Func | |
| 4 | 18 § 5101 | | Obstruct Admin Law/Other Govt Func | |
| 5 | 18 § 5101 | | Obstruct Admin Law/Other Govt Func | |

**Closed**
  **Philadelphia**
    **CP-51-MD-0004749-2014**        Proc Status: Completed        DC No:        OTN:
    Arrest Dt:      Disp Date:      Disp Judge:

    **MC-51-CR-0003501-2022**        Proc Status: Completed        DC No: 2271000034    OTN:U 248666-5
    Arrest Dt: 03/03/2022    Disp Date: 06/17/2022    Disp Judge: Perez, Mia Roberts
    Def Atty: McLaughlin, William Ryan - (CA)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 4902 §§ A | F3 | Perjury | Held for Court |
| 2 | 18 § 4902 §§ A | F3 | Perjury | Held for Court |
| 3 | 18 § 5101 | M2 | Obstruct Admin Law/Other Govt Func | Held for Court |
| 4 | 18 § 5101 | M2 | Obstruct Admin Law/Other Govt Func | Held for Court |
| 5 | 18 § 5101 | M2 | Obstruct Admin Law/Other Govt Func | Held for Court |

    **MC-51-MD-0000851-2014**        Proc Status: Completed        DC No:        OTN:
    Arrest Dt:      Disp Date:      Disp Judge:
    Def Atty: Nitti, Danielle G. - (PR)

---

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Case ID: 231002233
Control No.: 23114867

FILED
21 NOV 2023 04:08 pm
Civil Administration
J. BOYD

# EXHIBIT C

Case ID: 231002233
Control No.: 23114867

## AFFIDAVIT OF NON-SERVICE

| Case:<br>231002233 | Court:<br>Commonwealth of PA Court of Common Pleas | County:<br>Philadelphia County | Filed and Attested by the<br>Office of Judicial Records<br>17 Nov 2023 03:58 pm |
|---|---|---|---|
| Plaintiff / Petitioner:<br>Christopher Goodwin | | Defendant / Respondent:<br>City of Philadelphia, et al. | |
| Received by:<br>Legal Errands, Inc. | | For:<br>Law Office of Alan J. Tauber, P.C. | |
| To be served upon:<br>James Pitts | | | |

I, Joseph O'Donovan, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| Recipient Name / Address: | James Pitts, 5745 Hazel Ave, Philadelphia, PA 19143 |
|---|---|
| Manner of Service: | Non-Service |
| Documents: | Complaint |

Additional Comments:
1) Unsuccessful Attempt: Oct 24, 2023, 12:27 pm EDT at 5745 Hazel Ave, Philadelphia, PA 19143
Service address is unoccupied and vacant, confirmed it with neighbor.

2) Unsuccessful Attempt: Nov 2, 2023, 12:47 pm EDT at 5745 Hazel Ave, Philadelphia, PA 19143
No answer at residence property vacant

3) Unsuccessful Attempt: Nov 9, 2023, 11:21 am EST at 5745 Hazel Ave, Philadelphia, PA 19143
Service address is vacant

Joseph O'Donovan                    Date 11/10/23

Legal Errands, Inc.
1200 Lincoln Ave, Suite D
Prospect Park, PA 19076
215-751-1124

Subscribed and sworn to before me by the affiant who is
personally known to me.

Notary Public

Date 11/10/23          Commission Expires

OFFICIAL SEAL
SHAWN F SCHAFFER
NOTARY PUBLIC · NEW JERSEY
My Comm. Expires March 22, 2024

Case ID: 231002233
Control No.: 23114867

FILED
21 NOV 2023 04:08 pm
Civil Administration
J. BOYD

# EXHIBIT D

Case ID: 231002233
Control No.: 23114867

**Affidavit of Jon Cioschi, Esq.**
**Pursuant to 18 Pa.C.S. § 4904**

I, Jon Cioschi, hereby declare:

1.      I am counsel of record for Plaintiff Christopher Goodwin in *Goodwin v. City of Phila.*, et al., Common Pleas Civil Case No. 231002233.

2.      In attempting to effect service on Defendant James Pitts in this matter, I identified William McLaughlin, Esq., as counsel of record for Defendant Pitts in Pitts' ongoing criminal prosecution in this Court under Docket Number CP-51-CR-0004729-2022.  I identified Mr. McLaughlin as counsel for Defendant Pitts in this matter through the Unified Judicial System's public docket search.

3.      Equipped with this information, I identified Mr. McLaughlin's law firm—McLaughlin Law Office, P.C.—and the firm's phone number, (215) 242-9000, through a Google search.

4.      Along with Mr. Goodwin's co-counsel, Alan Tauber, Esq., I called Mr. McLaughlin's law firm  on November 13, 2023 at 12:28 PM and left a voicemail message, in which I described Mr. Goodwin's complaint and the purpose of our call: to determine if Mr. McLaughlin would accept service or otherwise assist in securing service for his client, Defendant Pitts.

5.      I also conducted internet searches to locate Mr. McLaughlin's email address.  Those were unsuccessful.

6.      Accordingly, Mr. Tauber and I asked Investigator Diane Cowan to conduct her own search for Mr. McLaughlin's email address and successfully identified it as bill@mclaughlinesq.com.

7.      Copying Mr. Tauber, I then sent the following message to Mr. McLaughlin at 1:50 PM, attaching Mr. Goodwin's filed civil complaint and cover sheet:

1

**Affidavit of Jon Cioschi, Esq.**
**Pursuant to 18 Pa.C.S. § 4904**

This is Jon Cioschi from Wiseman & Schwartz. Copied is Alan Tauber, also from W&S.

We have filed the attached complaint (with corresponding cover sheet) against your client, James Pitts. We have made numerous efforts to serve him at his 5745 Hazel Avenue address. But those efforts have not been successful.

We are writing to see if you have the authority to accept service for Mr. Pitts, or if you are willing to secure that authority.

Thanks, and best,

Jon & Alan

Ex. A.

8.      Five minutes later, Mr. McLaughlin replied to this email as follows: "I am not and will not be authorized to accept service of this or any other documents. Thank you." *Id.*

9.      I hereby declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

/s/ Jon Cioschi                              November 17, 2023
Jon Cioschi, Esq.                            Date

2

# EXHIBIT A

Case ID: 231002233
Control No.: 23114867

Jon Cioschi <cioschi@wisemanschwartz.com>                                    11/13/2023 1:59 PM

## Re: Civil Complaint Against James Pitts

To William McLaughlin <bill@mclaughlinesq.com>   Copy Alan Tauber <atauber@atauberlaw.com>

---

Thank you, Bill, for the prompt reply.  You can disregard our voicemail from earlier this afternoon.

Jon

> On 11/13/2023 1:55 PM EST William McLaughlin <bill@mclaughlinesq.com> wrote:
>
> I am not and will not be authorized to accept service of this or any other documents.  Thank you.
>
> William R. McLaughlin, Esq.
> McLaughlin Law Office, P.C.
> 6701 Germantown Avenue, Suite 210-7
> Philadelphia, PA 19119
> 215-242-9000
> bill@mclaughlinesq.com
> www.mclaughlinesq.com
>
> This email is from a law firm and may contain confidential or privileged information.  If you are not the intended recipient, do not read, copy or distribute this email or any attachments, and please notify me immediately and delete this email and any attachments.  Thank y
>
> On Mon, Nov 13, 2023 at 1:50 PM Jon Cioschi <cioschi@wisemanschwartz.com> wrote:
>> Bill,
>>
>> Hope you are well.
>>
>> This is Jon Cioschi from Wiseman & Schwartz.  Copied is Alan Tauber, also from W&S.
>>
>> We have filed the attached complaint (with corresponding cover sheet) against your client, James Pitts.  We have made numerous efforts to serve him at his 5745 Hazel Avenue address.  But those efforts have not been successful.
>>
>> We are writing to see if you have the authority to accept service for Mr. Pitts, or if you are willing to secure that authority.
>>
>> Thanks, and best,
>>
>> Jon & Alan
>> *****************************
>> Jon Cioschi, Esq.
>> Pronouns: he/him/his
>> Wiseman & Schwartz, LLP
>> 718 Arch Street, Suite 702N
>> Philadelphia, Pa. 19106
>> Office: (215) 360-3988
>> Direct / Cell: (610) 574-1877
>> E-mail: cioschi@wisemanschwartz.com
>> www.wisemanschwartz.com

*****************************
Jon Cioschi, Esq.
Pronouns: he/him/his
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702N
Philadelphia, Pa. 19106
Office: (215) 360-3988
Direct / Cell: (610) 574-1877
E-mail: cioschi@wisemanschwartz.com
www.wisemanschwartz.com

Case ID: 231002233
Control No.: 231114867

PHILADELPHIA COURT OF COMMON PLEAS
**PETITION/MOTION COVER SHEET**

| CONTROL NUMBER: |
|---|
| 23114867 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

**FOR COURT USE ONLY**

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
|---|---|

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

October        Term, 2023
     *Month*                              *Year*
No. _____ 02233

Name of Filing Party:

GOODWIN VS CITY OF PHILADELPHIA ETAL

CHRISTOPHER GOODWIN-PLF

**INDICATE NATURE OF DOCUMENT FILED:**

Has another petition/motion been decided in this case?  ☐ Yes  ☒ No
Is another petition/motion pending?  ☐ Yes  ☒ No

☐ Petition *(Attach Rule to Show Cause)*  ☒ Motion
☐ Answer to Petition  ☐ Response to Motion

*If the answer to either question is yes, you must identify the judge(s):*

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
|---|---|
| MOTION FOR ALTERNATIVE SERVICE | MTSVR |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding:

**I. CASE PROGRAM**

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE GWENDOLYN BRIGHT
Applicable Petition/Motion Deadline: N/A
Has deadline been previously extended by the Court: N/A

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

ALAN J TAUBER
  LAW OFFICE OF ALAN J TAUBER TWO PENN
  CENTER, STE 900 , PHILADELPHIA PA
  19102
CITY OF PHILADELPHIA
  1401 ARCH STREET , PHILADELPHIA PA
  19102
JAMES CLARK
  8613 STEEPLE DRIVE , PHILADELPHIA PA
  19128
JAMES PITTS
  5745 HAZEL AVENUE , PHILADELPHIA PA
  19143
THOMAS GAUL
  9265 DARLINGTON ROAD , PHILADELPHIA
  PA 19115

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____          November 21, 2023          JONATHAN D. CIOSCHI          _____
*(Attorney Signature/Unrepresented Party)*          *(Date)*          *(Print Name)*          *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2311046969
21-NOV-23 16:16:16

GEORGE PIRRONE
   210 WILLOW ROAD POINT , BEAUFORT SC
   29906
JOHN VERRECCHIO
   1211 LONEY STREET , PHILADELPHIA PA
   19111

FILED
21 NOV 2023 04:08 pm
Civil Administration
J. BOYD

CERTIFICATE OF SERVICE

I, Alan Tauber, hereby certify that the foregoing pleading was electronically filed

with the Court on behalf of Plaintiff Christopher Goodwin, and all of the below parties were

served first class United States mail at the addresses listed below.

James Pitts
5745 Hazel Avenue, Philadelphia, PA 19143
7524 Gilbert Street, Philadelphia, PA 19150
1502 North Robinson Street, Philadelphia, PA 19151
4854 North Gransback Street, Philadelphia, PA 19120

City of Philadelphia
Anne Taylor, Deputy City Solicitor
1401 Arch Street
Philadelphia, PA 19102

James Clark
8613 Steeple Drive, Philadelphia, PA 19128
8606 Thomas Mill Terrace, Philadelphia, PA 19128

Thomas Gaul
9625 Darlington Road
Philadelphia, PA 19115

George Pirrone
210 Willow Road Point
Beaufort, SC 29906

John Verrecchio
1211 Loney Street
Philadelphia, PA 19111

/s/ Alan J. Tauber
Alan J. Tauber, Esq.

Case ID: 231002233
Control No.: 23114867

# EXHIBIT C

City of Philadelphia Law Department
**BAILEY E. AXE**
Deputy City Solicitor
Attorney I.D. No. 309686
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
215-683-5443

*Attorney for Defendant City of Philadelphia*

---

|  |  |  |
|---|---|---|
| **CHRISTOPHER GOODWIN,** | : | COURT OF COMMON PLEAS |
|  | : | PHILADELPHIA COUNTY |
| **Plaintiff,** | : | CIVIL TRIAL DIVISION |
|  | : |  |
| **v.** | : | October Term, 2023 |
|  | : |  |
| **CITY OF PHILADELPHIA, *et al.*,** | : |  |
|  | : |  |
| **Defendants.** | : | No. 2233 |
|  | : |  |

---

NOTICE OF FILING OF NOTICE OF REMOVAL

**TO THE OFFICE OF JUDICIAL RECORDS:**

Pursuant to 28 U.S.C. § 1446(d), Defendant, the City of Philadelphia, by and through its undersigned counsel, hereby gives notice that it has filed in the United States District Court for the Eastern District of Pennsylvania the attached Notice of Removal (without exhibits) of the above-captioned action.

Pursuant to 28 U.S.C. § 1446, the filing of this Notice effects the removal of this action to the federal court, and this Court is directed to "proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d).

Respectfully submitted,

Date:  November 29, 2023

*/s/ Bailey E. Axe*
Bailey E. Axe, Esquire
Deputy City Solicitor
City of Philadelphia Law Department